Mark J. Skapik (SBN 164957)
Email: mskapik@skapiklaw.com
Geralyn L. Skapik (SBN 145055)
Email: gskapik@skapiklaw.com
John D. Graham (WSBA 44448) – of counsel
Email: jgraham@skapiklaw.com
**SKAPIK LAW GROUP**
5861 Pine Avenue, Suite A-1
Chino Hills, CA 91709-6540
(909) 398-4404; Fax: (909) 398-1883

Eric Christopher Morris (SBN 243425)
Email: emorris@lawsclg.com
**SOUTHERN CALIFORNIA LAWYERS GROUP, PC**
2151 Convention Center Way, Suite 211
Ontario, CA 91764
(909) 466-4400; Fax: (909) 839-5004

Attorneys for PLAINTIFFS and RELATORS

FILED
CLERK, U.S. DISTRICT COURT

JUL 22 2013

CENTRAL DISTRICT OF CALIFORNIA
BY                                    DEPUTY

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA, ex rel.

TERISA MERCER CARON, VERONICA TREJO, PAIGE STEVENS, HEATHER LUEDTKE, TAMECA SHELDON, CINDY JUAREZ,

        QUI TAM PLAINTIFFS,

        v.

B&H EDUCATION, INC., a Delaware Corporation, d/b/a MARINELLO SCHOOL OF BEAUTY; B&H EDUCATION HOLDINGS, L.L.C., a Delaware Limited Liability Company; Dr. R. RASHED ELYAS, DR. NAGUI ELYAS, MIKE BENVENUTI, COO, MICHAEL FLECKER, CFO; ABRY PARTNERS VI, L.P., an unknown entity; ABRY INVESTMENT PARTNERSHIP, L.P., an unknown entity; ABRY SENIOR EQUITY II, L.P., an unknown entity; UNITED BEAUTY ENTERPRISES, INC., a California Corporation; SCOPE BEAUTY ENTERPRISES, INC., a California Corporation, TFC CREDIT CORPORATION, a California Corporation; and DOES 1 through 100,

CASE NO. CV13-05256-RGK (AJWx)

FILED UNDER SEAL

COMPLAINT

JURY REQUESTED

COPY

COMPLAINT- JURY TRIAL DEMANDED

1   inclusive,

2            DEFENDANTS.

COMPLAINT – JURY TRIAL DEMANDED

Plaintiffs and Relators allege as follows:

## I.   INTRODUCTION

1.    This complaint is brought by Relators under the False Claims Act, *31 U.S.C. §§ 3729 et seq.* Unlike many other qui tam actions against for-profit secondary schools, this case involves substantial and compelling information brought forward by the Relators and witnesses against the Defendants.

2.    The Higher Education Act of 1965 (HEA), including Title IV, was signed into law by then President Lyndon Johnson.  The law was intended "to strengthen the educational resources of our colleges and universities and to provide financial assistance for students in postsecondary and higher education."[1] Unfortunately, the Title IV program has since been the subject of excessive fraud, waste, and abuse by unscrupulous charlatans who have put ill-gotten profits above the public good.

3.    Today, a new industry has emerged, the "Title IV business venture" with "for profit" or "proprietary" schools beholden to its shareholders and owners, instead of the student or American taxpayer, the intended beneficiaries.[2]  A recent Government Accountability Office (GAO) report uncovered this very problematic relationship and its frequency for fraud.[3]  Relators bring this matter to **stop** the rampant Title IV fraud and waste being perpetrated by Defendants below.

4.    This complaint involves violations of the False Claims Act by B&H EDUCATION, INC., a Delaware Corporation, d/b/a MARINELLO SCHOOL OF BEAUTY (hereinafter "MSB"); B&H EDUCATION HOLDINGS, L.L.C., a Delaware Limited Liability Company; DR. R. RASHAD ELYAS, Dr. NAGUI

---

[1] Legislation: *The Higher Education Act of 1965 (Pub. L. No. 89-329).*
[2] *See*: Gayland O. Hethcoat II, *For Profits Under Fire: The False Claims Act As A Regulatory Check On The For Profit Education Sector,* November 4, 2011, Loyola Consumer Law Review.
[3] U.S. Gov't Accountability Office, GAO-10-948T, For Profit Colleges: Undercover Testing Finds Colleges Encouraged Fraud And Engaged In Deceptive And Questionable Marketing Practices n1. (2010) (All fifteen institutions had made deceptive statements re: accreditation, graduation, employment, and expected salaries), http://www.gao.gov/new.items/d10948t.pdf

COMPLAINT – JURY TRIAL DEMANDED

1  ELYAS, MIKE BENVENUTI, COO, MICHAEL FLECKER, CFO; TFC CREDIT

2  CORPORATION, a California Corporation; (collectively Defendants). The

3  individual executives and or company owners are named herein, since Relators

4  have specific evidence identifying their illegal acts in this matter.[4]

5

6  ## II.   OVERVIEW OF THE SCHEME

7  5.      The violations of the False Claims Act (FCA) arise because

8  Defendants knowingly and materially engaged and continue to perpetrate in, as of

9  the date of this complaint, a comprehensive, nation-wide scheme designed to

10  defraud the United States through false claims, false statements, and false records.

11  Defendants, through their effort to maximize profits, regardless of legality or

12  student eligibility, have conspired, concealed, obstructed, manipulated, lied, and or

13  altered student information, records, actual reporting data, accounting, statistics,[5]

14  audits, and material documents in order to over-award and draw down the *maximum*

15  amount of Title IV funds for ineligible and or non-existent students.  This pervasive

16  fraud scheme, pursuant to Relators testimony and documentation, was for the

17  purpose of maintaining Defendant eligibility in the Federal Student Aid programs

18  so to continue to reap profits from the Government and the students.

19  6.      Physical evidence from Relators and witnesses will show:

20  • Manipulation and Falsification of student entrance exam and or

21  ability-to-benefit (ATB) tests.  Manipulation and alteration of High

22  School Completion Programs (HSCP) and tampering with GED

23  testing at Parkridge Private School, a pre-arranged feeder testing

24  center, located in Long Beach, CA.

---

[4] Senior members of MSB directed efforts to keep ineligible students on the attendance rosters, falsifying clock-hour time reports, directing and encouraging fraudulent activity, obstructing DOE audits, concealment of Student Academic Reports, "cleaning up" school records prior to an audit, and paying cash bonuses and gifts in return for keeping ineligible students on Title IV assistance.

[5] Falsified statistics certified and provided to DOE, Auditors, Accreditation agencies, and State Education Bureaus include; Falsified statistics that include:  graduation rates, drop rates, loan default rates, licensure rates, and career placement statistics.

- Falsification and manipulation of student rosters and altered attendance records, student identification "swipe card" confiscation, manipulation and duplication of student clock hours.
- Creation of a "ghost student" scheme where students who stop attending school or simply never started school, remained on the attendance rolls so Defendants can continue to draw student aid fund monies.
- Falsification and manipulation of Student Academic Reports (SAP) and or altered grades.
- Utilize through fraud, pre formulated, TFC/Marinello Hard-Money Loans.
- Falsification and manipulation of the 90/10 rule – the 90/10 rule is a requirement whereby the DOE mandates that each student who is to receive federal aid must provide 10% of his/her personal funds towards tuition.
- Creation of "fake students" whereby Defendants would pay the tuition in one lump sum cash payment, or create "fake scholarships" or "fake private grants," whereby the money was created to a "fake student" who would attend class for a few days then drop. The cash payment would then be credited to students who could not or did not make the "90/10" payment. This would allow Defendants to then "qualify" the student who did not make a cash payment, for federal loan money which, of course, is paid directly to the school.
- Relators and witness testimony will show that graduation rates and career placement data was falsely to keep the federal aid maximized.

COMPLAINT – JURY TRIAL DEMANDED

1        •   Falsifying and or obstructing Department of Education (DOE)

2       program audits, concealment of accurate data to auditors and

3       accreditation officials.

4        •   Falsification and concealment of the 14-day absence rule and

5       alteration of Leave of Absence (LOA) record.

6        •   Computer manipulation of student file records through

7       Defendant's Point of Service (POS), Guest Vision, computer

8       programs: Vocado and Rafael Mercado (RGM) systems.  (See:

9       Section IV (H) below.  FAFSA fraud—FAO failed to properly

10      verify social security number of student against California

11      Identification Card before applying for Financial Aid.

12       •   Defendants employed aggressive marketing, "hard sell" and

13      deceptive techniques in order to achieve double digit enrollment

14      numbers so that the Admissions Department could declare a "double

15      digit" month or make it into the "twenties club!" In order to achieve

16      these results, Admissions Representatives target underprivileged

17      areas in lower socioeconomic areas, and focus on students that have

18      not completed high school, with the only student requirement being

19      social security number. Once the school finds a student that fits their

20      "profile" they intimidate, harass, and pressure the prospective

21      student into enrolling—calling and harassing the prospective student

22      2-3 times per day until the student enrolls or changes his/her cell

23      phone number.  MSB employs a scheme called SIR that Admissions

24      Representatives use to intimidate students into enrolling.  MSB

25      refers to this program as its ability to "Gain Commitment."  Further

26      MSB employs a "bait and switch" scheme whereby the school

27      represents to the student that he or she is enrolled into a certain

28

COMPLAINT – JURY TRIAL DEMANDED

1   program that the school is not offering and then "switches" him/her

2   into a program that the school offers.

3       7.    Relators estimate the fraud *exceeds* **$50,000,000.00 dollars** over five

4   years, and continues to accrue.  This amount does not include 31 U.S.C. §3729 (G)

5   civil penalties and treble damages.

6

7   ## III.   **INTRODUCTION**

8       8.    Plaintiffs and Relators bring this qui tam action on behalf of the United

9   States of America, the Department of Education ("DOE"), and the State of

10  California against Defendants (collectively "DEFENDANTS" and/or

11  "MARINELLO PARTIES" and/or "MARINELLO SCHOOL OF BEAUTY"

12  and/or "MSB" ) to recover damages and civil penalties, under the False Claims

13  Act, *31 U.S.C. §§ 3729-33* (FCA), and to recover damages and other monetary

14  relief under the common law and equitable theories of unjust enrichment and

15  payment by mistake.  Defendants own and operate approximately sixty seven (67)

16  for-profit, proprietary schools, primarily in California, with several schools in

17  Oregon, Nevada, and Utah.  The vast majority of its revenue is derived *directly*

18  from federal student aid programs.

19      9.    This action arises from false statements and claims that Defendants

20  MARINELLO SCHOOL OF BEAUTY knowingly presented to, or caused to be

21  presented to, the United States and the United States Department of Education, in

22  violation of the FCA and common law.

