MARK J. SKAPIK (SBN 164957)
mskapik@skapiklaw.com
GERALYN L. SKAPIK (SBN 145055)
gskapik@skapiklaw.com
ERIC MORRIS (SBN 243425)
eric.c.morris@gmail.com
JOHN D. GRAHAM (WSBA 44448) – of counsel
jgraham@skapiklaw.com
**SKAPIK LAW GROUP**
5861 Pine Avenue, Suite A-1
Chino Hills, CA  91709-6540
(909) 398-4404 | Fax: (909) 398-1883

NIALL P. McCARTHY (SBN 160175)
nmccarthy@cpmlegal.com
JUSTIN T. BERGER (SBN 250346)
jberger@cpmlegal.com
**COTCHETT, PITRE & McCARTHY, LLP**
San Francisco Airport Office Center
840 Malcolm Road
Burlingame, California  94010
Tel: (650) 697-6000 | Fax: (650) 692-3606

*Attorneys for Relators*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **UNITED STATES OF AMERICA**, *ex rel.* **TERISA MERCER CARON, VERONICA TREJO, PAIGE STEVENS, HEATHER LUEDTKE, TAMECA SHELTON**, and **CINDY JUAREZ**, individuals<br><br>Plaintiffs,<br><br>v.<br><br>**B&H EDUCATION, INC.**, a Delaware Corporation, d/b/a MARINELLO SCHOOL OF BEAUTY; **B&H EDUCATION HOLDINGS, L.L.C.**, a Delaware Limited Liability Company; **DR. R. RASHED ELYAS**, an individual; | Case No.  CV-13-5256-RGK(AJWx)<br><br>**FIRST AMENDED COMPLAINT**<br><br><u>JURY REQUESTED</u> |

1    **DR. NAGUI ELYAS**, an individual;
     **MICHAEL BENVENUTI, COO**, an
2    individual; **MICHAEL FLECKER,**
     **CFO**, an individual; **ABRY PARTNERS**
3    **VI, L.P.**, an unknown entity; **ABRY**
     **INVESTMENT PARTNERSHIP, L.P.**,
4    an unknown entity; **ABRY SENIOR**
     **EQUITY II, L.P.**,  an unknown entity;
5    **UNITED BEAUTY ENTERPRISES,**
     **INC.**, a California Corporation; and
6    **SCOPE BEAUTY ENTERPRISES,**
     **INC.**, a California Corporation,
7
             Defendants.
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FIRST AMENDED COMPLAINT – JURY TRIAL DEMANDED**;
Case No. CV-13-05256-RGK (AJWx)

## TABLE OF CONTENTS

I.     INTRODUCTION.................................................................................1

II.    OVERVIEW OF THE SCHEME ........................................................2

III.   JURISDICTION AND VENUE..........................................................3

IV.    PARTIES ...............................................................................................4

    A.    Relator Plaintiffs .........................................................................4

    B.    Defendants....................................................................................5

V.     STATUTORY BACKGROUND .........................................................9

    A.    The Federal False Claims Act .....................................................9

    B.    Programs under Title IV of the Higher Education Act of 1965.............11

    C.    Claims for Payment under Title IV Programs .........................................13

    D.    Defendants' Participation in Title IV HEA Programs ............................17

VI.    DEFENDANTS' FRAUDULENT SCHEMES....................................20

    A.    Defendants Made Material Misrepresentations to the DOE by Falsifying Student Attendance Records.................................................20

    B.    Defendants Concealed Their Lack of Compliance With the "90/10" Requirement. ................................................................................24

    C.    Defendants Falsified Entrance Exams, GEDs, high school diploma, and/or Ability To Benefit (ATB) tests. ...........................................26

    D.    Defendant Falsified, Forged, and or Altered Grades and Student Academic Progress Reports. .......................................................30

    E.    Defendants Falsified Placement Statistics. .............................................31

    F.    Defendants Manipulated Federal Financial Aid Default Statistics.........35

VII.   THE SUBMISSION OF FALSE CLAIMS .....................................35

VIII.  CAUSES OF ACTION .....................................................................36

IX.    PRAYER FOR RELIEF.....................................................................39

X.     DEMAND FOR JURY TRIAL..........................................................41

## I.    INTRODUCTION

1.    This complaint is brought by Relators Terisa Mercer Caron, Veronica Trejo, Paige Stevens, Heather Luedtke, Tameca Shelton, and Cindy Juarez (collectively "Relators") under the False Claims Act, 31 U.S.C. §§ 3729 *et seq*., on behalf of the United States of America, to stop rampant fraud at a chain of for-profit beauty schools that has led to a vast waste of taxpayer money.

2.    The Higher Education Act of 1965 ("HEA"), including Title IV, was signed into law by then President Lyndon Johnson.  The law was intended "to strengthen the educational resources of our colleges and universities and to provide financial assistance for students in postsecondary and higher education."[1] Unfortunately, the Title IV program has since been the subject of excessive fraud, waste, and abuse by unscrupulous corporations who have put ill-gotten profits above the public good.

3.    Today, a new industry has emerged, the "Title IV business venture" with "for profit" or "proprietary" schools beholden to their shareholders and owners, instead of the student or American taxpayer, the intended beneficiaries.[2] Relators bring this matter to **stop** the rampant Title IV fraud and waste being perpetrated by Defendants.

4.    This complaint involves violations of the False Claims Act by B&H EDUCATION, INC., a Delaware Corporation, d/b/a MARINELLO SCHOOL OF BEAUTY (hereinafter "MSB"); B&H EDUCATION HOLDINGS, L.L.C., a Delaware Limited Liability Company; DR. R. RASHAD ELYAS, Dr. NAGUI ELYAS, MIKE BENVENUTI, COO, MICHAEL FLECKER, CFO; (collectively "Defendants"). The individual executives and or company owners are named

---

[1] Legislation: *The Higher Education Act of 1965 (Pub. L. No. 89-329)*.
[2] *See* Gayland O. Hethcoat II, *For Profits Under Fire: The False Claims Act As A Regulatory Check On The For Profit Education Sector,* November 4, 2011, Loyola Consumer Law Review.

**FIRST AMENDED COMPLAINT – JURY TRIAL DEMANDED**;
Case No. CV-13-05256-RGK (AJWx)

1

herein, since Relators have specific evidence identifying their illegal acts in this matter.[3]

## II.   OVERVIEW OF THE SCHEME

5.     Defendants own and operate approximately sixty seven (67) for-profit, proprietary schools, primarily in California, with several schools in Oregon, Nevada, and Utah.  The vast majority of MSB's revenue is derived *directly* from federal student aid programs.

6.     Defendants have knowingly and materially engaged in a comprehensive, nationwide scheme designed to defraud the United States through false claims, false statements, and false records.  Defendants, through their desire to maximize profits, regardless of legality or student eligibility, have conspired, concealed, obstructed, manipulated, lied, and/or altered student information, records, actual reporting data, accounting, statistics, audits, and material documents in order to over-award and draw down the *maximum* amount of Title IV funds for ineligible and/or non-existent students.  This pervasive scheme was for the purpose of maintaining Defendants' eligibility for Federal Student Aid programs so to continue to reap profits from the Government and students.

7.     Among other schemes, Defendants engaged in the following:

- Falsification and manipulation of the "90/10" rule:  The 90/10 rule is a requirement whereby the Department of Education ("DOE") mandates that at least 10% of a campus' funding come from sources *other than* Federal Student Aid.  Defendants have engaged in multiple schemes to conceal their lack of compliance with the 90/10 rule.

---

[3] Senior members of MSB directed efforts to keep ineligible students on the attendance rosters, falsifying clock-hour time reports, directing and encouraging fraudulent activity, obstructing DOE audits, concealment of Student Academic Reports, "cleaning up" school records prior to an audit, and paying cash bonuses and gifts in return for keeping ineligible students on Title IV assistance.

**FIRST AMENDED COMPLAINT – JURY TRIAL DEMANDED**;
Case No. CV-13-05256-RGK (AJWx)

- Falsification of graduation and career placement data.
- Manipulation of student attendance records to ensure continued draw-downs of federal student loans.
- Manipulation and falsification of student entrance exams and/or ability-to-benefit ("ATB") tests. Manipulation and alteration of High School Completion Programs ("HSCP") and tampering with GED testing at Parkridge Private School, a pre-arranged feeder testing center, located in Long Beach, CA.
- Falsification and manipulation of Student Academic Reports ("SAP") and/or student grades.

8.     As a result of these schemes, Defendants have bilked taxpayers out of **tens of millions of dollars in federal student loans**. This amount does not include civil penalties and treble damages required under the False Claims Act. Plaintiffs and Relators bring this qui tam action on behalf of the United States of America against Defendants to recover damages and civil penalties, under the False Claims Act, 31 U.S.C. §§ 3729-33.