23      10.    Defendant knowingly presented and/or made, or caused to be

24  presented and/or made, the false claims and statements at issue, in order to

25  participate, and maintain participation at all relevant periods, in the

26  federal student aid programs authorized pursuant to Title IV of the Higher

27  Education Act of 1965, as amended, *20 U.S.C. §§ 1070 et seq.* (Title IV, HEA

28  programs).  The Title IV, HEA programs, which are administered by the

- 7 -

1  Department of Education, provides students with financial aid in the form of,
2  among other things, Federal Pell Grants and loans guaranteed by the Federal
3  Government. From at least 2007 continually through the present, Defendants
4  knowingly submitted, or caused to be submitted, hundreds of false claims in order
5  to maximize Defendant profits in the following, but not limited to, comprehensive
6  schemes,: (a) FAFSA enrollment, (b) Falsification of entrance exams, (c)
7  Falsification of GEDs/high school diploma, and/or Ability To Benefit ("ATB")
8  fraud,  (d) Falsification of attendance, leave of absences ("LOA") and or roster
9  manipulation, (e) Falsification of grades and or Student Academic Progress
10  ("SAP") reporting, (f) Front loading, (g) Failure to make refunds, (h) Ghost
11  students, (i) Leasing of eligibility, (j) Loan theft, forgeries, and or alteration of
12  documents, (k) Fraud, theft by school employees, (l) Default rate fraud, (m)
13  Falsification and manipulation of the 90/10 requirement, (n) Financial statement
14  falsification, (o)  ATB fraud, (p) Falsified last date of attendance, and (q)
15  Obstruction of a federal audit, and or program review.  This sophisticated scheme
16  was and continues to be directed, supervised and manipulated from the top down.
17  Defendant CEO, COO, and CFO sought out "seasoned" Title IV veterans from
18  competitor schools to assist in maintaining, concealing, manipulating, and
19  "maximizing" federal aid, directed from the corporate offices in Whittier and
20  Beverly Hills, California.
21        11.    In order to be eligible to receive federal funding under Title IV,
22  MARINELLO SCHOOL OF BEAUTY were required to adhere to a variety of
23  regulations related to the operation of its for-profit, proprietary schools. *See,*
24  *e.g., 34 C.F.R. Parts 600, 668*. MARINELLO SCHOOL OF BEAUTY entered
25  into contractual agreements with the Department of Education, called Program
26  Participation Agreements (PPAs), in which Defendants specifically agreed to abide
27  by these regulations. Execution of these PPAs with the Department of Education
28  was a condition precedent to Defendants eligibility to receive federal funding under

- 8 -

1    Title IV of the Higher Education Act (HEA). Defendants also certified each time it

2    drew down federal grant monies that the funds were being expended in accordance

3    with the conditions of the applicable PPAs.

4          12.    Among other things, MARINELLO SCHOOL OF BEAUTY was

5    required to maintain a license to operate in each state in which its campuses were

6    located and to maintain accreditation by an accrediting agency recognized by the

7    Secretary of Education for that purpose.  MARINELLO SCHOOL OF BEAUTY

8    was further prohibited from making any false representations to

9    prospective students regarding, among other things, the employability of its

10    graduates upon graduation. Defendants agreed that it would comply with these and

11    other requirements in each PPA it executed.

12          13.    Beginning in at least 2007 and continuing to the present, Defendants

13    engaged in a widespread scheme to defraud the United States, Department of

14    Education and the State of California in order to receive federal funding it would

15    not otherwise have been entitled to receive. Defendant's fraudulent conduct

16    involved at least twenty (20) of MARINELLO SCHOOL OF BEAUTY campuses,

17    including but not limited to the following campuses:  Plaza del Sol (01), San

18    Bernardino (05), Reseda (06), Hemet (08), Las Vegas (11), Inglewood (12), San

19    Diego (14), City of Industry (16), Moreno Valley (18), Palmdale (19), El Cajon

20    (20), Ontario (22), Lomita (23), Whittier (25), San Mateo (28), San Francisco (29),

21    Sacramento (31), Victorville (44), Murrieta (47), and Bell (48), schools.

22          14.    Defendants made false statements and concealed material information

23    from the Department of Education and State of California in order to ensure that it

24    would maintain its state license and/or continue to receive federal funding under

25    Title IV of the HEA. For example, regulations require that a proprietary school

26    maintain a minimum 60 percent placement rate to be eligible for licensure.

27    Defendants fabricated and or negligently reported (a) completion rates, (b)

28    placement rates, (c) and licensure rates of students from at least twenty campuses,

1  in order to make it appear as if Defendants placed substantially more MARINELLO

2  graduates in jobs, than Defendants actually did. MARINELLO SCHOOL OF

3  BEAUTY reported and certified as "true and correct" these false placement

4  statistics to the DOE. By falsifying its placement statistics, Defendants were able to

5  ensure that it maintained its state license. State licensure, in turn, is a requirement to

6  be eligible for federal funding under Title IV of the HEA.

7       15.    Defendants also engaged in false advertising in an attempt to

8  induce students to enroll at its campuses, in violation of California regulations,

9  federal regulations implementing Title IV of the HEA, and its PPAs. For example,

10  Defendants used the fabricated placement statistics MARINELLO reported as a

11  tool to induce students to enroll at Campuses. MARINELLO SCHOOL OF

12  BEAUTY agents lied to prospective students at multiple Campuses about the

13  amounts of money they should expect to earn in Cosmetology, Barbering and

14  related programs after graduation from MARINELLO SCHOOL OF BEAUTY.

15  Defendants also enrolled multiple students into particular programs of beauty, at

16  hostile and/or substandard facilities, where students and faculty physically and

17  verbally fought with one another regularly.  One example, includes the San

18  Bernardino Campus 05 where student's "swipe" or identification cards were

19  confiscated, and retained by Defendants in an ongoing effort to control, manipulate

20  attendance records, and or maintain Title IV eligibility. Another strategy, regularly

21  employed by Defendants was telling applicants who had previously dropped out of

22  MARINELLO SCHOOL OF BEAUTY that their current loan indebtedness to the

23  Federal Government would be forgiven if they *re-enrolled* at MARINELLO

24  SCHOOL OF BEAUTY, but Defendants had no intention of repaying the students'

25  federal loan indebtedness. Defendants false advertising to prospective applicants, in

26  violation of California regulations, federal regulations, and its PPAs, was designed

27  to induce students to enroll at MARINELLO SCHOOL OF BEAUTY who might

28  not otherwise have enrolled had they been told the truth by Defendants.

16.     MARINELLO SCHOOL OF BEAUTY engaged in other fraudulent conduct in an attempt to secure federal aid for students who, but for Defendants conduct, would have been ineligible for assistance under Title IV of the HEA. For instance, Defendants fabricated and or did not require, nor verify, high school diplomas of prospective students at campuses 05, 44 and 18 in order to permit unqualified students to enroll at MARINELLO SCHOOL OF BEAUTY. Defendants then improperly received and retained Title IV assistance for those unqualified students.  Defendants also engaged in a variety of fraudulent actions designed to ensure that prospective students passed an Ability-to-Benefit (ATB) test - a then-existing alternative under federal law for students without a high school diploma or its recognized equivalent to receive Title IV funding while enrolled at Defendants schools.  Defendant actions included: (1) using surrogate test takers to sit for applicants; (2) improperly "coaching" test takers on the questions and answers before the exam; and (3) using a proctor to administer the tests who was not properly qualified and (4) provided answers to applicants and or students to the questions.  MSB also routinely altered grades and attendance records of students at campuses (01), (05), (08), (44), (14) and (18) who were not meeting minimum requirements. Defendants kept students on its attendance rolls and, as such, federal financial aid recipient list - by extending graduation dates fraudulently. Defendant employees were instructed to "pump up" financial aid records in order to secure more federal funding for students than the students were eligible to receive.

17.     Employees were encouraged, and directed through top management through email and sales calls to maintain "BIG VOLUME" in students admissions, calling for "aggressive appointment setting". A constant slogan was "PACK THE FRONT END AND THEN BACKFILL FOR SUCCESS!"

18.     Between 2010 and 2011, senior management offered "ONE MONTH SALARY" for high completion statistics in Bell, Portland, San Diego, and Lomita schools.

COMPLAINT – JURY TRIAL DEMANDED

19      Defendants conduct was knowing and material to MARINELLO SCHOOL OF BEAUTY continued eligibility to participate in the Title IV programs. As a result of Defendant's fraudulent scheme and its false representations of Title IV eligibility, Defendants have received millions of dollars of Title IV financial aid that it otherwise would not have received but for its conduct.

## IV.   **JURISDICTION AND VENUE**

20.     This Court has subject matter jurisdiction over the United States' claims brought under the False Claims Act, *31 U.S.C. §§ 3279, et seq.,* pursuant to *31 U.S.C. §§ 3730* and *3732*. This Court has supplemental jurisdiction to entertain the common law and equitable causes of action under *28 U.S.C. § 1367(a)*.

21.     This Court has personal jurisdiction over Defendants pursuant to *31 U.S.C. § 3732(a)* because Defendants transacts business and is found in this district, and acts proscribed by *31 U.S.C. § 3729* occurred in this district.

22.     Venue is proper in this district pursuant to *31 U.S.C. § 3732(a)*, and under *28 U.S.C. §§ 1391(b)* and *1395(a)*, because Defendant is a California corporation and owns and operates traditional campuses within this district. Furthermore, certain of the acts that form the basis of this Complaint occurred in this district.

## V.   **PARTIES**

RELATORS:

23.     This is a qui tam action brought pursuant to the FCA by the various Relators on behalf of the United States, and Department of Education.

24.     Relator Terisa Mercer Caron (hereinafter, "Caron") is a citizen of the United States of America, and is a resident of San Bernardino County, in the State

COMPLAINT – JURY TRIAL DEMANDED

1    of California. She is an "original source" of this information within the meaning of

2    *31 U.S.C. § 3730(e)(4)(B)*, but states that, to her knowledge, the information

3    contained herein concerning Defendant's alleged False Claims Act violations has

4    not been publicly disclosed.  Caron worked for Defendant, as a Campus Director of

5    its Moreno Valley and Huntington Beach Campuses from March 2008 to April,

6    2012.