## III.   JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction over the United States' claims brought under the False Claims Act, 31 U.S.C. §§ 3279, *et seq.,* pursuant to 31 U.S.C. §§ 3730 and 3732.

10.     This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because Defendants transact business and are found in this district, and acts proscribed by 31 U.S.C. § 3729 occurred in this district.

11.     Venue is proper in this district pursuant to 31 U.S.C. § 3732(a), and under 28 U.S.C. §§ 1391(b) and 1395(a), because Defendants are California corporations and own and operate traditional campuses within this district.

Furthermore, certain of the acts that form the basis of this Complaint occurred in this district.

## IV.   PARTIES

### A.   Relator Plaintiffs

12.   This is a *qui tam* action brought pursuant to the False Claims Act by the various Relators on behalf of the United States, and Department of Education.

13.   Relator Terisa Mercer Caron ("Caron") is a citizen of the United States of America, and is a resident of San Bernardino County, in the State of California. She is an "original source" of this information within the meaning of 31 U.S.C. § 3730(e)(4)(B), but states that, to her knowledge, the information contained herein concerning Defendants' alleged False Claims Act violations has not been publicly disclosed.  Caron worked for Defendants, as a Campus Director of their Moreno Valley and Huntington Beach Campuses from March 2008 to June 2012.

14.   Relator Veronica Trejo ("Trejo") is a citizen of the United States of America, and is a resident of Riverside County, in the State of California.  She is an "original source" of this information within the meaning of 31 U.S.C. § 3730(e)(4)(B), but states that, to her knowledge, the information contained herein concerning Defendants' alleged False Claims Act violations has not been publicly disclosed.  Trejo was employed by Defendants as their Financial Aid Officer for the Moreno Valley campus from 2008 through July 2012.

15.   Relator Paige Stevens ("Stevens") is a citizen of the United States of America, and is a resident of San Bernardino County, in the State of California. She is an "original source" of this information within the meaning of 31 U.S.C. § 3730(e)(4)(B), but states that, to her knowledge, the information contained herein concerning Defendants' alleged False Claims Act violations has not been publicly disclosed.  Stevens was employed by Defendants as a Cosmetology Instructor in their Victorville campus, from May 2011 through September 2013.

16.     Relator Heather Luedtke ("Luedtke") is a citizen of the United States of America, and is a resident of Riverside County, in the State of California. She is an "original source" of this information within the meaning of 31 U.S.C. § 3730(e)(4)(B), but states that, to her knowledge, the information contained herein concerning Defendants' alleged False Claims Act violations has not been publicly disclosed.  Luedtke was employed by Defendants in their Moreno Valley campus as a Career Services Manager from April 2012 through June 2012.

17.     Relator Tameca Shelton ("Shelton") is a citizen of the United States of America, and is a resident of San Bernardino County, in the State of California. She is an "original source" of this information within the meaning of 31 U.S.C. § 3730(e)(4)(B), but states that, to her knowledge, the information contained herein concerning Defendants' alleged False Claims Act violations has not been publicly disclosed.  Shelton was employed by Defendants in their Victorville campus as an Instructor from January 2011 through February 2012.

18.     Relator Cindy Juarez ("Juarez") is a citizen of the United States of America, and is a resident of Riverside County, in the State of California.  She is an "original source" of this information within the meaning of 31 U.S.C. § 3730(e)(4)(B), but states that, to her knowledge, the information contained herein concerning Defendants' alleged False Claims Act violations has not been publicly disclosed.  She was employed by Defendants as a Registrar and Financial Aid Officer for their Hemet campus between July 2009 and August 2012.

**B.     Defendants**

19.     MARINELLO SCHOOL OF BEAUTY ("MSB") is a privately owned, for-profit post-secondary school, named after the founder of Modern Cosmetology, Giovanni Marinello.  B&H EDUCATION INC. acquired MSB in 2004.  MSB has since grown to approximately sixty-seven (67) campuses in seven states.  The school is nationally accredited by the National Accrediting Commission of Career

Arts and Sciences ("NACCAS").

20.     MSB is required to provide Clock Hour Programs and offers the following programs recognized by the State Board of Barbering and Cosmetology: Cosmetology (1600 Clock Hours), Manicurist (400 Clock Hours), Esthetician (600 Clock Hours), Advanced Facial & Body Treatments (600 Clock Hours), Clinical Esthetician (900 Clock Hours), Master Spa Therapist (1200 Clock Hours), Teacher Training (600 Clock Hours).  MSB also offered "advanced workshops," which are eligible for federal funding because they require at least 600 hours and provide already licensed professionals in the industry with certificates of advanced training. These "advanced workshops" include:  Massage Therapy (720 Clock Hours), Massage Therapy (600 Clock Hours), CIDESCO (1500 Clock Hours), Barbering (1500 Clock Hours), Professional Makeup Artistry (720 Clock Hours), Make-Up Artist – Bridal (100 Clock Hours), and Make-Up Artist Media (100 Clock Hours).

21.     MSB is approved to operate in California by the Bureau for Private Postsecondary Education ("BPPE").  The California Board of Barbering and Cosmetology ("BBC") sets minimum standards for MSB and issues licenses to graduates upon passing the Board of Barbering and Cosmetology licensing examinations.  Accordingly to the MSB 2011-2012 Catalog, "All Marinello students who successfully complete a course of study will be awarded an appropriate diploma," or certificate.  In order for a graduate of MSB to ultimately receive his or her license from the BBC, MSB must provide a Proof of Training ("POT") certificate to the State in favor of the student.

22.     During the relevant time period, MSB had a corporate office and team located in Whittier and Beverly Hills, California that was responsible for the overall management of MSB and its various campuses.  The Vice Presidents of Operations were responsible for setting overall corporate goals and strategies, and overseeing the operations at each of MSB's campuses.  MSB campuses were managed at the individual level by a School Director, as well as regional managers of admissions,

**FIRST AMENDED COMPLAINT – JURY TRIAL DEMANDED**;
Case No. CV-13-05256-RGK (AJWx)

6

registrars, career services, and financial aid, among others.  Each campus also had a number of other employees who focused on running the operations of the specific campuses, including Admissions Representatives and Career Services, Clinic Sales, Faculty, among other employees.

23.   PLAINTIFFS are informed and believe and on that basis allege that, at all relevant times, B&H EDUCATION, INC., d/b/a MARINELLO SCHOOL OF BEAUTY was, and is:

    a.   A corporation, partnership, association, joint venture or other fictitious entity;

    b.   Doing business as, and also known as, MARINELLO SCHOOL OF BEAUTY; and

    c.   Doing business and otherwise present in the County of Los Angeles, State of California, and this Judicial District.

24.   PLAINTIFFS are informed and believe and on that basis allege that, at all relevant times, B&H EDUCATION HOLDINGS, L.L.C., d/b/a MARINELLO SCHOOL OF BEAUTY was, and is:

    a.   A corporation, partnership, association, joint venture or other fictitious entity;

    b.   Doing business as, and also known as, MARINELLO SCHOOL OF BEAUTY; and

    c.   Doing business and otherwise present in the County of Los Angeles, State of California, and this Judicial District.

25.   PLAINTIFFS are informed and believe and on that basis allege that, at all relevant times, ABRY PARTNERS VI, L.P was, and is:

    a.   A corporation, partnership, association, joint venture or other fictitious entity;

    b.   Doing business as, and also known as, MARINELLO SCHOOL OF BEAUTY; and

c.    Doing business and otherwise present in the County of Los Angeles, State of California, and this Judicial District.

26.    PLAINTIFFS are informed and believe and on that basis allege that, at all relevant times, ABRY INVESTMENT PARTNERSHIP, L.P.; was, and is:

a.    A corporation, partnership, association, joint venture or other fictitious entity;

b.    Doing business as, and also known as, MARINELLO SCHOOL OF BEAUTY; and

c.    Doing business and otherwise present in the County of Los Angeles, State of California, and this Judicial District.

27.    PLAINTIFFS are informed and believe and on that basis allege that, at all relevant times, ABRY SENIOR EQUITY II, L.P. was, and is:

a.    A corporation, partnership, association, joint venture or other fictitious entity;

b.    Doing business as, and also known as, MARINELLO SCHOOL OF BEAUTY; and

c.    Doing business and otherwise present in the County of Los Angeles, State of California, and this Judicial District.

28.    PLAINTIFFS are informed and believe and on that basis allege that, at all relevant times, UNITED BEAUTY ENTERPRISES, INC., was, and is:

a.    A corporation, partnership, association, joint venture or other fictitious entity;

b.    Doing business as, and also known as, MARINELLO SCHOOL OF BEAUTY; and

c.    Doing business and otherwise present in the County of Los Angeles, State of California, and this Judicial District.