7        25.    Relator Veronica Trejo (hereinafter, "Trejo") is a citizen of the United

8    States of America, and is a resident of Riverside County, in the State of California.

9    She is an "original source" of this information within the meaning of *31 U.S.C. §*

10   *3730(e)(4)(B)*, but states that, to her knowledge, the information contained herein

11   concerning Defendant's alleged False Claims Act violations has not been publicly

12   disclosed.  Trejo was employed by Defendant as its Financial Aid Officer for its

13   Moreno Valley campus during 2010 – 2012.

14       26.    Relator Paige Stevens (hereinafter "Stevens") is a citizen of the United

15   States of America, and is a resident of San Bernardino County, in the State of

16   California. She is an "original source" of this information within the meaning of *31*

17   *U.S.C. § 3730(e)(4)(B)*, but states that, to her knowledge, the information contained

18   herein concerning Defendant's alleged False Claims Act violations has not been

19   publicly disclosed.    Stevens is employed by Defendant as a Cosmetology

20   Instructor in its Victorville campus, from May 2011 through to the present.

21       27.    Relator Heather Luedtke (hereinafter, "Luedtke") is a citizen of the

22   United States of America, and is a resident of San Diego County, in the State of

23   California. She is an "original source" of this information within the meaning of *31*

24   *U.S.C. § 3730(e)(4)(B)*, but states that, to her knowledge, the information contained

25   herein concerning Defendant's alleged False Claims Act violations has not been

26   publicly disclosed.   Luedtke is employed by Defendant in its San Diego campus as

27   a Career Services Manager from April 2012 through to the present.

28

COMPLAINT – JURY TRIAL DEMANDED

28.     Relator, Tameca Sheldon (hereinafter "Sheldon") is a citizen of the United States of America, and is a resident of San Bernardino County, in the State of California.   She is an "original source" of this information within the meaning of *31 U.S.C. § 3730(e)(4)(B)*, but states that, to her knowledge, the information contained herein concerning Defendant's alleged False Claims Act violations has not been publicly disclosed.   Sheldon was employed by Defendant in its Victorville campus as an Instructor from January 2011 through to February, 2012.

29.     Relator, Cindy Juarez (hereinafter "Juarez") is a citizen of the United States of America, and is a resident of Riverside County, in the State of California. She is an "original source" of this information within the meaning of *31 U.S.C. § 3730(e)(4)(B)*, but states that, to her knowledge, the information contained herein concerning Defendant's alleged False Claims Act violations has not been publicly disclosed.  She was employed by Defendants as its Registrar and Financial Aid Officer for its Hemet campus during July 2009 - Aug 2012.  In this position, JUAREZ was responsible for daily POS and Guest Vision and RGM reporting of raw attendance data, swipe card management, issuance, and clock hour compliance. JUAREZ was responsible for LOA forms, 14-day rule compliance, Add/Drop reporting of actual data to corporate offices, and student population registry. JUAREZ was responsible for High School, GED and or ATB verification and testing, enrollment agreements, Student Academic Progress (SAP) and student retention polices.

## DEFENDANTS

30.     PLAINTIFFS are informed and believe and on that basis allege that, at all relevant times, B&H EDUCATION, INC., d/b/a MARINELLO SCHOOL OF BEAUTY was, and is:

      a.     A corporation, partnership, association, joint venture or other fictitious entity;

COMPLAINT – JURY TRIAL DEMANDED

1      b.      doing business as, and also known as, MARINELLO SCHOOL
2              OF BEAUTY; and
3      c.      doing business and otherwise present in the County of Los
4              Angeles, State of California, and this Judicial District..
5      31.    PLAINTIFFS are informed and believe and on that basis allege that, at
6  all relevant times, B&H EDUCATION HOLDINGS, L.L.C., d/b/a MARINELLO
7  SCHOOL OF BEAUTY was, and is:
8      a.      A corporation, partnership, association, joint venture or other
9              fictitious entity;
10     b.      doing business as, and also known as, MARINELLO SCHOOL
11             OF BEAUTY; and
12     c.      doing business and otherwise present in the County of Los
13             Angeles, State of California, and this Judicial District.
14     32.    PLAINTIFFS are informed and believe and on that basis allege that, at
15  all relevant times, ABRY PARTNERS VI, L.P was, and is:
16     a.      A corporation, partnership, association, joint venture or other
17             fictitious entity;
18     b.      doing business as, and also known as, MARINELLO SCHOOL
19             OF BEAUTY; and
20     c.      doing business and otherwise present in the County of Los
21             Angeles, State of California, and this Judicial District.
22     33.    PLAINTIFFS are informed and believe and on that basis allege that, at
23  all relevant times, ABRY INVESTMENT PARTNERSHIP, L.P.; was, and is:
24     a.      A corporation, partnership, association, joint venture or other
25             fictitious entity;
26     b.      doing business as, and also known as, MARINELLO SCHOOL
27             OF BEAUTY; and
28     c.      doing business and otherwise present in the County of Los

COMPLAINT – JURY TRIAL DEMANDED

1    Angeles, State of California, and this Judicial District.

2        34.    PLAINTIFFS are informed and believe and on that basis allege that, at

3    all relevant times, ABRY SENIOR EQUITY II, L.P. was, and is:

4            a.    A corporation, partnership, association, joint venture or other

5                 fictitious entity;

6            b.    doing business as, and also known as, MARINELLO SCHOOL

7                 OF BEAUTY; and

8            c.    doing business and otherwise present in the County of Los

9                 Angeles, State of California, and this Judicial District.

10       35.    PLAINTIFFS are informed and believe and on that basis allege that, at

11   all relevant times, UNITED BEAUTY ENTERPRISES, INC., was, and is:

12           a.    A corporation, partnership, association, joint venture or other

13                fictitious entity;

14           b.    doing business as, and also known as, MARINELLO SCHOOL

15                OF BEAUTY; and

16           c.    doing business and otherwise present in the County of Los

17                Angeles, State of California, and this Judicial District.

18       36.    PLAINTIFFS are informed and believe and on that basis allege that, at

19   all relevant times, SCOPE BEAUTY ENTERPRISES, INC.; was, and is:

20           a.    A corporation, partnership, association, joint venture or other

21                fictitious entity;

22           b.    doing business as, and also known as, MARINELLO SCHOOL

23                OF BEAUTY; and

24           c.    doing business and otherwise present in the County of Los

25                Angeles, State of California, and this Judicial District.

26       37.    PLAINTIFFS are informed and believe and on that basis allege that, at

27   all relevant times Dr. R. RASHED ELYAS, was the CEO of B&H EDUCATION,

28   INC., d/b/a MARINELLO SCHOOL OF BEAUTY

- 16 -

1        38.    PLAINTIFFS are informed and believe and on that basis allege that, at

2    all relevant times Dr. NAGUI ELYAS was the President and COO of B&H

3    EDUCATION, INC., d/b/a MARINELLO SCHOOL OF BEAUTY;

4        39.    PLAINTIFFS are informed and believe and on that basis allege that, at

5    all relevant times MICHAEL BENVENUTI, was the COO of Marinello School of

6    Beauty

7        40.    PLAINTIFFS are informed and believe and on that basis allege that, at

8    all relevant times MICHAEL FLECKER, was the CFO of Marinello School of

9    Beauty;

10       41.    PLAINTIFFS are informed and believe and on that basis allege that, at

11   all relevant times TFC CREDIT CORPORATION, a California Corporation,

12   controlled by Marinello School of Beauty, which provided private student loans to

13   Marinello School of Beauty students.

14       42.    PLAINTIFFS are informed and believe and on that basis allege that, at

15   all relevant times, each of DEFENDANTS, in the alternative, participated in,

16   directed, authorized, ratified, controlled, aided and abetted, and/or otherwise caused

17   or contributed to the acts and omissions of the other DEFENDANTS herein alleged

18   and PLAINTIFFS' damages as herein alleged.

19       43.    PLAINTIFFS are currently unaware of the true names and capacities

20   of DOES 1 through 100, inclusive, and therefore sue such DEFENDANTS by these

21   fictitious names. PLAINTIFFS are informed and believe and on that basis allege

22   that, at all relevant times, each of the DOES committed, permitted, participated in,

23   enabled, aided and abetted or otherwise caused or contributed to the wrongful acts

24   and omissions of DEFENDANTS herein alleged, or are otherwise legally

25   responsible in some manner for the unlawful acts and omissions of DEFENDANTS

26   herein alleged.  PLAINTIFFS will seek to amend this complaint to allege the true

27   names and capacities of DOES when ascertained.

28

COMPLAINT – JURY TRIAL DEMANDED

# VI.  STATUTORY BACKGROUND

## A. The Federal False Claims Act (FAC)

44.     The False Claims Act, as amended by the Fraud Enforcement and Recovery Act of 2009 (FERA), *Pub. L. 111-21, § 4(f), 123 Stat. 1617, 1625* (2009), provides in pertinent part that a person is liable to the United States government for three times the amount of damages the government sustains because of the act of that person, plus a civil penalty, for each instance in which the person "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." *31 U.S.C. § 3729(a)(1)(A) (2009).* Prior to the FERA amendments, the FCA provided that a person is liable to the United States government for each instance in which the person "knowingly presents, or causes to be presented, to an officer or employee of the United States Government...[a] false or fraudulent claim for payment or approval." *31 U.S.C. § 3729(a)(1) (2006).*

45.     The FCA defines the term "claim" to mean "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be drawn down or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (i) provides or has provided any portion of the money or property requested or demanded; or (ii) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded...." *31 U.S.C. § 3729(b)(2)(A) (2009).*

46.     As amended by FERA, the FCA also makes a person liable to the United States government for three times the amount of damages which the government sustains because of the act of that person, plus a civil penalty, for each instance in which the person "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." *31 U.S.C.*

1  *§ 3729(a)(1)(B) (2009)*. The FCA, prior to the FERA amendments, provided that a

2  person is liable to the United States government for each instance in which the

3  person "knowingly makes, uses, or causes to be made or used, a false record or

4  statement to get a false or fraudulent claim paid or approved by the

5  Government." *31 U.S.C. § 3729(a)(2) (2006)*.

6       47.    The FCA defines the terms "knowing" and "knowingly" to mean that a

7  person, with respect to information: (1) "has actual knowledge of the information;"

8  (2) "acts in deliberate ignorance of the truth or falsity of the information;" or (3)

9  "acts in reckless disregard of the truth or falsity of the information." *31 U.S.C.*

10  *§ 3729(b)(1)(A) (2009)*. The FCA further provides that "no proof of specific intent

11  to defraud" is required. *31 U.S.C. § 3729(b) (2006); 31 U.S.C. § 3729(b)(1)(B)*

12  *(2009)*.