29.    PLAINTIFFS are informed and believe and on that basis allege that, at all relevant times, SCOPE BEAUTY ENTERPRISES, INC.; was, and is:

a.   A corporation, partnership, association, joint venture or other fictitious entity;

b.   Doing business as, and also known as, MARINELLO SCHOOL OF BEAUTY; and

c.   Doing business and otherwise present in the County of Los Angeles, State of California, and this Judicial District.

30.   PLAINTIFFS are informed and believe and on that basis allege that, at all relevant times Dr. R. RASHED ELYAS, was the Chief Executive Officer of B&H EDUCATION, INC., d/b/a MARINELLO SCHOOL OF BEAUTY.

31.   PLAINTIFFS are informed and believe and on that basis allege that, at all relevant times Dr. NAGUI ELYAS was the President and Chief Operating Officer of B&H EDUCATION, INC., d/b/a MARINELLO SCHOOL OF BEAUTY.

32.   PLAINTIFFS are informed and believe and on that basis allege that, at all relevant times MICHAEL BENVENUTI, was the Chief Operating Officer of MARINELLO SCHOOL OF BEAUTY.

33.   PLAINTIFFS are informed and believe and on that basis allege that, at all relevant times MICHAEL FLECKER, was the Chief Financial Officer of MARINELLO SCHOOL OF BEAUTY.

34.   PLAINTIFFS are informed and believe and on that basis allege that, at all relevant times, each of the DEFENDANTS, in the alternative, participated in, directed, authorized, ratified, controlled, aided and abetted, and/or otherwise caused or contributed to the acts and omissions of the other DEFENDANTS herein alleged and PLAINTIFFS' damages as herein alleged.

## V.   STATUTORY BACKGROUND

### A.   The Federal False Claims Act

35.   The Federal False Claims Act ("FCA"), as amended by the Fraud Enforcement and Recovery Act of 2009 ("FERA"), Pub. L. 111-21, § 4(f), 123 Stat.

1617, 1625 (2009), provides in pertinent part that a person is liable to the United States government for three times the amount of damages the government sustains because of the act of that person, plus a civil penalty, for each instance in which the person "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."  31 U.S.C. § 3729(a)(1)(A) (2009).

36.    The FCA defines the term "claim" to mean "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be drawn down or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (i) provides or has provided any portion of the money or property requested or demanded; or (ii) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2)(A) (2009).

37.    As amended by FERA, the FCA also makes a person liable to the United States government for three times the amount of damages which the government sustains because of the act of that person, plus a civil penalty, for each instance in which the person "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B) (2009).

38.    The FCA defines the terms "knowing" and "knowingly" to mean that a person, with respect to information: (1) "has actual knowledge of the information;" (2) "acts in deliberate ignorance of the truth or falsity of the information;" or (3) "acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A) (2009). The FCA further provides that "no proof of specific intent to defraud" is required. 31 U.S.C. § 3729(b) (2006); 31 U.S.C. § 3729(b)(1)(B) (2009).

39.     On behalf of the United States of America, Relators allege that, from at least 2007 through the present, Defendants violated the FCA by "knowingly" submitting and/or causing the submission of false claims for payment to the Department of Education in the form of Free Applications for Federal Student Aid ("FAFSA") and the resulting drawdowns of Title IV funds related to each approved FAFSA.  These claims for payment were false because Defendants:  (1) fraudulently maintained state licensure (and, in turn, eligibility to receive Title IV funding) by making false statements and misrepresentations to the State and DOE about some or all of its (i) completion rates, (ii) placement rates, and (iii) licensure rates, among other things; (2) made knowingly false statements and promises in MSB's PPAs, and in certifications accompanying its drawdowns of federal aid, that it was complying with, and would continue to comply with, applicable laws and regulations governing the award of Title IV funding; and/or (3) made, or caused to be made, false representations in grant and loan applications that the students seeking federal financial aid were eligible to receive such aid.

## B.     Programs under Title IV of the Higher Education Act of 1965

40.     Under Title IV of the Higher Education Act of 1965, 20 U.S.C. §§ 1070 *et seq.* ("HEA"), Congress established various student loan and grant programs, including but not limited to, the Federal Pell Grant Program ("Pell"), the Federal Family Education Loan Program ("FFELP"), and the Federal Direct Loan Program ("FDLP") in order to financially assist eligible students in obtaining a post-secondary education.

### 1.     Federal Regulations Governing Title IV Funding

41.     There are a variety of federal statutes and regulations that govern the award of Title IV, HEA program funds. First, only "eligible" students are permitted to receive federal financial aid under Title IV of the HEA. In order to qualify as an eligible student, a student must meet the requirements of 34 C.F.R. § 668.32. Among other things, the student must be enrolled or accepted for enrollment in an

eligible program at an eligible institution; must have a high school diploma or its recognized equivalent, unless an enumerated exception applies (such as, during the relevant time period, having "obtained a passing score specified by the Secretary on an independently administered test"); and must be maintaining satisfactory academic progress in his or her course of study according to the school's published standards, and in accordance with federal guidelines.  34 C.F.R. §§ 668.32, 668.34.

42.    An institution may only retain Title IV funds that it earns.  When a student withdraws without completing a program of instruction, an institution must calculate the amount of Title IV funds that it can retain and refund to the Department of Education and the student any excess funds that it has not earned. 34 C.F.R. § 668.22.

43.    Institutions wishing to participate in Title IV, HEA programs also must comply with other federal requirements. A school must be accredited and be licensed to operate in each state in which it is doing business in order to be eligible to receive Title IV funding.  20 U.S.C. § 1001; 34 C.F.R. § 600.5(a)(4), (6).

44.    Federal regulations also prohibit institutions from making substantial misrepresentations to prospective applicants about, among other things, the nature of the institution's educational programs or the employability of its graduates.  34 C.F.R. § 668(f).  During the relevant time period, a misrepresentation consisted of "any false, erroneous or misleading statement" that an institution made to a student or prospective student, and a substantial misrepresentation consisted of "any misrepresentation on which the person to whom it was made could reasonably be expected to rely, or has reasonably relied, to that person's detriment."  34 C.F.R. § 668.71 (2007-2010).

45.    Misrepresentations that are explicitly prohibited by state and federal regulation include, among other things, misrepresentations regarding the employability of an eligible institution's graduates, 34 C.F.R. § 668.74, and misrepresentations concerning "the nature of an institution's financial charges," 34

**FIRST AMENDED COMPLAINT – JURY TRIAL DEMANDED**;
Case No. CV-13-05256-RGK (AJWx)

12

C.F.R. § 668.72.

46.     The Department of Education has the authority to revoke or terminate an institution's PPA if it is found to have engaged in substantial misrepresentation. 34 C.F.R. §§ 668.13(d); 668.86(a)(l)(ii)(A).

### 2.     Program Participation Agreements

47.     All post-secondary educational institutions must enter into a Program Participation Agreement ("PPA") with the Department of Education in order to become eligible to receive payment of Title IV funds under programs such as Pell, FFELP, or FDLP, or for students to receive Title IV funding. 20 U.S.C. § 1094; 34 C.F.R. § 668.14.

48.     "A program participation agreement conditions the initial and continued participation of an eligible institution in any Title IV, HEA program upon compliance with the provisions of this part, the individual program regulations, and any additional conditions specified in the program participation agreement that the Secretary requires the institution to meet."  34 C.F.R. § 668.14(a)(1).

49.     By signing a PPA, an educational institution agrees that its participation in Title IV, HEA programs, including receiving payment of Title IV funds, is "subject to the terms and conditions set forth in [the PPA]."

50.     Each PPA expressly conditions a school's initial and continuing eligibility to receive payment under Title IV, HEA programs on compliance with specific statutory requirements that include the proper determination of student eligibility for these funds, and compliance with all institutional eligibility requirements, such as those set forth in paragraphs 41 through 47 above.

### C.     Claims for Payment under Title IV Programs

51.     After a school becomes eligible to receive Title IV funding by entering into a PPA, claims for payment of those funds can be made in various ways.  Under Pell and FDLP, for example, students submit requests for funding directly to the

**FIRST AMENDED COMPLAINT – JURY TRIAL DEMANDED**;
Case No. CV-13-05256-RGK (AJWx)                                    13

Department of Education, or to the Department of Education with the assistance of schools.  Under the FFELP, students and schools jointly submit requests to private lenders for loans that are then guaranteed by state agencies and are, in turn, insured by the Department of Education and paid in the event of a default.

52.     With respect to all Title IV, HEA programs, the disbursement of federal funds rests on required statements of eligibility.  Schools must make such statements for payment requests to be considered.

53.     For all Title IV, HEA programs, students who are interested in receiving federal student aid must complete a FAFSA.

### 1.     *Title IV Grant Programs*

54.     Under the Pell Grant program, which provides federal funds to assist post-secondary school students in financial need, 20 U.S.C. § 1070a; 34 C.F.R. § 690.1, the student initiates the process by submitting a FAFSA to the Department of Education to have his/her expected family contribution ("EFC") calculated in order to receive an accurate amount of Pell funds.  34 C.F.R. § 690.12(a).  The student either sends the FAFSA directly to the Department of Education or provides it to a school for the school to transmit to the Department of Education on the student's behalf.  34 C.F.R. § 690.12(b).