13       48.    The United States alleges that, from at least 2007 through the present,

14  MARINELLO SCHOOL OF BEAUTY violated the FCA by "knowingly"

15  submitting and/or causing the submission of false claims for payment to the

16  Department of Education in the form of Free Applications for

17  Federal Student Aid (FAFSA) and the resulting drawdowns of Title IV funds

18  related to each approved FAFSA. These claims for payment were false because

19  Defendants: (1) fraudulently maintained its state licensure (and, in turn, its

20  eligibility to receive Title IV funding) by making false statements and

21  misrepresentations to the State and DOE about some or all of its (i) completion

22  rates, (ii) placement rates, and (iii) licensure rates;  among other things; (2) made

23  knowingly false statements and promises in its PPAs, and in certifications

24  accompanying its drawdowns of federal aid, that it was complying with, and would

25  continue to comply with, applicable laws and regulations governing the award of

26  Title IV funding; and/or (3) made, or caused to be made, false representations in

27  grant and loan applications that the students seeking federal financial aid were

28  eligible to receive such aid.

**B. Programs under Title IV of the Higher Education Act of 1965**

49.     Under Title IV of the Higher Education Act of 1965, *20 U.S.C. §§ 1070 et seq.,* Congress established various student loan and grant programs, including but not limited to, the Federal Pell Grant Program (Pell), the Federal Family Education Loan Program (FFELP), and the Federal Direct Loan Program (FDLP) in order to financially assist eligible students in obtaining a post-secondary education.

**1.     Federal Regulations Governing Title IV Funding**

50.     There are a variety of federal statutes and regulations that govern the award of Title IV, HEA program funds. First, only "eligible" students are permitted to receive federal financial aid under Title IV of the HEA. In order to qualify as an eligible student, a student must meet the requirements of *34 C.F.R. § 668.32.* Among other things, the student must be enrolled or accepted for enrollment in an eligible program at an eligible institution; must have a high school diploma or its recognized equivalent, unless an enumerated exception applies (such as, during the relevant time period, having "obtained a passing score specified by the Secretary on an independently administered test"); and must be maintaining satisfactory academic progress in his or her course of study according to the school's published standards, and in accordance with federal guidelines. *34 C.F.R. §§ 668.32, 668.34.*

51.     An institution may only retain Title IV funds that it earns. When a student withdraws without completing a program of instruction, an institution must calculate the amount of Title IV funds that it can retain and refund to the Department of Education and the student any excess funds that it has not earned. *34 C.F.R. § 668.22.*

52.     Institutions wishing to participate in Title IV, HEA programs also must comply with other federal requirements. A school must be accredited and be licensed to operate in each state in which it is doing business in order to be eligible

COMPLAINT – JURY TRIAL DEMANDED

1    to receive Title IV funding. *20 U.S.C. § 1001;34 C.F.R. § 600.5(a)(4), (6).*

2       53.    Federal regulations also prohibit institutions from making substantial

3    misrepresentations to prospective applicants about, among other things, the nature

4    of the institution's educational programs or the employability of its graduates. 34

5    C.F.R. Part 668, Subpart F. During the relevant time period, a misrepresentation

6    consisted of "any false, erroneous or misleading statement" that an institution made

7    to a student or prospective student, and a substantial misrepresentation consisted of

8    "any misrepresentation on which the person to whom it was made could reasonably

9    be expected to rely, or has reasonably relied, to that person's detriment." *34 C.F.R.*

10   *§ 668.71* (2007-2010).

11      54.    Misrepresentations that were explicitly prohibited by state and federal

12   regulation include, among other things, misrepresentations regarding the

13   employability of an eligible institution's graduates, *34 C.F.R. § 668.74,* and

14   misrepresentations concerning "the nature of an institution's financial charges," *34*

15   *C.F.R. § 668.72.*

16      55.    The Department of Education has the authority to revoke or terminate

17   an institution's PPA if it is found to have engaged in substantial

18   misrepresentation. *34 C.F.R. §§ 668.13(d)*; *668.86(a)(l)(ii)(A).*

19      **2.    Program Participation Agreements**

20      56.    All post-secondary educational institutions must enter into PPAs with

21   the Department of Education in order to become eligible to receive payment of Title

22   IV funds under programs such as Pell, FFELP, or FDLP, or to have

23   its students receive Title IV funding. *20 U.S.C. § 1094;34 C.F.R. § 668.14.*

24      57.    "A program participation agreement conditions the initial and

25   continued participation of an eligible institution in any Title IV, HEA program

26   upon compliance with the provisions of this part, the individual program

27   regulations, and any additional conditions specified in the program participation

28

- 21 -

1   agreement that the Secretary requires the institution to meet." *34 C.F.R. §*

2   *668.14(a)(1).*

3         58.    By signing a PPA, an educational institution agrees that its

4   participation in Title IV, HEA programs, including receiving payment of Title IV

5   funds, is "subject to the terms and conditions set forth in [the PPA]."

6         59.    Each PPA expressly conditions a school's initial and continuing

7   eligibility to receive payment under Title IV, HEA programs on compliance with

8   specific statutory requirements that include the proper determination

9   of student eligibility for these funds, and compliance with all institutional eligibility

10  requirements, such as those set forth in paragraphs 28-33 above.

11               C. **Claims for Payment under Title IV Programs**

12        60.    After a school becomes eligible to receive Title IV funding by entering

13  into a PPA, claims for payment of those funds can be made in various ways. Under

14  Pell and FDLP, for example, students submit requests for funding directly to the

15  Department of Education, or to the Department of Education with the assistance of

16  schools. Under the FFELP, students and schools jointly submit requests to private

17  lenders for loans that are then guaranteed by state agencies and are, in turn, insured

18  by the Department of Education and paid in the event of a default.

19        61.    With respect to all Title IV, HEA programs, the disbursement of

20  federal funds rests on required statements of eligibility. Schools must make such

21  statements for payment requests to be considered.

22        62.    For all Title IV, HEA programs, students who are interested in

23  receiving federal student aid must complete a FAFSA.

24               1.    **Title IV Grant Programs**

25        63.    Under the Pell Grant program, which provides federal funds to assist

26  post-secondary school students in financial need, *20 U.S.C. § 1070a; 34 C.F.R. §*

27  *690.1,* the student initiates the process by submitting a FAFSA to the Department of

28

- 22 -

Education to have her expected family contribution ("EFC") calculated in order to receive an accurate amount of Pell funds. *34 C.F.R. § 690.12(a)*. The student either sends the FAFSA directly to the Department of Education or provides it to a school for the school to transmit to the Department of Education on the student's behalf. *34 C.F.R. § 690.12(b)*.

64.    The Department of Education sends the student's application information and EFC to the student on a Student Aid Report ("SAR") and sends each school the student has designated an Institutional Student Information Record ("ISIR") for that student. *34 C.F.R. §690.13*.

65.    The school uses the above-described information, including the EFC, to calculate the student's eligibility for all aid and to assemble a "financial aid award package" for the student borrower. The financial aid package may include Pell Grants, FDLP Direct Loans, or Campus-Based Aid (which, in turn, includes Federal Supplemental Educational Opportunity Grants, Federal Work-Study, and Federal Perkins Loans), as well as other scholarships or aid for which the student may be eligible.

66.    The student can accept all or part of the financial aid award package.

67.    If the student accepts a Pell Grant, an FDLP Direct Loan (for which the Department of Education is both lender and guarantor), or both a Pell Grant and a Direct Loan, the school creates an electronic "origination" record that the school submits to a Department of Education computerized database called "COD," the Common Origination and Disbursement system. The origination record includes student demographic data, the award or payment period, the award amount, and disbursement dates and amounts. The COD database, in turn, links the information in the origination record to another Department of Education database, called "CPS," the Central Processing System, which compares the information in the origination record to the information on the student's SAR and ISIR.

68.    Provided that the information submitted by the school is consistent

with the information possessed by the Department of Education, the Department of Education makes funds available for the school to electronically draw down from a computerized system known as "G5."

69.     Schools must electronically certify in G5 prior to drawing down the funds that "by processing this payment request...the funds are being expended within three business days of receipt for the purpose and condition[s] of the [Program Participation] agreement."

70.     In addition to the Pell Grants themselves, the Department of Education also pays to the school an annual administrative cost allowance of $5.00 for each student who receives a Pell Grant, to be used to pay the costs of administering the Pell Grant and other Title IV, HEA federal student aid programs. *20 U.S.C. § 1096; 34 C.F.R. § 690.10.*

### 2. Title IV Loan Programs

71.     Under the FFELP, which includes subsidized and un-subsidized Stafford Loans, a guaranty agency makes the eventual claim for payment by the United States. No new loans were made under FFELP after July 1, 2010. Prior to that date, the school and student submitted an application to a private lender for a loan on behalf of the student. If a student defaults in repaying a loan under the FFELP program, a state or private guaranty agency reimburses the lender or subsequent holder of the loan for the outstanding balance and takes assignment of the loan for collection action. *34 C.F.R. § 682.401(b)(14).* If the guaranty agency is unable to collect from the borrower, the Department of Education reimburses the guaranty agency for the loss it incurred in honoring the defaulted claims, *230 U.S.C. § 1078(c)(1)(A),* and the Department of Education may, in its discretion, take assignment of the loan. *20 U.S.C. § 1078(c)(8).* In this way, the government is ultimately called upon to satisfy claims for payment.

72.     In order to participate in the FFELP or any other Title IV loan

1 program, as opposed to a grant program, a student completes a Master Promissory

2 Note (MPN) and submits the MPN to the educational institution. The institution, in

3 turn, completes a "School Certification," in which it certifies the accuracy of the

4 information it provided to the Department of Education and the student's eligibility

5 for the loan. *34 C.F.R. § 682.102.* While the MPN itself is valid for ten years, the

6 educational institution determines the student's ongoing eligibility for aid and

7 completes the School Certification annually.

8      73.    Under the FFELP, the educational institution submits the MPN to the

9 lender. Upon approval by the lender, the lender obtains a loan guarantee from a

10 guarantee agency. *34 C.F.R. § 682.102.* The loan is made in reliance upon the

11 accuracy of the information provided by the educational institution.

12      74.    The lender transfers the FFELP funds directly into the educational

13 institution's account. Upon receiving the FFELP funds, the educational institution

14 credits a student's account for education-related expenses, such as tuition, fees,

15 books, and supplies.