55.     The Department of Education sends the student's application information and EFC to the student on a Student Aid Report ("SAR") and sends each school the student has designated an Institutional Student Information Record ("ISIR") for that student. 34 C.F.R. §690.13.

56.     The school uses the above-described information, including the EFC, to calculate the student's eligibility for all aid and to assemble a "financial aid award package" for the student borrower.  The financial aid package may include Pell Grants, FDLP Direct Loans, or Campus-Based Aid (which, in turn, includes Federal Supplemental Educational Opportunity Grants, Federal Work-Study, and Federal Perkins Loans), as well as other scholarships or aid for

**FIRST AMENDED COMPLAINT – JURY TRIAL DEMANDED**;
Case No. CV-13-05256-RGK (AJWx)

14

which the student may be eligible.

57. The student can accept all or part of the financial aid award package.

58. If the student accepts a Pell Grant, an FDLP Direct Loan (for which the Department of Education is both lender and guarantor), or both a Pell Grant and a Direct Loan, the school creates an electronic "origination" record that the school submits to a Department of Education computerized database called "COD," the Common Origination and Disbursement system. The origination record includes student demographic data, the award or payment period, the award amount, and disbursement dates and amounts. The COD database, in turn, links the information in the origination record to another Department of Education database, called "CPS," the Central Processing System, which compares the information in the origination record to the information on the student's SAR and ISIR.

59. Provided that the information submitted by the school is consistent with the information possessed by the Department of Education, the Department of Education makes funds available for the school to electronically draw down from a computerized system known as "G5."

60. Schools must electronically certify in G5 prior to drawing down the funds that "by processing this payment request...the funds are being expended within three business days of receipt for the purpose and condition[s] of the [Program Participation] agreement."

61. In addition to the Pell Grants themselves, the Department of Education also pays to the school an annual administrative cost allowance of $5.00 for each student who receives a Pell Grant, to be used to pay the costs of administering the Pell Grant and other Title IV, HEA federal student aid programs. 20 U.S.C. § 1096; 34 C.F.R. § 690.10.

### 2. *Title IV Loan Programs*

62. Under the FFELP, which includes subsidized and un-subsidized Stafford Loans, a guaranty agency makes the eventual claim for payment by the

**FIRST AMENDED COMPLAINT – JURY TRIAL DEMANDED**;
Case No. CV-13-05256-RGK (AJWx)

15

United States.  No new loans were made under FFELP after July 1, 2010.  Prior to that date, the school and student submitted an application to a private lender for a loan on behalf of the student.  If a student defaults in repaying a loan under the FFELP program, a state or private guaranty agency reimburses the lender or subsequent holder of the loan for the outstanding balance and takes assignment of the loan for collection action.  34 C.F.R. § 682.401(b)(14).  If the guaranty agency is unable to collect from the borrower, the Department of Education reimburses the guaranty agency for the loss it incurred in honoring the defaulted claims, 230 U.S.C. § 1078(c)(1)(A), and the Department of Education may, in its discretion, take assignment of the loan.  20 U.S.C. § 1078(c)(8).  In this way, the government is ultimately called upon to satisfy claims for payment.

63.     In order to participate in the FFELP or any other Title IV loan program, as opposed to a grant program, a student completes a Master Promissory Note ("MPN") and submits the MPN to the educational institution.  The institution, in turn, completes a "School Certification," in which it certifies the accuracy of the information it provided to the Department of Education and the student's eligibility for the loan.  34 C.F.R. § 682.102.  While the MPN itself is valid for ten years, the educational institution determines the student's ongoing eligibility for aid and completes the School Certification annually.

64.     Under the FFELP, the educational institution submits the MPN to the lender.  Upon approval by the lender, the lender obtains a loan guarantee from a guarantee agency.  34 C.F.R. § 682.102.  The loan is made in reliance upon the accuracy of the information provided by the educational institution.

65.     The lender transfers the FFELP funds directly into the educational institution's account.  Upon receiving the FFELP funds, the educational institution credits a student's account for education-related expenses, such as tuition, fees, books, and supplies.

**FIRST AMENDED COMPLAINT – JURY TRIAL DEMANDED**;
Case No. CV-13-05256-RGK (AJWx)

16

66.     For subsidized Stafford Loans, the government pays the interest on the student's behalf during the time the student is enrolled in school on at least a half-time basis, and during the student's grace period before repayment commences.  34 C.F.R. § 682.102(d)(2).

67.     In the event of default on the loan, the DOE pays to the guarantee agency all or part of the unpaid principal and accrued interest, as well as a variety of administrative costs.  34 C.F.R. § 682.404.

**D.     Defendants' Participation in Title IV HEA Programs**

68.     MARINELLO SCHOOL OF BEAUTY signs and submits PPAs to the Department of Education on behalf of all of Defendants' educational institutions throughout the United States.  Defendants have executed PPAs for approximately sixty-seven of its campuses.  For example, one of the MSB PPAs in effect from 2008 to the present, listed the following information:

| | |
|---|---|
| Effective date of Approval: | April 30, 2008 |
| **Signed by R. Rashed Elyas, CEO** | April 29, 2008 |
| Approval Expiration Date: | December 31, 2013 |
| Reapplication Date: | September 30, 2013 |
| Name of Institution: | Marinello School Of Beauty |
| Address of Institution: | 24741 Alessandro Boulevard |
| | Moreno Valley, CA. 92553-3941 |
| OPE ID Number: | 02221300 |
| DUNS Number: | 792317778 |
| Taxpayer ID Number: | 562419687 |

69.     The PPAs signed by MSB state that "[t]he execution of this Agreement by the Institution and the Secretary is a prerequisite to the Institution's initial or continued participation in any Title IV, HEA Program."

70.     By signing the PPAs, MARINELLO SCHOOL OF BEAUTY certified that it would comply with Title IV of the HEA's requirements.  All of the PPAs signed by Defendants state:  "[t]he Institution understands and agrees that it is subject to and will comply with the program statutes and implementing regulations for institutional eligibility as set forth in 34 CFR Part 600 and for each Title IV, HEA program in which it participates, as well as the general provisions set forth in Part F and Part G of Title IV of the HEA, and the Student Assistance General Provisions regulations set forth in 34 C.F.R. Part 668."

71.     MARINELLO SCHOOL OF BEAUTY also certified in each PPA that "[i]t will comply with all statutory provisions of or applicable to Title IV of the HEA, all applicable regulatory provisions prescribed under that statutory authority, and all applicable special arrangements, agreements, and limitations entered into under the authority of statutes applicable to Title IV of the HEA."

72.     Defendants also agreed in the PPAs to meet all state licensure and accreditation requirements:  "[MSB] will meet the requirements established pursuant to Part H of Title IV of the HEA by the Secretary, State [authorizing bodies], and nationally recognized accrediting agencies."

73.     Each of the PPAs signed by MARINELLO SCHOOL OF BEAUTY further state:  "In the case of an institution that advertises job placement rates as a means of attracting students to enroll in the institution, it will make available to prospective students, at or before the time that those students apply for enrollment:

(i)     The most recent available data concerning employment statistics, graduation statistics, and any other information necessary to substantiate the truthfulness of the advertisements; and

(ii)    Relevant state licensing requirements of the State in which the institution is located for any job for which an educational program offered by the institution is designed

**FIRST AMENDED COMPLAINT – JURY TRIAL DEMANDED**;
Case No. CV-13-05256-RGK (AJWx)                                              18

to prepare those prospective students."

74.     All of the PPAs during the relevant periods identified above were signed by MARINELLO SCHOOL OF BEAUTY Chief Executive Officer, Dr. R. RASHED ELYAS, Dr. NAGUI ELYAS, Chief Operating Officer MIKE BENVENUTI, and/or Chief Financial Officer MICHEAL FLECKER, all senior officers of MARINELLO SCHOOL OF BEAUTY.

75.     As described in greater detail below, MARINELLO SCHOOL OF BEAUTY knowingly made false statements, certifications, and claims regarding its compliance with Department of Education regulations and the terms of its PPAs. Beginning in at least 2007, MARINELLO SCHOOL OF BEAUTY was fraudulently maintaining its licensure with California (and, hence, its eligibility to participate in Title IV programs) by, among other things, fabricating placement rates.  Defendants were also violating federal regulations by repeatedly lying to students about, among other things, the opportunities they would have as MSB graduates to induce them to enroll at MARINELLO SCHOOL OF BEAUTY.  In order to secure greater federal funding, MSB also enrolled and maintained enrollment for students who were not eligible, and then concealed their ineligibility by fabricating documents.