16      75.    For subsidized Stafford Loans, the government pays the interest on

17 the student's behalf during the time the student is enrolled in school on at least a

18 half-time basis, and during the student's grace period before repayment

19 commences. *34 C.F.R. § 682.102(d)(2).*

20      76.    In the event of default on the loan, the Department pays to the

21 guarantee agency all or part of the unpaid principal and accrued interest, as well as

22 a variety of administrative costs. *34 C.F.R. § 682.404.*

          **D. Defendant Participation in Title IV. HEA Programs**

            **1.    Program Participation Agreements**

25      77.    MARINELLO SCHOOL OF BEAUTY signs and submits PPAs to the

26 Department of Education on behalf of all of Defendant educational institutions

27 throughout the United States. Defendants have executed PPAs for approximately

28

1  sixty seven of its campuses. Below is an example of a PPA(s) signed by "R. Rashed
2  Elyas CEO", of MARINELLO SCHOOL OF BEAUTY and the Department of
3  Education from 2008 through the present.

4       • <u>Program Participation Agreement</u>:
5          o  Effective date of Approval:     April 30, 2008
6          o  **Signed by R. Rashed Elyas, CEO**  April 29, 2008
7          o  Approval Expiration Date:     December 31, 2013
8          o  Reapplication Date:     September 30, 2013
9          o  Name of Institution:  MARINELLO SCHOOL OF BEAUTY
10         o  Address of Institution:  24741 Alessandro Boulevard, Moreno
11            Valley, CA. 92553-3941
12         o  OPE ID Number:     02221300
13         o  DUNS Number:     792317778
14         o  Taxpayer ID Number:     562419687

15     78.    The PPAs signed by MSB state that "[t]he execution of this Agreement
16 by the Institution and the Secretary is a prerequisite to the Institution's initial or
17 continued participation in any Title IV, HEA Program."

18     79.    By signing the PPAs, MARINELLO SCHOOL OF BEAUTY certified
19 that it would comply with Title IV of the HEA's requirements. All of the PPAs
20 signed by Defendants state: "[t]he Institution understands and agrees that it is
21 subject to and will comply with the program statutes and implementing regulations
22 for institutional eligibility as set forth in 34 CFR Part 600 and for each Title IV,
23 HEA program in which it participates, as well as the general provisions set forth in
24 Part F and Part G of Title IV of the HEA, and the Student Assistance General
25 Provisions regulations set forth in *34 C.F.R. Part 668*."

26     80.    MARINELLO SCHOOL OF BEAUTY also certified in each PPA that
27 "[i]t will comply with all statutory provisions of or applicable to Title IV of the
28 HEA, all applicable regulatory provisions prescribed under that statutory authority,

and all applicable special arrangements, agreements, and limitations entered into under the authority of statutes applicable to Title IV of the HEA...."

81.    Defendants also agreed in the PPAs to meet all state licensure and accreditation requirements: "[ATI] will meet the requirements established pursuant to Part H of Title IV of the HEA by the Secretary, State [authorizing bodies], and nationally recognized accrediting agencies."

82.    Each of the PPAs signed by MARINELLO SCHOOL OF BEAUTY further state: "In the case of an institution that advertises job placement rates as a means of attracting students to enroll in the institution, it will make available to prospective students, at or before the time that those students apply for enrollment-

(i)    The most recent available data concerning employment statistics, graduation statistics, and any other information necessary to substantiate the truthfulness of the advertisements; and

(ii)    Relevant state licensing requirements of the State in which the institution is located for any job for which an educational program offered by the institution is designed to prepare those prospective students."

83.    All of the PPAs during the relevant periods identified above were signed by MARINELLO SCHOOL OF BEAUTY CEO, Dr. R. RASHED ELYAS, Dr. NAGUI ELYAS, MIKE BENVENUTI, COO, and or MICHEAL FLECKER, CFO, all senior officers of MARINELLO SCHOOL OF BEAUTY.

84.    As described in greater detail below, MARINELLO SCHOOL OF BEAUTY knowingly made false statements, certifications, and claims regarding its compliance with Department of Education regulations and the terms of its PPAs. Beginning in at least 2007, MARINELLO SCHOOL OF BEAUTY was fraudulently maintaining its licensure with California (and, hence, its eligibility to participate in Title IV programs) by, among other things, fabricating placement rates. Defendant was also violating federal regulations by repeatedly lying to students about, among other things, the opportunities they would have as

- 27 -

1  MARINELLO graduates to induce them to enroll at MARINELLO SCHOOL OF

2  BEAUTY.  In order to secure greater federal funding, MARINELLO also enrolled

3  and maintained enrollment for students who were not eligible, and then concealed

4  their ineligibility by fabricating documents.

5       85.   MARINELLO SCHOOL OF BEAUTY nevertheless executed the

6  PPAs and agreed that it would comply with applicable federal regulations and the

7  terms of the PPAs. Defendants then drew down federal grant funds and again stated

8  that the funds were being used in accordance with the conditions of the PPAs.

9  Defendant's statements were false when made, and caused the Department of

10 Education to pay various claims under Title IV, HEA programs that it would not

11 have paid but for Defendants fraud.

12      **2.**    **Federal Funds Received from the Department of Education**

13      86.   MARINELLO SCHOOL OF BEAUTY has received substantial sums

14 in Title IV funding from the Department of Education as a result of its fraudulent

15 conduct.

16      **VII.**   **DEFENDANTS FRAUDULENT SCHEME**

17      **A. Background**

18      87.   MSB is a privately owned, for-profit post-secondary school.  Named

19 after the founder of Modern Cosmetology, Giovanni Marinello; B & H Education

20 Inc. acquired Marinello in 2004.  MSB has since grown to approximately 67

21 schools in 7 States.  The school is nationally accredited by the National Accrediting

22 Commission of Career Arts and Sciences (NACCAS).

23      88.   MSB is required to provide Clock Hour Programs and offers the

24 following programs:  Cosmetology (1600 Clock Hours),  Manicurist (400 Clock

25 Hours), Esthetician (600 Clock Hours), Advanced Facial & Body Treatments (600

26 Clock Hours), Clinical Esthetician (900 Clock Hours), Master Spa Therapist (1200

27 Clock Hours), Teacher Training (600 Clock Hours), Massage Therapy (720 Clock

28 Hours), Massage Therapy (600 Clock Hours), CIDESCO (1500 Clock Hours),

1  Barbering (1500 Clock Hours), Professional Makeup Artistry (720 Clock Hours),

2  Make-Up Artist – Bridal (100 Clock Hours), Make-Up Artist Media (100 Clock

3  Hours).

4       89.    MSB is approved to operate in California by the Bureau for Private

5  Postsecondary Education (BPPE).  The California Board of Barbering and

6  Cosmetology (BBC) sets minimum standards for MSB and issues licenses to

7  graduates upon passing the Board of Barbering and Cosmetology licensing

8  examinations.  Accordingly to the MSB 2011-2012 Catalog, "All Marinello

9  students who successfully complete a course of study will be awarded an

10  appropriate diploma…".  In order for a graduate of MSB to ultimately receive its

11  license from the BBC, MSB must provide a Proof of Training (POT) certificate to

12  the State in favor of the student.

13       90.    During the relevant time period, MSB had a corporate office and team

14  located in Whittier & Beverly Hills, California that was responsible for the overall

15  management of MSB various campuses and its various campuses. The corporate

16  team was responsible for setting overall corporate goals and strategies, and

17  overseeing the operations at each of MSB campuses. MSB campuses were managed

18  at the individual level by a School Director, as well as directors of admissions,

19  career services, and financial aid, among others. Each campus also had a number of

20  other employees who focus on running the operations of the specific campuses,

21  including Admissions Representatives and Career Services employees.

22       91.    MSB management employed a corporate strategy focused on increased

23  admissions and profits above all else. MSB's main priority was increasing its

24  enrollment numbers and, hence, its revenues. In furtherance of that strategy, MSB

25  employed an army of Admissions Representatives and put intense pressure on them

26  to enroll as many students as possible.

27       92.    Admissions Representatives went to great lengths to recruit bodies.

28  Recruitment was aggressively performed on radio, television, fashion shows,

1    Paparazzi events, Teen Health Fairs, VA and or Military events, March of Dimes,
2    foster care homes, McDonalds, AA meetings, homeless and or food shelters,
3    Autism organization events, and junior high schools. They would
4    induce students to enroll at MSB with promises of gift cards, pizza parties,
5    coupons, enrollment fee waivers, high double or triple digit salaries upon
6    graduation and direct career placement assistance. MSB Admissions
7    Representatives were told to make their sales goals no matter what. If they did not
8    meet MSB aggressive goals, they were told they would be terminated. Once
9    enrolled into MSB, the staff was instructed to reduce the amount of drops, be
10   flexible with LOAs, and re-enroll any drops. Instructors were counseled to
11   "average out grades" and or fabricate student academic scores.

12       93.    To meet those sales goals, Admissions Representatives would
13   enroll students regardless of whether those students were qualified for enrollment or
14   whether MSB was the right fit for them. As discussed below, they would fabricate
15   proofs of education to enroll unqualified students. They also engaged in program
16   manipulation whereby Admissions Representatives would attempt to
17   convince students not to enroll in the program they were interested in, but instead to
18   enroll in the longer 1500 or 1600 clock hour programs in an effort to maximize
19   federal aid or over award Title IV funding. MSB's primary focus was filling slots,
20   not on finding the right educational opportunity for each prospective student. In
21   some cases, as explained below, Admissions Representatives would
22   enroll students in programs even though they knew the student would not be able to
23   find employment after graduation due to, for example, a criminal record, multiple
24   attempts on the entrance exam, or failure of ATB criteria. Once
25   enrolled, students would be pressured to attend at least minimally, the classes
26   during Level 1, at which point MSB drew down Title IV funds on their behalf.

27       94.    MSB Admissions Representatives would lure students to MSB with
28   attractive actors and actresses on radio and TV advertisements with promises of

COMPLAINT – JURY TRIAL DEMANDED

1    first-rate beauty training and job placement upon graduation. But when they

2    arrived, the reality was far different. To generate as much revenue as possible, MSB

3    would often oversell classes, resulting in overcrowding. Equipment was out of date

4    and the quality of instruction was often poor, with Instructor turnover very high.

5    Many of its facilities were also poorly-maintained, outdated, lacked security and

6    unsafe.  For example, Campus's 22, 05, 44, and 18 experienced car thefts, break

7    ins, illegal drug use, fights, and even prostitution. Safety concerns at several of

8    these campuses required police coverage during school hours. Students at MSB

9    were also sometimes violent towards each other, instructors, and staff, which

10   prevented an educational environment conducive to learning.