76.     MARINELLO SCHOOL OF BEAUTY nevertheless executed the PPAs and agreed that it would comply with applicable federal regulations and the terms of the PPAs. Defendants then drew down federal grant funds and again stated that the funds were being used in accordance with the conditions of the PPAs. Defendants' statements were false when made, and caused the Department of Education to pay various claims under Title IV, HEA programs that it would not have paid but for Defendants fraud.

77.     MARINELLO SCHOOL OF BEAUTY has received tens of millions of dollars in Title IV funding from the Department of Education as a result of its fraudulent conduct.

## VI.   DEFENDANTS' FRAUDULENT SCHEMES

### A.   Defendants Made Material Misrepresentations to the DOE by Falsifying Student Attendance Records.

78.     Under the HEA, if a student has not attended a class within any fourteen-day period, then the student is considered "withdrawn," and cannot continue to earn federal student loans and grants.  34 C.F.R. § 668.22(b)(1), (1)(3). This is commonly known as the "14-day rule," and any violation thereof requires a school to return all unearned federal funds to the DOE.  Information for Financial Aid Professionals, *Volume 5: Withdrawals and the Return of Title IV Funds*, FEDERAL STUDENT AID HANDBOOK, at 5-19 – 5-22 (2013), *available at* https://ifap.ed.gov.fsahandbook/attachments/1314FSAHbkVol5MASTER.pdf; 34 C.F.R. § 668.164(e).

79.     In order to avoid having to return federal student loan and grant money to the government based on the 14-day rule, Defendants routinely falsified student attendance records.  Specifically, when a student hit fourteen days of consecutive absence, Defendants entered a false record of attendance for day fourteen; often just adding one hour of fake attendance.  Defendants thereby falsely evaded their obligation to return federal funds to the DOE.

80.     For example, at Defendants' Hemet campus, attendance records were routinely manipulated on weekly lists of students approaching fourteen (14) days of absence.  The manipulation was done at the direction of Regional Director Colleen Meyer, who indicated that the directive was coming from Dr. Garo Ghazarian, Campus Director and Regional Vice President of Operations.

81.     The same attendance manipulation occurred at Defendants' San Diego campus.  In fact, Defendants' own internal audit of its San Diego campus demonstrates a pattern and culture of manipulation and cover up of falsified attendance records.

82.     Specifically, in October 2012, Dr. Nader Timsah, Vice President of Student Services/Internal Audit for MSB, conducted an audit of the attendance records of all active students of the San Diego campus.  The results were dramatic.  The audit identified thirty students whose attendance records in MSB's system ("the RGM") were not accurate.  Dr. Timsah summarized his initial findings in an October 19, 2012 e-mail sent to Dr. Ghazarian, MIKE BENVENUTI, and DR. NAGUI ELYAS.  In that e-mail, Dr. Timsah indicated that "there are around 30 students with attendance hours not matching RGM."  RGM is the internal system used to maintain students' files, including attendance records.  Another audit document describes in detail eleven students whose attendance was manipulated to avoid the 14-day rule.  For example, with respect to the first student on the list, R.P., the audit indicates a "manual entry for 1 hour," on her fourteenth day of absence, "[w]hile the class roster shows student as absent."  The audit concludes: "student should have been dropped."  The same pattern holds true for all eleven students detailed on the list.[4]

83.     Another e-mail from the same time period – October 15, 2012 – indicates that the same problem was occurring at other campuses as well.  The e-mail, sent from Chief Operating Officer MIKE BENVENUTI, and forwarded by Dr. Ghazarian, indicates that approximately sixty (60) students "appear to be past 14 days" and "should have already been dropped."  The e-mail chain was sent to multiple campuses across MSB.

84.     The following chart lists additional examples of students from Defendants' Victorville campus, whose attendance records were altered to avoid the 14-day rule, and Defendants' obligation to return federal student loan funds.

---

[4] Defendant Dr. Nagui subsequently contracted with independent software developers to design and produce an independent clock-hour tracking program, the "Vocodo" program.  Vocodo by-passed the RGM system and was run by a select team at MSB's corporate office.

**FIRST AMENDED COMPLAINT – JURY TRIAL DEMANDED**;
Case No. CV-13-05256-RGK (AJWx)

| Date of Manipulation | Student |
|---|---|
| 5/30/2011 | DH, SL, LM, DM, MS, SM |
| 6/27/2011 | VA |
| 7/11/2011 | VA |
| 7/25/2011 | VA |
| 8/8/2011 | VA, CS |
| 9/5/2011 | HN |
| 9/19/2011 | WH |
| 10/3/2011 | PH, MW |
| 2/20/2012 | JW, AE, MF, BH, |
| 3/5/2012 | JW, TM, |
| 4/2/2012 | MP |
| 4/16/2012 | AD |
| 4/30/2012 | MF, MP |
| 5/14/2012 | MB |
| 5/28/2012 | MW |
| 6/11/2012 | MW |
| 6/25/2012 | DR |
| 7/23/2012 | CC, CO, LV |
| 8/6/2012 | CC, MG |
| 8/20/2012 | GM, SS |
| 9/3/2012 | NP |
| 9/17/2012 | AH |
| 10/1/2012 | CG, JM,AS |
| 10/15/2012 | ED (LOA but dropped) |
| 10/17/2012 | TR |
| 10/29/2012 | MG, |
| 11/26/2012 | AL, LN, AT |

85.    In addition to manipulating the 14-day rule to avoid returning money to the federal government, Defendants also manipulated Leave of Absence ("LOA") records to the same end.

86.    Specifically, MSB's policy permitted only one LOA per student during their course of study and that LOA was limited to 180 days.  However, student MW at the Victorville campus was repeatedly put on LOAs despite never attending a class.  Instructors and Registrars, including Shelton and Stevens, complained about students like MW being left on class rosters despite not

1    attending classes for months.  Furthermore, LOA required documentation, which

2    was often either missing or forged.

3         87.    The San Diego Campus defrauded the DOE by refusing to drop

4    students after fourteen (14) days, and/or intentionally leaving the students on the

5    rosters even when they were not physically present or had already dropped from

6    the program, in an effort to draw down additional federal aid and frequently keep

7    their Add/Drop statistics favorable.  Instead of dropping the students accordingly,

8    Defendants manipulated the LDA and LOA files without proper documentation.

9    The San Diego Campus Registrar actually typed the students' backup

10   documentation, fabricating the dates and signatures on the LOA. On another

11   occasion, in student GP's file, the Director's name was forged.  Student attendance

12   discrepancies at the San Diego campus include:

| Attendance Discrepancy | Student Name |
|---|---|
| 6/1/2012 | CC |
| 6/20/2012 | LD |
| 6/26/2012 | KS |
| 7/6/2012 | DT |
| 7/27/2012 | RE |
| 8/3/2012 | SM |
| 8/4/2012 | RP |
| 8/29/2012 | GC |
| 9/12/2012 | TB |
| 9/18/2012 | IVF |
| 9/29/2012 | LM |

22        88.    Additionally, students SD, RE, EJ, JP, RP, and YS were not correctly

23   dropped from the Grad/Drop report.  Another internal audit revealed the following

24   30 students with total attendance hours not matching the RGM system:  SL, SC,

25   IE, JG, VDMJ, NP, JP, ER, JR, MR, IFV, CN, AMA, CC, BD, BD, MH, LH, JI,

26   MJ, BM, QM, DN, RR, KS, JS, JT, WZ, KV, LH, KM, and CM.

27        89.    Defendants engaged in other schemes to manipulate student attendance

28   records.  For example, at several Inland Empire campuses, including the San

**FIRST AMENDED COMPLAINT – JURY TRIAL DEMANDED**;
Case No. CV-13-05256-RGK (AJWx)                                              23

Bernardino campus, students' "swipe" or identification cards were confiscated and retained by Defendants. Defendants then swiped those cards to record false attendance in Defendants' POS/Guest Vision system. In another example, even when a student had been dropped and the proper documentation was provided by the campus registrar to MSB's corporate office, MSB would keep these students as "active" or "active grad" in order to continue to draw down federal funding.

**B.    Defendants Concealed Their Lack of Compliance With the "90/10" Requirement.**

90.    Defendants' PPAs, and 34 CFR § 668.14(b)(16), required MSB to ensure that at least 10 percent of its revenues for each fiscal year derived from sources other than Title IV, HEA program funds. This is known as the "90/10" rule. Defendants engaged in multiple schemes to avoid the 90/10 rule, and conceal their lack of compliance with it.