11        95.    Students found that their employment prospects after graduation from

12   MSB were not as promised. Despite spending thousands of dollars for training in a

13   new career field, many found that they were not any better off after graduating from

14   MSB than they were prior to enrollment, Many students in this position incurred

15   substantial oppressive debt, school penalties, billing inconsistencies, delayed or lost

16   cost of living loans and federal grant funds held.  MSB students were intentionally

17   unable to obtain their State Board licensing, because MSB withheld their Proof of

18   Training certificates until either cash was paid, or students acquiesced to private

19   18% interest promissory notes.  Students were constantly harassed by MSB internal

20   collection agency, which would commonly loose or leave students aging accounts

21   on the books to accrue additional penalties.  Students were not awarded diplomas

22   after completing the required number of clock hours

23        96.    MSB Career Services Department was often unhelpful and/or

24   unsuccessful in placing students in their fields after graduation. Students were thus

25   unable to find quality jobs and often returned to jobs similar to those they held prior

26   to enrolling at MSB. To keep up the appearance of a successful school, however,

27   MSB would falsify placement statistics and then continue to lie to students about

28   the opportunities available to them as a MSB graduate.

97.   MSB focus on putting profits ahead of students' needs and quality of education resulted in MSB engaging in a variety of fraudulent practices designed to extract as much federal funding as possible from the Department of Education and from students. MSB conduct, as explained below, violated the Federal False Claims Act and resulted in payment by mistake and in MSB being unjustly enriched.

98.   MSB from at least 2007 continually through the present, Defendants knowingly submitted, or caused to be submitted hundreds of false claims and false statements in order to maximize MSB profits derived almost exclusively from federal student aid monies.

99.   MSB engaged in, encouraged, counseled, and coerced, directly and or indirectly, to fraudulently report or conceal actual data to DOE program auditors. MSB manipulated student accounting, internal audit reports, spreadsheets, formulas, rosters, SAP reports, grading, LOA sheets, POS logs, Guest Vision reporting, RGM and Vocado documents, 90/10 reports, inserted all cash ghost students, cash flow reports, Placement statistics, and Add/Drop reports.

100.   Key reports needed for NACASS certification, DOE compliance, and PPA eligibility, which contained data inputted at the campus level was modified advantageously *after*, and at the corporate level, overridden, stricken, and or altered by Defendants untruthfully in order to comply with Title IV, maximize profit, and obstruct the DOE program audit. Attendance reports by Defendants own admissions, were irreconcilable and fraudulent. Defendants further physically altered, and or forged, and concealed key documents, including but not limited to: Last Date of Attendance logs, LOA sheets and or LOA reports, SAP reports, and or 90/10 reports in order to conceal and obstruct a DOE program audit in 2012.

101.   In several Inland Empire campuses including campuses 05, 44, 08, student "swipe cards" were confiscated, never provided, or given out - then retained on a large ring, or card catalog styled box near the POS/Guest Vision system in order to control and manipulate attendance records. Current enrollees, LOAs, and

COMPLAINT – JURY TRIAL DEMANDED

1    dropped students cards were all comingled and used in the POS system with

2    voluminous discrepancies.

3              **B.  Defendants Falsified Entrance Exams, GEDs, high school**

4                    **diploma, and/or Ability To Benefit (ATB) tests.**

5         102.   MSB engaged in other fraudulent conduct in an attempt to secure

6    federal aid for students who, but for Defendants conduct, would have been

7    ineligible for assistance under Title IV of the HEA. For instance, Defendants

8    fabricated and or did not require, nor verify, high school diplomas of

9    prospective students at campuses 05, 44 and 18 in order to permit

10   unqualified students to enroll at MSB.  Defendants then improperly received and

11   retained Title IV assistance for those unqualified students.

12        103.   Defendants also engaged in a variety of fraudulent actions designed to

13   ensure that prospective students passed an Ability-to-Benefit (ATB) test - a then-

14   existing alternative under federal law for students without a high school diploma or

15   its recognized equivalent to receive Title IV funding while enrolled at Defendants

16   schools.  MSB would utilize a questionable "grandfathering" system pervasively

17   for ATB students who may have transferred or enrolled at an earlier secondary

18   school.

19        104.   Defendant actions included: (1) using surrogate test takers to sit for

20   applicants; (2) improperly "coaching" test takers on the questions and answers

21   before the exam; and (3) using a proctor to administer the tests who was not

22   properly qualified and (4) provided answers to applicants and or students to the

23   questions.

24        105.   Defendants also routinely altered grades and attendance records

25   of students at campuses 01, 05, 08, 44, 14 and 18 who were not meeting minimum

26   requirements. Defendants kept students on its attendance rolls and, as such,

27   federal financial aid recipient list - by extending graduation dates fraudulently.

28   MSB employees were instructed to "pump up" financial aid records in order to

COMPLAINT – JURY TRIAL DEMANDED

1   secure more federal funding for students than the students were eligible to receive.

2   ## C. Defendant Made Material Misrepresentations to the DOE by
3   ## Falsifying Student Attendance Rosters, Fabricating Leave of
4   ## Absences, Add/Drops, and Re-enrollment Records.

5        106.   During 2007 to the present, student attendance records were falsified
6   in handwritten rosters, the POS/Guest Vision programs and or the RGM system.
7   Enrollees, regardless of physical school presence, and or after dropping from
8   program were invariably placed in the LOA column, LDA was altered, and or a
9   swipe card was used momentarily to "reset" the 14 days.  This was done without
10  proper verification, and or manually edited or altered in the POS and RGM systems
11  even though the student was not physically present.   Defendants had the ability to
12  alter or manually override the POS, Guest Vision, and or RGM systems.  Swipe
13  cards were kept locked up behind the counter, or with the Registrar in a locked
14  room.  These swipe cards kept were from dropped, active, and LOA labeled
15  students in a card catalog style box, instead of - on the person of the actual student.
16  No separation methodology was employed for these comingled student cards.
17  Students, after 14 consecutive days of no shows, were deliberately instructed to be
18  left on the roster, or told to "put attendance on",  and or placed into LOA status for
19  the sole purpose of "tolling" the financial aid calendar in order to collect more
20  federal student aid, manipulate Add/Drop statistics, tally up school penalties, and
21  manipulate statistics.  This benevolent scheme came with rewards.  MSB
22  employees received *cash bonuses* or attractive *Visa gift cards* all provided by CEO
23  Dr. N. ELYAS.  In order to maximize profits, LOAs were converted to re-
24  enrollment status and severe pressure was applied to employees to get students back
25  in.

26       107.   Students from campus's 05, 44, and 14, after multiple attempts,
27  requested copies of financial aid awards, and or accounting, but were told by the
28  FAO, Director, and or Registrar that the requested information was not available.

- 34 -

The FAOs, Directors, and or Registrars at these campuses were instructed by Defendants to "not give out corporate phone number to students". This delay and tolling tactic were companywide techniques in an effort to isolate the problem at the local level. An example from campus 44 of students and their manipulation dates are set forth below. The students initials our set forth as Relators fear that these students will be retaliated against once their identity is disclosed. Upon request by the Court the students' names will be revealed.

**Victorville Campus 44 Altered Roster**

| Date of Manipulation | Student | Date of Manipulation | Student | Date of manipulation | Student |
|---|---|---|---|---|---|
| 3/5/2012 | JW, TM, | 10/3/2011 | PH, MW | 8/8/2011 | VA, CS |
| 4/2/2012 | MP | 10/17/2012 | TR | 5/14/2012 | MB |
| 4/16/2012 | AD | 10/31/2012 | | 5/28/2012 | MW |
| 4/30/2012 | MF, MP | 5/30/2011 | DH, SL, LM, DM, MS, SM | 6/11/2012 | MW |
| 2/20/2012 | JW, AE, MF, BH, | 6/27/2011 | VA | 6/25/2012 | DR |
| 9/5/2011 | HN | 7/11/2011 | VA | 7/23/2012 | CC, CO, LV |
| 9/19/2011 | WH | 7/25/2011 | VA | 8/6/2012 | CC, MG |

| Date of Manipulation | Student | Date of Manipulation | Student |
|---|---|---|---|
| 8/20/2012 | GM, SS | 11/26/2012 | AL, LN, AT |
| 9/3/2012 | NP | | |
| 9/17/2012 | AH | | |

| | |
|---|---|
| 10/1/2012 | CG, JM,AS |
| 10/15/2012 | ED (LOA but dropped) |
| 10/29/2012 | MG, |

108.   Campus 14 defrauded the DOE by refusing to drop students after 14 days, and or intentionally leaving the students on the rosters even when they were not physically present or had already dropped from the program, in an effort to draw down additional federal aid and frequently keep their Add/Drop statistics favorable.  Instead of dropping the students accordingly, Defendant manipulated the LDA and LOA files without proper documentation.  The Registrar in Campus 14 actually typed the student's backup documentation, fabricating the dates and signatures on the LOA. On another occasion, in student GP's file, the Directors name was forged. Student discrepancies include:

San Diego Campus 14

| Attendance Discrepancy | Student Name |
|---|---|
| 8/4/2012 | RP |
| 9/18/2012 | IVF |
| 8/3/2012 | SM |
| 6/1/2012 | CC |
| 6/20/2012 | LD |
| 6/26/2012 | KS |
| 7/27/2012 | RE |
| 9/12/2012 | TB |
| 9/29/2012 | LM |
| 7/6/2012 | DT |
| 8/29/2012 | GC |

COMPLAINT – JURY TRIAL DEMANDED

1      109.   Additionally, students SD, RE, EJ, JP, RP, and YS were not correctly

2  dropped from the Grad/Drop report.  Another internal audit revealed the following

3  30 students with total attendance hours not matching the RGM system:  SL, SC, IE,

4  JG, VDMJ, NP, JP, ER, JR, MR, IFV, CN, AMA, CC, BD, BD, MH, LH, JI, MJ,

5  BM, QM, DN, RR, KS, JS, JT, WZ, KV, LH, KM, and CM.

6

7         **D. <u>Defendant Falsified, Forged, and or Altered Grades and</u>**

8                 **<u>Student Academic Progress Reports.</u>**

9      110.   An example of falsification of grades, originated in Campus 44, where

10  Instructors Bridget Short, Paige Stevens, Tameca Sheldon, and Britany Jarmon

11  were instructed by Denise Holloway, Francesca Michaels and or Joan Yourstone

12  between 2010 and 2012, to go back retroactively, and fabricate, and or alter Student

13  Academic Reports for each of their students in an effort to lie and defraud the

14  accreditation agency NACASS and DOE.  Specifically, Britany Jarmon was

15  instructed by Registrar Francesca Michaels and Financial Aid Officer ("FAO") CA

16  to manually "average out" her student's grades who fell below the 70% requirement

17  in order to keep them in the program, and pull the maximum amount of financial

18  aid and school profit, approximately $25,000.00 dollars for Cosmetology students,

19  including beauty kits and average penalty fees.