91.    First, Defendants routinely "over-awarded" student loans in order to artificially increase their non-Title IV revenues. Specifically, in April 2011, Defendants held a corporate training at the Whittier headquarters with the financial aid officers from all of the campuses. At the training, Steve Mucciaro, MSB Financial Aid Administrator, and MICHAEL FLECKER, MSB Chief Financial Officer, instructed the financial aid officers to intentionally "over award" financial aid to students, and was explicit that the goal was to help with "90/10" compliance. In other words, Mucciaro and FLECKER instructed the officers to award students amounts above and beyond the full amount of tuition and fees. The excess amount, sometimes referred to as "living expenses," Mucciaro asserted could be counted towards the required ten percent (10%) non-Title IV revenue. When experienced financial aid officers questioned MSB's executives about the legality of this "over awarding" scheme, Mr. FLECKER became irate and directed the staff to simply follow instructions while refusing to answer any further questions.

92.     As of July 1, 2011, DOE explicitly disallowed this "over awarding" practice; i.e., the over-awarded living expense amount could not be counted toward the 10% non-Title IV revenue.  Defendants, due to their systematic over-awarding, had placed themselves in a bind:  students had learned to request, and expect, the maximum amount of student loans for which they qualified, including living expenses.  Disbursing all of those funds, however, caused Defendants to fall out of compliance with the 90/10 rule.  Defendants simply had too few legitimate sources of non-Title IV income.  Accordingly, Defendants conjured up a new scheme: they simply withheld student loan amounts from disbursement.  Defendants believed that if they did not disburse the loan amounts to students, then those funds would not be counted towards the 90%, and they would be back in compliance.

93.     This scheme, however, blatantly violated HEA regulations with which Defendants had agreed to comply in their PPAs.  Specifically, 34 CFR § 668.164(e) requires schools to disburse to students any excess loan amounts (i.e., living expenses), "**[n]o later than 14 days after**" the excess arises.  Defendants regularly violated this regulation, thereby wrongfully retaining federal funds to which they had no right.  The scheme also caused to be false Defendants' certification through the DOE's G5 system that funds drawn down would be "expended within three business days of receipt . . . ."

94.     In addition, Defendants enrolled several sham "cash-pay" students, falsified their attendance and grades, and counted their tuition payments to the 10 percent (10%) non-Title IV revenues.

95.     For example, on or around November 2011, Relator Caron received a call directly from DR. NAGUI ELYAS (it was, of course, rare for a School Director to receive a call from the CEO).  DR. ELYAS informed Caron that she would be receiving a "new cash student" in Moreno Valley (Riverside County) who received a scholarship through DR. ELYAS'S church in Los Angeles.  A check in the approximate amount of $27,000.00 was received and deposited into

**FIRST AMENDED COMPLAINT – JURY TRIAL DEMANDED**;
Case No. CV-13-05256-RGK (AJWx)

25

the Moreno Valley Wells Fargo Bank branch, in favor of student HN.  Student HN showed up on or around December 2011 and was in school for a total of two (2) days and disappeared, never to be seen again by Moreno Valley Campus instructors.

96.     During the add drop reporting, Caron was instructed by her supervisor Dr. Ghazarian to "put attendance on HN" instead of dropping the student.  When Caron refused, she was reprimanded and told the order was directly from the President, DR. NAGUI ELYAS, to put the student on a falsified LOA and she could lose her job for disobeying.

97.     Defendants also used the "advanced workshop" programs to manipulate the 90/10 requirements.  For example, the Moreno Valley campus was given cash credit for these classes despite none of these advanced workshop classes being offered at that location.  When Relator Mercer questioned this, she was simply told it was to "assist [her] campus with [their] 90/10 issue."

98.     From 2007 through to the present, Defendants repeatedly failed to properly comply with the 90/10 Title IV requirements.

**C.     Defendants Falsified Entrance Exams, GEDs, high school diploma, and/or Ability To Benefit (ATB) tests.**

99.     MSB engaged in other fraudulent conduct in an attempt to secure federal aid for students who, but for Defendants conduct, would have been ineligible for assistance under Title IV of the HEA.  For instance, Defendants fabricated and or did not require, nor verify, high school diplomas of prospective students at the Inland Empire, San Bernardino, Victorville, and Moreno Valley campuses in order to permit unqualified students to enroll at MSB. Defendants then improperly received and retained Title IV assistance for those unqualified students.  Relators are aware of at least twenty-three (23) students who had their proofs of education fabricated at MSB.  Those students were enrolled at

the Inland Empire, San Bernardino, Victorville, Moreno Valley, Hemet, and San Diego campuses and MSB drew down federal funding on their behalf.

100.   Defendants also engaged in a variety of fraudulent actions designed to ensure that prospective students passed an Ability-to-Benefit ("ATB") test, a then-existing alternative under federal law for students without a high school diploma or its recognized equivalent to receive Title IV funding while enrolled at Defendants schools.  MSB would utilize a questionable "grandfathering" system pervasively for ATB students who may have transferred or enrolled at an earlier secondary school.

101.   Defendant actions included:  (1) using surrogate test takers to sit for applicants; (2) improperly "coaching" test takers on the questions and answers before the exam; and (3) using a proctor to administer the tests who was not properly qualified and (4) providing answers to applicants and or students to the questions.  At the West Covina and San Bernardino campuses surrogate test takers were allowed to take the ATB exam for others.  Relators witnessed this occurring and complained to Dr. Ghazarian.  One proctor allowed a wife to take the ATB exam for her husband.  MSB also assisted an ATB proctor who had been decertified by Wonderlic, Inc., the test publisher of MSB's ATB test, in becoming certified under another name and allowed him to proctor ATB tests for prospective students.  Wonderlic had determined in 2009 that there were certain anomalies in testing results, which indicated that the tests had not been properly administered.  Wonderlic thus decertified him in July 2009.

102.   When a campus's passage rate for ATB tests was low, MSB's Vice President of Admissions Mike Selter and Regional Director of Admissions/San Bernardino Campus Director Sherry Boyd assigned specific proctors to increase student passage rates.  Mr. Selter and Ms. Boyd would tell campus directors they were sending these proctors over and the campus's enrollment statistics would dramatically improve.  At the Moreno Valley campus, the ATB pass rate rose from

**FIRST AMENDED COMPLAINT – JURY TRIAL DEMANDED**;
Case No. CV-13-05256-RGK (AJWx)

27

53% to over 90% after Mr. Selter and Ms. Boyd sent one of these proctors to the campus.  However, Relator Luedtke and another MSB employee, Rosa Cruz, watched the proctor merely collecting students' names, driver's license numbers, and social security numbers and then entering them into the computer system as having "passed."  When Relator Mercer reported this and other issues with passed students who were illiterate to Dr. Ghazarian, he only stated the program was managed by Defendant Dr. NAGUI ELYAS's cousin and instructed to  "leave it alone"

103.   Defendants also developed a relationship with Parkridge Private School ("Parkridge") that allowed Defendants to enroll students after funding for the ATB students was discontinued in July 2012.  Through its "Project Diploma" program, Defendants targeted Parkridge to enroll would-be ATB students in its courses.  In an August 2012 email to all Directors and Registrars, Regional Admissions Manager Francyne Conway announced MSB's Parkridge program and emphasized "the bonus is we are approved (the SD & Registrar only) as individuals who can act as proctors!"  Ms. Conway then directed all Directors and Registrars to fill out the proctor application, which she conveniently attached to her e-mail.  Parkridge was critical to MSB's bottom-line, with MSB executives claiming "this will help bring back the ATB population that drove us to budget success" and "we are anticipating a huge increase in student participation."

104.   In a related scheme to increase the amount of federal financial aid MSB received, the MSB Education Department would also delay graduation dates for some students so that they could extend the window of time for which MSB could collect financial aid for them. The MSB Registrars at the Victorville, Lomita, and San Diego campuses would change student graduation dates to make it appear as if it had taken the student much longer to graduate than it actually did. In the meantime, MSB would draw down additional financial aid for those students.

105.   MSB financial aid employees also engaged in a variety of fraudulent

practices that resulted in students receiving more federal aid than they were entitled to receive.  For example, MSB employees, as directed by MSB management, including Regional Vice President Dr. Ghazarian, COO MIKE FLECKER, DR. NAGUI ELYAS, and Financial Aid Officer Steve Mucciaro:

    a.    Coached financial aid applicants to list themselves as "independent" rather than "dependent" regarding income tax status;

    b.    Counseled students to falsely list relatives' children as applicants' dependents in order to increase applicants' eligibility for financial aid;

    c.    Improperly retained applicants' FAFSA PIN numbers so that MSB employees could edit and alter FAFSA applications; and

    d.    Encouraged fraudulent FAFSA submissions omitting applicants' spouses' tax returns in order to increase the amount of available federal student aid available for applicants.

106.   Management at MSB condoned and encouraged this fraudulent conduct.  For example, a Manager of Admissions at the Whittier Campus became aware that an Admissions Representative, had, among other things, coached a student on how to appear to be an independent student for financial aid purposes (even though he should have been listed as a dependent student).