20      111.   Campus 14 contained forged, altered LOA documents, where dates,

21  and actual student names were manipulate to comply with DOE audit.

22      112.   Once these students were fed through the program for over $20,000.00

23  dollars each, many were charged oppressive "penalty fees" at $11 dollars per hour

24  for mistakes or accounting errors created by Defendant scheme.  Defendants

25  utilized this penalty program and other financing activities, which would have

26  otherwise been deemed illegal under the HEA, through its agent, TFC Credit

27  Corporation, which consistently charged an annual percentage rate (APR) of 18%.

28  The interest rate for these, pre-formulated, promissory notes were never less than

1   18% percent, and never individually underwritten for risk.  Instead, the entire

2   processing of the loan was handled directly by MSB in favor of TFC.  Because

3   these penalties have a natural tendency to exponentially increase over time,

4   hundreds of purported "graduates" were unable to sit for the state licensure exam,

5   because of financial insolvency, and Defendant subsequently withheld required

6   documents needed to actually sit for the state exams.

### E. Defendants Knowingly Misled And Defrauded DOE By Waiving Registration Fees, Manipulating the 90/10 requirement, And Utilizing Ghost Students.

10   113.   Several campuses, between 2007 and through the present, in an effort

11   to induce as many students to sign up for Defendant programs and maximize Title

12   IV funds, actively waived and did not require students to pay the 10% cash

13   requirement and or a registration fee.

14   114.   On or around November, 2011 Relator Caron received a call directly

15   from DR. NAGUI ELYAS, a rare call for a School Director to receive a call from

16   the CEO.  DR. ELYAS informed Caron that she would be receiving a "new cash

17   student" in Moreno Valley (Riverside County) who received a scholarship through

18   Dr. E's church in Los Angeles.  A check in the approximate amount of $27,000.00

19   was received and deposited into the Moreno Valley Wells Fargo Bank branch, in

20   favor of student HN.  Student HN showed up on or around December 2011 and was

21   in school for a total of two days and disappeared, never to be seen again by Campus

22   18 Instructors.

23   115.   During the add drop reporting, Caron was instructed by her supervisor

24   Garo Ghazarian to "put attendance on HN" instead of dropping the student.  When

25   Caron refused, she was reprimanded and told the order was directly from the CEO,

26   and she could lose her job for disobeying.

27   116.   From 2007 through to the present, Defendants repeatedly failed to

28   properly comply with the 90/10 Title IV requirements.  The rule provides that 10%

- 38 -

1    of the tuition must come directly from the student.  An example of this failure is

2    outlined in Defendants, 90/10 summary report including schools Anaheim 46;

3    Bakersfield 48; Fresno 49; Huntington Beach 30; Murrieta 47; Napa 51; and San

4    Rafael 50.  The summary report indicates for 1/1/2011 through 1/1/2012 the total

5    amount in student account amounted to:  $6,945,413, yet the ten percent component

6    is less than 5%.  In an effort to increase the ten (10%) requirement, MSB owners

7    would make personal loans directly to the affected campus in the form of cash

8    concealed as scholarships or through surrogate agents. Subsequent to these events,

9    MSB owners would incorporate as different entities in order to maintain and

10    operate bank accounts and secure collateral.

11        117.   One example is Lil'Arts Inc. where Campus 14 employees were listed

12    as "Board of Directors" and passed Resolutions maintaining a corporate bank

13    account at Bank of America and to "ratify" an SBA loan of $215,000 and separate

14    shareholder loans of $90,000.00 to pay for the "monthly bills".

15          **F. MSB Misled the Department of Education by Falsifying**

16              **Placement Statistics**

17        118.   MSB engaged in a widespread scheme to mislead the Department of

18    Education by falsely representing the number of graduates of its school who were

19    placed in jobs in their field of study after graduation.

20        119.   The requirement for proprietary schools is to place at least 60 percent

21    of their graduates in jobs in their field of study in order to be eligible for licensure.

22    To ensure it met that requirement, MSB knowingly fabricated the placement

23    statistics it reported to NACASS, BPPE,  BBC and the DOE for Campuses 05, 44,

24    18, 01, 12, and 14.  For at least the years 2007 through 2012, it then certified,

25    falsely, that the information it was providing to the agencies on the placement of its

26    graduates was correct. MSB engaged in this fraudulent scheme in order to maintain

27    its licensing and, hence, its ability to draw down federal financial aid.

28        120.   MSB was required to report its placement statistics for each of its

COMPLAINT – JURY TRIAL DEMANDED

programs at Campuses 05, 44, 18, 01, 12, and 14 on an annual basis. In accordance with that requirement, MSB submitted its purportedly accurate placement figures its annual reports and fact sheets and certified them as being accurate.

121.   MSB artificially inflated the placement rates to make it appear as if it had placed substantially more graduates at jobs in their fields of study than it actually did. MSB accomplished this artificial inflation through a variety of methods.

122.   One method that MSB Career Services employees used to inflate MSB placement numbers was to create fake business cards for MSB graduates they could not place. Career Services employees would create the business cards online and place them in the students' files. The students would then be recorded as self-employed on MSB reports to the agency. For example, a former Career Services Coordinator at Campus 05 and 18 was aware of several students in the Massage Therapy program who had business cards created for them before they had taken or passed the licensure exam. When the Career Services Coordinator raised this concern to the then Director of Career Services for these Campuses, she was told that this was part of the program and that the business cards could be placed in the students' Career Placement files and the students counted as "placed."

123.   Other members of management at MSB were aware of the business card scam.  Several employees involved in creating the fake business cards were taught how to do so by MSB Regional Director of Career Placement, Sonia Rafael. Another former Career Services employee Sherry Booth complained to Campus Director and then to MSB Vice-President Garo Ghazarian about the practice of creating fake business cards. When she received no response, she called the Whittier Director of Human Resources, but was disregarded.

124.   The following are examples of students that had fake business cards created so they could be listed as self-employed:

125.   Cosmetology, Esthetician, and Spa Therapist students: BD, JC, CC,

- 40 -

1   JC, JC, SC, RE, CF, RF, AG, LG, KH, MJ, JJ, WJ, DK, RL, IM, RM, FM, MM,

2   JR, JR;

3       126.   Another scheme used by MSB to artificially inflate the placement

4   figures it reported to the DOE was to improperly claim students as placed in their

5   fields if they could find any tangential relationship between the student's job and his

6   or her field of study. Several students who graduated in Cosmetology and worked

7   as cashiers were improperly counted as placed in their field of study because they

8   worked with inside a salon. For example, one employee counted as "placed" a Spa

9   Therapist graduate who worked at AM/PM. This employee claims she was directed

10   to do so by GG.

11       127.   Another student with a 100 Clock Hour completion as a Make Up

12   Artist, was counted as placed in her field while working at McDonalds near

13   Campus 18.

14       128.   MSB also employed graduates for a day or so past graduation at MSB,

15   at the front counter swiping students in and out, and then improperly counted them

16   as placed in their fields. For example, graduate AM was one such example.

17       129.   Another method used by MSB career services employees to inflate

18   placement rates was to create false companies and then fraudulently claim

19   that students had found employment there.

20       130.   Audits completed for MSB confirmed that the placement rates MSB

21   was reporting were not accurate. In 2009 through 2012, MSD hired an independent

22   accountant to audit MSB placement figures for the time period 2009 through 2010.

23   The findings of the third party accountant's review included hundreds of

24   inconsistencies with actual data and data reported to the DOE.   In certain instances,

25   as in Campus 14, less than 20% actually were legitimately placed.

26       131.   MSB fabrication of placement statistics resulted in MSB receiving

27   federal financial assistance that it otherwise would not have been entitled to receive.

28   By falsifying its placement rates, MSB was able to ensure that it met licensure

requirements, DOE compliance, and that MSB maintain a sixty percent placement rate. State licensure and accreditation in turn, is a requirement to be eligible for federal funding under Title IV of the HEA.  MSB's PPAs explicitly state that MSB is required to maintain its state license in order to be eligible for federal funding. Falsification of placement statistics was thus material to the DOE's decision-making process regarding licensing and resulted in MSB drawing down federal funding which it otherwise would not have been eligible to receive but for its fraudulent conduct.

### G. MSB Caused the Department of Education to Award Financial Aid to Ineligible Students and Fabricated Documents to Conceal Their Ineligibility

132.   In order receive funding under Title IV of the HEA, federal law requires that a prospective student at ATI have a valid high school diploma or its recognized equivalent, or, during the relevant time period, be able to pass an ATB test. Federal law also states that only a student maintaining satisfactory academic progress in his or her course of study according to the school's published standards, and in accordance with federal guidelines, is eligible for financial assistance under Title IV of the HEA. By signing its PPAs, MSB agreed it would comply with these regulations.

133.   MSB engaged in various fraudulent schemes in order to ensure that the Department of Education awarded Title IV funding to students who were not qualified to receive such federal funds. MSB engaged in these schemes so that it could increase its enrollment numbers and receive federal financial aid on behalf of those students, regardless of whether the students were actually benefitting from MSB instruction. MSB then fabricated documents to cover up its fraudulent practices. MSB conduct caused the Department of Education to award federal funding to students who would not otherwise have been eligible to receive such funding.

COMPLAINT – JURY TRIAL DEMANDED

134. MSB regularly engaged in falsifying high school diplomas in order to award Title IV funds in violation of federal regulations. For example, MSB fabricated a number of Campus 05, 14, and 23 diplomas.

135. Relators are aware of at least 23 students who had their proofs of education fabricated at MSB. Those students were enrolled at Campus 05, 44, 08, 14, and 19 and MSB drew down federal funding on their behalf.

136. Several Admissions Representatives, including TLM at Campus 14 and Campus 23 participated in fabricating entrance documents.

137. MSB also engaged in fraudulent conduct in connection with the administration of its ATB test, in order to award Title IV funds to unqualified students without a valid high school diploma. It allowed students who failed an ATB test, and did not have any alternative eligibility qualifications, to receive Title IV funds, in violation of federal regulations.

138. At Campus 05, and 18 surrogate test takers were allowed to take the ATB exam for others. Relators witnessed this occurring and complained to Garo Ghazarian. One proctor allowed a wife to take the ATB exam for her husband.

139. MSB also employed a close relative of one of the senior officials who was inserted into problem campuses to make sure ATB examinees were fabricated. Several other nepotistic relationships at MSB were noted.

140. MSB also assisted an ATB proctor who had been decertified by Wonderlic, Inc., the test publisher of MSB's ATB test, in becoming certified under another name and allowed him to proctor ATB tests for prospective students. Wonderlic had determined in 2009 that there were certain anomalies in testing results, which indicated that the tests had not been properly administered. Wonderlic thus decertified him in July 2009.