107.   Through its conduct above, MSB caused students to submit applications for federal financial aid that contained false statements, including false statements regarding students' eligibility for federal aid and/or students' financial situation.  Those false statements were material to the Department of Education's decision to award federal aid to those students.  MSB also falsely certified, in its PPAs and each time it drew down federal grant monies, that it was complying with federal regulations governing the eligibility and award of Title IV funding under the HEA.  MSB's false statements and fraudulent

conduct resulted in MSB receiving federal aid that it would otherwise not have been entitled to receive but for its fraud.

### D. Defendant Falsified, Forged, and or Altered Grades and Student Academic Progress Reports.

108. Federal statutes and regulations, incorporated into Defendants' PPA, require students to demonstrate Satisfactory Academic Progress. 20 U.S.C. § 1091(a)(2), (c) and 34 C.F.R. § 668.71.

109. "If a student who began attendance and has not officially withdrawn fails to earn a passing grade in at least one course offered over an entire period, the institution must assume, for Title IV purposes, that the student has unofficially withdrawn, unless the institution can document that the student completed the period." Information for Financial Aid Professionals, *Chapter 2: Withdrawals and the Return of Title IV Funds*, FEDERAL STUDENT AID HANDBOOK, at 5-66, 5-67 (2011), *available at* https://ifap.ed.gov.fsahandbook/attachments/1011Vol5Ch2.pdf.

110. Defendants routinely falsified or altered Student Academic Reports in order to falsely demonstrate Satisfactory Academic Progress. For example, at the Inland Empire/Victorville Campuses between 2010 and 2012, Instructors Stevens and Shelton were instructed by Victorville Campus Director Denise Holloway, Registrar Francesca Michaels, Sherry Booth and/or Vice President of Career Development Joan Yourstone to retroactively alter – "clean up" – Student Academic Reports for their students. For example, Registrar Francesca Michaels and Financial Aid Officer ("FAO") Charlotte Allen told instructors to manually "average out" her students' grades who fell below the seventy percent (70%) Satisfactory Academic Progress requirement in order to keep them in the program.

111. Other students whose test scores fell below seventy percent (70%) were repeatedly retested until they achieved scores greater than seventy percent

(70%).

112.   Defendants' scheme to defraud the Department of Education was so pervasive and dependent on enrollment numbers that even if students should have been dropped for academic performance, instructors and Campus Directors <u>could not enter failing grades into the computerized system</u>.  In an email from Elizabeth Stoll, the San Diego campus Registrar, to Terrilynette Minor, School Director of the San Diego Campus, Ms. Stoll inquired:  "If education could help out with the SAP issue we have in terms of putting zeros for grades.  If the modules don't give the instructors and [sic.] option to put a failing grade what should they put. [sic.] Taking and retaking exams over and over doesn't seem to be beneficial to the student.  Also, how are we ever suppose to [sic.] drop a student for academics if they can never fail an exam?"  Accordingly, aside from manipulation of attendance records, Defendants' systems prevented even academically inadequate performers from being dropped in an effort to retain as many fraudulent financial aid dollars as possible.

### E.   <u>Defendants Falsified Placement Statistics.</u>

113.   HEA regulations, with which Defendants agreed to comply, also strictly prohibit "[m]isrepresentation regarding the employability of an eligible institution's graduates."  34 CFR § 668.74.  In violation of this provision, MSB engaged in a widespread scheme to falsely representing the number of graduates of its school who were placed in jobs in their field of study after graduation.

114.   The base requirement for proprietary schools is to place at least sixty percent of their graduates in jobs in their field of study in order to be eligible for licensure.  To ensure it met that requirement, MSB knowingly fabricated the placement statistics it reported to NACASS, BPPE,  BBC and the DOE for the Inland Empire, San Bernardino, Victorville, Moreno Valley, Plaza Del Sol, Inglewood, and San Diego campuses.  For at least the years 2007 through 2012, it

certified, falsely, that the information it was providing to the agencies on the placement of its graduates was correct. MSB engaged in this fraudulent scheme in order to maintain its licensing and, hence, its ability to draw down federal financial aid.

115. MSB was required to report its placement statistics for each of its programs at Inland Empire, San Bernardino, Victorville, Moreno Valley, Plaza Del Sol, Inglewood, and San Diego campuses on an annual basis. In accordance with that requirement, MSB submitted its purportedly accurate placement figures its annual reports and fact sheets and certified them as being accurate.

116. MSB artificially inflated the placement rates to make it appear as if it had placed substantially more graduates at jobs in their fields of study than it actually did. MSB accomplished this artificial inflation through a variety of methods.

117. One method that MSB Career Services employees used to inflate MSB placement numbers was to create fake business cards for MSB graduates they could not place. Career Services employees would create the business cards online and place them in the students' files. The students would then be recorded as self-employed on MSB reports to the agency. For example, a former Career Services Coordinator at the Inland Empire and San Bernardino campuses was aware of several students in the Massage Therapy program who had business cards created for them before they had taken or passed the licensure exam. When the Career Services Coordinator raised this concern to the then Director of Career Services for these Campuses, she was told that this was part of the program and that the business cards could be placed in the students' Career Placement files and the students counted as "placed."

118. Other members of management at MSB were aware of the business card scam. Several employees involved in creating the fake business cards were taught how to do so by MSB Corporate Director of Career Placement Sonia

Rafael.  Another former Career Services employee complained to Campus Directors and then to MSB Vice President Dr. Ghazarian about the practice of creating fake business cards.  When she received no response, she called the Whittier Director of Human Resources, but was disregarded.

119.   The following are examples of Cosmetology, Esthetician, and Spa Therapist students that had fake business cards created so they could be listed as self-employed:  BD, JC, CC, JC, JC, SC, RE, CF, RF, AG, LG, KH, MJ, JJ, WJ, DK, RL, IM, RM, FM, MM, JR, JR.

120.   Another scheme used by MSB to artificially inflate the placement figures and alumni salaries it reported to the DOE, was to improperly claim students as placed in their fields if they could find any tangential relationship between the student's job and his or her field of study.  Several students who graduated in Cosmetology and worked merely as cashiers at salons were improperly counted as placed in their field of study.

121.   Even worse, Defendants counted as "placed" a Spa Therapist graduate who worked at an AM/PM minimarket.  The employee who did so claims she was directed to do so by Dr. Ghazarian.  Another student with a 100 Clock Hour completion as a Makeup Artist, was counted as placed in her field while working at a McDonalds near the Moreno Valley campus.

122.   MSB also employed graduates for a day or so past graduation at MSB, at the front counter swiping students in and out, and then improperly counted them as placed in their fields.  Graduate AM was one such example.

123.   MSB also inflated alumni salaries for students placed in entry level positions to justify the tuition amounts MSB charged.  Federal guidelines require tuition rates match graduates' ability to work an entry level position in their chosen field.  As entry level position salaries increased, MSB was able to correspondingly raise its tuition and draw down more federal financial aid monies.

124.   Relator Mercer complained to Dr. Ghazarian when she became aware

**FIRST AMENDED COMPLAINT – JURY TRIAL DEMANDED**;
Case No. CV-13-05256-RGK (AJWx)

33

of MSB's Regional Manager of Career services changing alumni salary entries made by the campus career services personnel.  Regional Career Development Manager Raquel Davila admitted to Relator Mercer that she was instructed by Dr. NAGUI ELYAS and MSB's Corporate Career Services Director Sonia Rafiel to change alumni salary entries made by the campus career services personnel. Relator Mercer complained to Dr. Ghazarian about this but was told the instruction "comes from the top" and to leave it alone.

125.   Audits completed for MSB confirmed that the placement rates MSB reported were not accurate.  In 2009 through 2012, MSB hired an independent accountant to audit MSB placement figures for the time period 2009 through 2010. The findings of the third party accountant's review included hundreds of inconsistencies with actual data and data reported to the DOE.  In certain instances, as with the San Diego campus, less than twenty percent (20%) actually were legitimately placed.

126.   MSB's fabrication of placement statistics and alumni salaries resulted in MSB receiving federal financial assistance that it otherwise would not have been entitled to receive.  By falsifying its placement rates, MSB was able to ensure that it met licensure requirements, DOE compliance, and that MSB maintained a sixty percent (60%) placement rate.  State licensure and accreditation in turn, is a requirement to be eligible for federal funding under Title IV of the HEA.  MSB's PPAs explicitly state that MSB is required to maintain its state license in order to be eligible for federal funding.  Falsification of placement statistics was thus material to the DOE's decision-making process regarding licensing and resulted in MSB drawing down federal funding which it otherwise would not have been eligible to receive but for its fraudulent conduct.  Moreover, Defendants' falsification directly violated HEA regulations, with which Defendants agreed to comply in their PPAs, strictly prohibiting "[m]isrepresentation regarding the employability of an eligible institution's graduates." 34 C.F.R. § 668.74.