141. MSB engaged in various fraudulent conduct in order to ensure that students not benefitting from instruction at MSB maintained their enrollment and, hence, their eligibility for federal financial aid. Pursuant to MSB attendance

- 43 -

1    policy, students who missed 14 consecutive days or more than 20 percent of their

2    classes were required to be dropped. MSB however, would

3    change student attendance records to avoid dropping students and losing

4    federal aid.

5    142.    According to at least one MSB Career Services employee, if

6    a student was approaching the 20 percent absence mark, MSB would attempt to get

7    the student to come in for "makeup" time or place on "probation period", even after

8    the 14 days lapsed.

9    143.    MSB would then falsify POS/Guest Vision time sheets, or scribble

10   over,  to make it appear as if the student "made up" more time than he or she

11   actually did. For example, students would sit in makeup time for about ten minutes

12   and then sign forms indicating that they had made up an hour of class time. MSB

13   would also give students makeup credit for time spent in their actual assigned

14   classes, thus giving them credit for two classes when they actually only attended

15   one.

16   144.    One student at Campus 14, DB who did not have a valid high school

17   diploma or its recognized equivalent, and had not passed an ATB test, had missed

18   over 14 days, left on LOA for more than 45 days, was able to re-enroll, then left

19   again, should have had some of the Title IV money returned to the Department of

20   Education because he did not have a valid high school diploma or its equivalent.

21   However, DB did receive and retain federal financial aid, and he has since defaulted

22   on his student loans.

23   145.    MSB engaged in other fraudulent conduct in order to ensure

24   that students maintained their enrollment at MSB (and, hence their eligibility for

25   federal aid), regardless of whether the students were eligible or benefitting from

26   MSB instruction.

27   146.    Directors and other staff held "scrub meetings" and pressured

28   instructors to falsify attendance sheets in order to meet enrollment and retention

COMPLAINT – JURY TRIAL DEMANDED

1  numbers as well as generally prevent students from dropping out of MSB.

2  147.   Directors and other staff altered or falsified grade reports in order to
3  prevent students from being dropped from classes. Even when drops finally
4  occurred, those drops took place weeks or months after a drop was appropriate. At
5  Campus 44 and 14 this was pervasive.

6  148.   MSB Education Department would also delay graduation dates for
7  some students so that they could extend the window of time for which MSB could
8  collect financial aid for them. The MSB Registrar at Campus 44, 23, and 14 would
9  change student graduation dates to make it appear as if it had taken
10  the student much longer to graduate than it actually did. In the meantime, MSB
11  would draw down additional financial aid for those students.

12  MSB financial aid employees also engaged in a variety of fraudulent practices that
13  resulted in students receiving more federal aid than they were entitled to receive.
14  For example, MSB employees, as directed by MSB management, including
15  Regional VP – Garo Ghazarian, and CEO:

16      a.   coached financial aid applicants to list themselves as
17           "independent" rather than "dependent" regarding income tax
18           status;
19      b.   counseled students to falsely list relatives' children as applicants'
20           dependents in order to increase applicants' eligibility
21           for financial aid;
22      c.   improperly retained applicants' FAFSA PIN numbers so that
23           MSB employees could edit and alter FAFSA applications; and
24      d.   encouraged fraudulent FAFSA submissions omitting applicants'
25           spouses' tax returns in order to increase the amount of available
26           federal student aid available for applicants.

27  149.   Management at MSB condoned and encouraged this fraudulent
28  conduct. For example, a Manager of Admissions at Campus 10 became aware that

- 45 -

an Admissions Representative, had, among other things, coached a student on how to appear to be an independent student for financial aid purposes (even though he should have been listed as a dependent student)

150.   Through its conduct above, MSB caused students to submit applications for federal financial aid that contained false statements, including false statements regarding the student's eligibility for federal aid and/or the student's financial situation. Those false statements were material to the Department of Education's decision to award federal aid to those students. MSB also falsely certified, in its PPAs and each time it drew down federal grant monies, that it was complying with federal regulations governing the eligibility and award of Title IV funding under the HEA. MSB false statements and fraudulent conduct resulted in MSB receiving federal aid that it would not otherwise have been entitled to receive but for its fraud.

## VIII.   THE SUBMISSION OF FALSE CLAIMS

151.   Every request for a federal grant or federally guaranteed loan made on behalf of a student  at least twenty (20) of MARINELLO SCHOOL OF BEAUTY campuses, including but not limited to the following campuses:  Plaza del Sol (01), San Bernardino (05), Reseda (06), Hemet (08), Las Vegas (11), Inglewood (12), San Diego (14), City of Industry (16), Moreno Valley (18), Palmdale (19), El Cajon (20), Ontario (22), Lomita (23), Whittier (25), San Mateo (28), San Francisco (29), Sacramento (31), Victorville (44), Murrieta (47), and Bell (48), schools constitutes a separate false claim. The following examples of student financial aid packages, each of which included a false secondary education credential in the student's file, illustrate MSB false claims:

152.   MSB student received a financial aid package consisting of

153.   Each of the grant awards listed and described above and each government repayment of loan interest or defaulted loan principal was caused by

MSB fraudulent maintenance of its state licensure, its false statements and promises in its PPAs that it would comply with applicable laws and regulations governing the award of federal financial aid, and/or the false representations in each grant and loan application that the student seeking federal government aid was eligible to receive Title IV funding under the HEA. MSB conduct was knowing and material to the Department of Education's willingness to award federal financial aid to MSB students. Each request for payment thus constitutes a false claim under the False Claims Act.

154.   The examples above are illustrative of the many false claims presented by, or caused to be presented by, MSB for federal financial assistance under Title IV of the HEA.

## IX.   CAUSES OF ACTION
### FIRST CAUSE OF ACTION
#### Violations of the False Claims Act: False or Fraudulent Claims
*(31 U.S.C. § 3729(a)(1)(A) (2009), formerly 31 U.S.C. § 3729(a)(l)(2006))*

155.   Plaintiffs reallege and incorporate by reference the allegations in Paragraphs 1-154 above as though fully set forth herein.

156.   MSB knowingly presented, or caused to be presented, to an officer or employee of the United States government, false or fraudulent claims for payment or approval, in violation of the False Claims Act, *31 U.S.C. § 3729(a)(1) (2009),* formerly *31 U.S.C. § 3729(a)(l)(2006)*, specifically, the claims for student loan and Pell Grant payments under the Title IV student financial assistance programs.

157.   Because of the Defendant's acts, the United States sustained damages in an amount to be determined at trial and, therefore, is entitled to treble damages under the False Claims Act, plus civil penalties of not less than $5,500 and up to $11,000 for each violation.

## SECOND CAUSE OF ACTION

### Violation of the False Claims Act: False Statements

*(31 U.S.C. § 3729(a)(1)(B) (2009), formerly 31 U.S.C. § 3729(a)(2)(2006))*

158.   Plaintiffs reallege and incorporate by reference the allegations in Paragraphs 1-157 above as though fully set forth herein.

159.   MSB knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim, and/or to get the United States to pay or approve false or fraudulent claims, in violation of the False Claims Act, *31 U.S.C. § 3729(a)(1)(B) (2009), formerly 31 U.S.C. § 3729(a)(2)(2006).*

160.   Because of the Defendant's acts, the United States sustained damages in an amount to be determined at trial and, therefore, is entitled to treble damages under the False Claims Act, plus civil penalties of not less than $5,500 and up to $11,000 for each violation.

## THIRD CAUSE OF ACTION

### Payment by Mistake

161.   Plaintiffs reallege and incorporate by reference the allegations in Paragraphs 1-160 above as though fully set forth herein.

162.   The allegations within this Complaint establish at a minimum, that the Department of Education paid Title IV funds to Marinello School of Beauty under the mistake that MSB was in fact eligible and properly certified as being in compliance with all federal and state requirements to make them eligible to receive Title IV, HEA program funds.

163.   By reason of these false certifications the United States mistakenly paid MSB all of the Title IV, HEA program funds that it received at all of its schools throughout the United States.

## FOURTH CAUSE OF ACTION

### Unjust Enrichment

164.   Plaintiffs reallege and incorporate by reference the allegations in

1   Paragraphs 1-163 above as though fully set forth herein.

2       165.   The allegation within this Complaint establish at a minimum that the

3   Department of Education paid Title IV funds to MSB which MSB was not entitled,

4   since it falsely certified it was in compliance with all state and federal requirements

5   when it was not.  MSB has therefore been unjustly enriched at the expense of the

6   United States.

7       166.   By reason of these false certifications and improper and inaccurate

8   claims and statement made to the United States, MSB has been unjustly enriched by

9   the amount of all of the Title IV, HEA program funds that it received at all of its

10  schools.

11

12             **X.**    **PRAYER FOR RELIEF**

13      Wherefore, Plaintiffs request the following relief as to all Causes of Action:

14      1.   Judgment in favor of the United States for an amount of damages,

15  trebled as required by law, pursuant to *31 U.S.C. § 3729(a)*, with civil penalties of

16  not less than $5,500 and up to $11,000 for each violation, plus such civil penalties

17  as are required by law, together with all such further relief as may be just and

18  proper;

19      2.   Award to Relators, as the Qui Tam plaintiffs, of the maximum amount

20  allowed pursuant to *31 U.S.C. § 3730 (d)* of the Federal False Claims Act on the

21  Unites States' recovery;

22      3.   Award to Relators of all reasonable expenses which the Court finds to

23  have been necessarily incurred, plus reasonable attorney's fees and costs;

24      4.   Award Punitive damages on all causes of action, to the extent

25  allowable by law;

26      5.   Award Compensatory damages as to all causes of action allowable by

27  law;

28

COMPLAINT – JURY TRIAL DEMANDED

6.     All prejudgment and post-judgment interest to which the United States is entitled to

7.     Such other relief as this Court may deem just and proper, together with interest and costs of this action.


THE RELATORS DEMAND A JURY TRIAL AS TO ALL ISSUES SO TRIALBLE


Dated:      July 18, 2013            SKAPIK LAW GROUP


                                By:   *Geralyn Skapik*
                                      GERALYN L. SKAPIK
                                      Attorneys for Relators/Plaintiffs.

- 50 -

COMPLAINT – JURY TRIAL DEMANDED

## JURY DEMAND

PLAINTIFFS hereby demand trial by jury.

Dated:        July 18, 2013                    SKAPIK LAW GROUP


                                        By:    _Geralyn Skapik_
                                               GERALYN L. SKAPIK
                                               Attorneys for Plaintiffs.

COMPLAINT – JURY TRIAL DEMANDED