**FIRST AMENDED COMPLAINT – JURY TRIAL DEMANDED**;
Case No. CV-13-05256-RGK (AJWx)

34

### F. **Defendants Manipulated Federal Financial Aid Default Statistics.**

127. The rate of student defaults on federal student loans was another factor considered in whether an institution remained eligible to receive federal financial aid monies.  Student who do not pay their loans for nine months are considered in "default."  "Cohort default rates" ("CDRs") measure the percentage of an institution's federal student loan borrowers who defaulted within three (3) years of entering repayment.  The DOE uses these CDRs to gauge whether an institution is a good investment of student and tax-payer financial aid.  Schools with high student default rates may be sanctioned or lose eligibility to receive federal financial aid altogether.

128. MSB targeted federal financial aid students to return to campus so that MSB's CDR would be lowered.  Students who dropped and subsequently defaulted on their federal loans were identified on campuses' "Campaign Boards." Campus directors were incentivized with bonuses to "re-enter" these students, particularly those whose drop date would change the CDR for their cohort year. Through marketing campaigns developed by MSB's corporate office, students were told they would have their program re-entry charges – the entire cost of the program – refunded if their attendance rate remained above a particular threshold. As a result, the student was no longer in default because they were classified as "in-school" status for loan repayment calculations. Thus, these "re-entered" students qualified for a new cohort year for determining the CDR and MSB's default rates appeared much lower than they actually were.  By manipulating these CDR metrics, MSB was able to avoid sanctions and removal from the federal financial aid program.

## VII. THE SUBMISSION OF FALSE CLAIMS

129. The foregoing schemes tainted thousands of requests for federal grants and federally guaranteed loans made on behalf of students of at least twenty (20) of

**FIRST AMENDED COMPLAINT – JURY TRIAL DEMANDED**;
Case No. CV-13-05256-RGK (AJWx)

35

MARINELLO SCHOOL OF BEAUTY campuses, including but not limited to the following campuses:  Plaza del Sol, San Bernardino, Reseda, Hemet, Las Vegas, Inglewood, San Diego, City of Industry, Moreno Valley, Palmdale, El Cajon, Ontario, Lomita, Whittier, San Mateo, San Francisco, Sacramento, Victorville, Murrieta, and Bell.  Each of those requests constitutes a separate false claim.

130.   Each of the grant awards, loan awards, and government repayment of loan interest or defaulted loan principal was caused by Defendants' fraudulent maintenance of MSB's state licensure, Defendants' false statements and promises in the PPAs that MSB would comply with applicable laws and regulations governing the award of federal financial aid, and/or the false representations in each grant and loan application that the student seeking federal government aid was eligible to receive Title IV funding under the HEA.  Defendants' conduct was knowing and material to the Department of Education's willingness to award federal financial aid to MSB students.  Each request for payment thus constitutes a false claim under the False Claims Act.

131.   The examples above are illustrative of the many false claims presented by, or caused to be presented by, MSB for federal financial assistance under Title IV of the HEA.

## VIII.  CAUSES OF ACTION

### <u>FIRST CAUSE OF ACTION</u>

#### On Behalf of the United States

**Violations of the False Claims Act: Presenting False or Fraudulent Claims**

**(31 U.S.C. § 3729(a)(1)(A) (2009), formerly 31 U.S.C. § 3729(a)(l)(2006))**

132.   Plaintiffs reallege and incorporate by reference the allegations in Paragraphs 1 through 125 above as though fully set forth herein.

133.   Defendants knowingly presented, or caused to be presented, to an officer or employee of the United States government, false or fraudulent claims for

1  payment or approval, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)

2  (2009), formerly 31 U.S.C. § 3729(a)(l)(2006), specifically, the claims for student

3  loan and Pell Grant payments under the Title IV student financial  assistance

4  programs.

5       134.   Because of the Defendants' acts, the United States sustained damages

6  in an amount to be determined at trial and, therefore, is entitled to treble damages

7  under the False Claims Act, plus civil penalties of not less than $5,500 and up to

8  $11,000 for each violation.

9  **<u>SECOND CAUSE OF ACTION</u>**

10  **On Behalf of the United States**

11  **Violation of the False Claims Act: Making or Using False Records or**

12  **Statements Material to Payment or Approval of False Claims**

13  **(31 U.S.C. § 3729(a)(1)(B) (2009), formerly 31 U.S.C. § 3729(a)(2)(2006))**

14       135.   Plaintiffs reallege and incorporate by reference the allegations in

15  Paragraphs 1 through 125 above as though fully set forth herein.

16       136.   Defendants knowingly made, used, or caused to be made or used, a

17  false record or statement material to a false or fraudulent claim, and/or to get the

18  United States to pay or approve false or fraudulent claims, in violation of the False

19  Claims Act, 31 U.S.C. § 3729(a)(1)(B) (2009), formerly 31 U.S.C.

20  § 3729(a)(2)(2006).

21       137.   Because of the Defendants' acts, the United States sustained damages

22  in an amount to be determined at trial and, therefore, is entitled to treble damages

23  under the False Claims Act, plus civil penalties of not less than $5,500 and up to

24  $11,000 for each violation.

25

26

27

28  \\\

**FIRST AMENDED COMPLAINT – JURY TRIAL DEMANDED**;
Case No. CV-13-05256-RGK (AJWx)

37

**THIRD CAUSE OF ACTION**

**(In the Alternative)**

**On Behalf of the United States**

**Violation of the False Claims Act: Retention of Proceeds to Which Not Entitled**

**31 U.S.C. § 3729(a)(1)(G)**

138.   Plaintiffs incorporate by reference and reallege all of the allegations contained in paragraphs 1 through 125 of this Complaint as though fully set forth herein.

139.   In the alternative, Defendants knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government.

140.   The conduct of Defendants violated 31 U.S.C. § 3729(a)(1)(G) and was a substantial factor in causing the United States to sustain damages in an amount according to proof.

**FOURTH CAUSE OF ACTION**

**On Behalf of the United States**

**Violation of the False Claims Act, Conspiracy to Commit Violations**

**31 U.S.C. § 3729(a)(1)(C)**

141.   Plaintiffs reallege and incorporate by reference the allegations in Paragraphs 1 through 125 above as though fully set forth herein.

142.   Defendants knowingly (as defined in 31 U.S.C. § 3729(b)(1)) conspired to commit violations of substantive portions of the False Claims Act, including but not limited to subparagraphs (A), (B), and (G) of 31 U.S.C. § 3729.

143.   Defendants conspired to: (1) knowingly present false records and statements; (2) knowingly make, use, and/or cause to be made and used false records and statements; and (3) knowingly make, use, or cause to be made or used,

**FIRST AMENDED COMPLAINT – JURY TRIAL DEMANDED**;
Case No. CV-13-05256-RGK (AJWx)

38

a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government.

144.   The conduct of Defendants violated 31 U.S.C. § 3729(a)(1)(C) and was a substantial factor in causing the United States to sustain damages in an amount according to proof.

## IX.    PRAYER FOR RELIEF

Wherefore, Plaintiffs request the following relief as to all Causes of Action:

1.      Judgment in favor of the United States for an amount of damages, trebled as required by law, pursuant to 31 U.S.C. § 3729(a), with civil penalties of not less than $5,500 and up to $11,000 for each violation, plus such civil penalties as are required by law, together with all such further relief as may be just and proper;

2.      Award to Relators, as the *Qui Tam* plaintiffs, of the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) of the Federal False Claims Act on the Unites States' recovery;

3.      Award to Relators of all reasonable expenses which the Court finds to have been necessarily incurred, plus reasonable attorney's fees and costs;

4.      All prejudgment and post-judgment interest to which the United States is entitled;

\\\

**FIRST AMENDED COMPLAINT – JURY TRIAL DEMANDED**;
Case No. CV-13-05256-RGK (AJWx)

39

1        5.    Such other relief as this Court may deem just and proper, together with

2    interest and costs of this action.

3    Dated: April 17, 2015          **COTCHETT, PITRE & McCARTHY, LLP**

4

5                       By:        */s/ Justin T. Berger*

6                           NIALL P. McCARTHY

7                           JUSTIN T. BERGER

8              **SKAPIK LAW GROUP**

9                           MARK J. SKAPIK

10                          GERALYN L. SKAPIK
                       JOHN D. GRAHAM

11

12             *Attorneys for Relators*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1   **X.    DEMAND FOR JURY TRIAL**

2          RELATORS hereby demand trial by jury.

3

4

5   Dated: April 17, 2015                    **COTCHETT, PITRE & McCARTHY, LLP**

6

7                                    By:    _____*/s/ Justin T. Berger*_____
                                            NIALL P. McCARTHY
8                                           JUSTIN T. BERGER

9

10                                   **SKAPIK LAW GROUP**
                                            MARK J. SKAPIK
11                                          GERALYN L. SKAPIK
                                            JOHN D. GRAHAM
12

13                                   *Attorneys for Relators*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FIRST AMENDED COMPLAINT – JURY TRIAL DEMANDED**;
Case No. CV-13-05256-RGK (AJWx)

41