MARK J. SKAPIK (SBN 164957)
mskapik@skapiklaw.com
GERALYN L. SKAPIK (SBN 145055)
gskapik@skapiklaw.com
ERIC MORRIS (SBN 243425)
eric.c.morris@gmail.com
JOHN D. GRAHAM (WSBA 44448) – of counsel
jgraham@skapiklaw.com
**SKAPIK LAW GROUP**
5861 Pine Avenue, Suite A-1
Chino Hills, CA  91709-6540
(909) 398-4404 | Fax: (909) 398-1883

NIALL P. McCARTHY (SBN 160175)
nmccarthy@cpmlegal.com
JUSTIN T. BERGER (SBN 250346)
jberger@cpmlegal.com
**COTCHETT, PITRE & McCARTHY, LLP**
San Francisco Airport Office Center
840 Malcolm Road
Burlingame, California  94010
Tel: (650) 697-6000 | Fax: (650) 692-3606

*Attorneys for Relators*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **UNITED STATES OF AMERICA**, *ex rel.* **TERISA MERCER CARON**, **VERONICA TREJO**, **PAIGE STEVENS**, **HEATHER LUEDTKE**, **TAMECA SHELTON**, and **CINDY JUAREZ**, individuals<br><br>Plaintiffs,<br><br>v.<br><br>**B&H EDUCATION, INC.**, a Delaware Corporation, d/b/a MARINELLO | Case No.  CV-13-5256-RGK(AJWx)<br><br>**RELATORS' OPPOSITION TO DEFENDANTS' AMENDED MOTION TO DISMISS** |

RELATORS' OPPOSITION TO DEFENDANTS' AMENDED MOTION TO DISMISS; Case No. CV-13-5256-RGK(AJWX)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

SCHOOL OF BEAUTY; **B&H
EDUCATION HOLDINGS, L.L.C.**, a
Delaware Limited Liability Company;
**DR. R. RASHED ELYAS**, an individual;
**DR. NAGUI ELYAS**, an individual;
**MICHAEL BENVENUTI, COO**, an
individual; **MICHAEL FLECKER,
CFO**, an individual; **ABRY PARTNERS
VI, L.P.**, an unknown entity; **ABRY
INVESTMENT PARTNERSHIP, L.P.**,
an unknown entity; **ABRY SENIOR
EQUITY II, L.P.**,  an unknown entity;
**UNITED BEAUTY ENTERPRISES,
INC.**, a California Corporation; and
**SCOPE BEAUTY ENTERPRISES,
INC.**, a California Corporation,

            Defendants.

**RELATORS' OPPOSITION TO DEFENDANTS' AMENDED MOTION TO
DISMISS;** Case No. CV-13-5256-RGK(AJWX)

# TABLE OF CONTENTS

I.    INTRODUCTION ....................................................................................1

II.   SUMMARY OF THE COMPLAINT .............................................................2

  A. Overview of the Fraudulent Schemes ..............................................3

  B. Factual Allegations ...........................................................................3

     1.  Defendants manipulated student attendance records so that students who should have been dropped were still eligible to receive Title IV monies. ......3

     2.  Defendants concealed their failure to meet the 90/10 financial compliance by "over awarding" financial aid packages and admitting sham "cash-pay" students. ..................................................................................................5

     3.  Defendants failed to verify academic eligibility of students and fabricated students' entrance exams in order to ensure the students' eligibility for Title IV funds. ................................................................................................6

     4.  Defendants manipulated student grades so that students who were failing to make satisfactory academic progress could still receive federal financial aid funds. ................................................................................................7

     5.  Defendants misrepresented placement statistics in order to maintain their required accreditation and eligibility for Title IV programs. ........................7

     6.  Defendants manipulated cohort default rates to maintain MSB's eligibility to receive Title IV funds. ................................................................................9

III.  LEGAL STANDARD ...............................................................................9

  A. Rule 12(b)(6) ...................................................................................10

  B. Rule 9(b) .........................................................................................10

IV.  ARGUMENT........................................................................................11

  A. Relators have provided sufficient particularity of the allegations against each defendant. ...................................................................................11

  B. The FAC Adequately Alleges Scienter ...........................................14

  C. Defendants' fraudulent schemes are each pleaded with sufficient particularity and assert a claim under which relief can be sought. .........................15

     1.  Defendants' Attendance Record Manipulation Scheme is Sufficiently Pled. ................................................................................................15

     2.  Defendants' Failure to Comply with the 90/10 Requirements is Sufficiently Pled and States a Claim upon Which Relief Can be Granted. ...17

**RELATORS' OPPOSITION TO DEFENDANTS' AMENDED MOTION TO DISMISS;** Case No. CV-13-5256-RGK(AJWX)

3.  Defendants' Entrance Exam, Diploma and ATB Manipulation Scheme is Sufficiently Pled. .........................................................................19

4.  Defendants' Grading and Academic Progress Scheme is sufficiently pled and asserts a viable claim for relief. ...........................................20

5.  Defendants' Falsified Placement Statistics are sufficiently pled and assert a viable claim for relief. ..............................................................20

6.  Defendants' manipulation of cohort default rates in order to continue to receive federal financial aid monies is a viable claim under the FCA. .........21

D. The FAC Pleaded Conspiracy with Specificity. ...........................................23

V.    CONCLUSION ............................................................................25

**RELATORS' OPPOSITION TO DEFENDANTS' AMENDED MOTION TO DISMISS;** Case No. CV-13-5256-RGK(AJWX)

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Ashcroft v. Iqbal*
  556 U.S. 662 (2009) ................................................................. 10, 14

*Bell Atl. Corp. v. Twombly*
  550 U.S. 544 (2007) ....................................................................... 10

*Big Apple BMW, Inc. v. BMW of N.A., Inc.* (3d Cir. 1992) 974 F.2d ..................... 24

*Bly-Magee v. California*
  236 F.3d 1014 (9th Cir. 2001)................................................... 11, 16

*Cason-Merenda v. Detroit Medical Center*
  No. 06-15601 (E.D. Mich. March 31, 2008) 2008 WL 880286 .......................... 25

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*
  (1962) 370 U.S. ............................................................................ 24

*Ebeid v. Lungwitz*
  616 F.3d 993 (9th Cir. 2010)................................................... passim

*Flash Memory Antitrust Litig.*
  (N.D. Cal. 2009) 643 F.Supp.2d ............................................... 25

*Flat Glass Antitrust Litig.*
  (3d Cir. 2004) 385 F.3d......................................................... 24

*Ice Cream Liquidation, Inc. v. Land O'Lakes, Inc.*
  (D. Conn. 2003) 253 F.Supp.2d ............................................... 25

*Moore v. Kayport Package Express*
  885 F.2d 531 (9th Cir. 1989)................................................... 12

*Moyo v. Gomez*
  32 F.3d 1382 (9th Cir. 1994)................................................... 10

*Odom v.Microsoft-Corp.*
  486 F.3d 541(9th Cir. 2006)................................................... 11, 16

*OSB Antitrust Litig.*
  No. 06-826 (E.D. Pa. Aug. 3, 2007) 2007 WL 2253419 ...................... 25

*Packaged Ice Antitrust Litig.*
  (E.D. Mich. 2010) 723 F.Supp.2d............................................. 24

*Peel v. Brooksamerica Mortgage Corp.*
  788 F. Supp. 2d 1149 (C.D.Cal. 2011)...................................... 10

*Pressure Sensitive Labelstock Antitrust Litig.*
   (M.D. Pa. 2008) 566 F.Supp.2d .............................................................. 24

*Rail Freight Fuel Surcharge Antitrust Litig.*
   (D.D.C. 2008) 587 F.Supp.2d ................................................................. 24

*Scwartz v. KPMG LLP*
   476 F.3d 756 (9th Cir. 2007) .................................................................. 12

*Southeastern Milk Antitrust Litig.*
   (E.D. Tenn. 2008) 555 F.Supp.2d ........................................................... 24

*Starr v. Sony BMG Music Entm't*
   (2d Cir. 2010) 592 F.3d .......................................................................... 25

*Tamoxifen Citrate Antitrust Litig.*
   (2d Cir. 2006) 466 F.3d .......................................................................... 24

*Tandem Computers, Inc.*
   818 F.2d 1433 (9th Cir. 1987) ................................................................ 11

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*
   (2007) 551 U.S. ...................................................................................... 23

*U.S. ex rel. Lee v. Corinthian Colleges*
   655 F.3d 984 (9th Cir. 2011) ............................................................ 10, 12

*United States ex rel. Dalitz v. AmSurg Corp.*
   2014 U.S. Dist. LEXIS 177374 (Case No. 2:12-cv-02218-TLN-CKD
   Eastern Dist. of Cal., December 24, 2014) ............................................. 23

*United States ex rel. Gatsiopoulos v. Kaplan Career Inst.*
   2010 U.S. Dist. LEXIS 135246 (S.D. Fla. Dec. 22, 2010) ..................... 19

*United States v. Smithkline Beecham Clinical Labs*
   245 F.3d 1048 (9th Cir. 2001) ................................................................ 12

*United States v. Univ. of Phoenix*
   461 F.3d 1166 (9th Cir. 2006) ............................................................. 9, 10

*Uruquilla-Diaz v. Kaplan University*
   780 F.3d 1039 (11th Cir. 2015) .............................................................. 21

**RELATORS' OPPOSITION TO DEFENDANTS' AMENDED MOTION TO
DISMISS;** Case No. CV-13-5256-RGK(AJWX)

iv

1

## RELATORS' OPPOSITION TO DEFENDANTS' AMENDED MOTION TO DISMISS

2

## I.   INTRODUCTION

3

4

5

6

7

8

9

10

11

        This *qui tam* lawsuit seeks to hold Defendants B&H Education Inc., d/b/a Marinello School of Beauty, B&H Education Holdings, L.L.C., Dr. Rashed Elyas, Dr. Nagui Elyas, Michael Benvenuti, Michael Flecker, Abry Partners VI, L.P., Abry Investment Partnership, L.P., and Abry Senior Equity II, L.P. (collectively, "Defendants"),[1] accountable for a multi-million dollar fraud on U.S. taxpayers through a Title IV business venture scheme funded through student financial aid programs.  That fraudulent scheme, which has cost taxpayers tens – likely hundreds – of millions of dollars since 2007, is detailed with more-than-sufficient particularity in the First Amended Complaint ("FAC").

12

13

14

15

16

17

18

19

20

        In their Motion to Dismiss ("Motion"), Defendants attack the FAC on the grounds that (a) allegations against Defendants are pled collectively; (b) allegations supporting the scienter element are not specific; (c) allegations describing each of Defendants' six fraudulent schemes lack particularity; and (d) Count Four's conspiracy claim is not specifically pled.  Defendants' overarching argument is that the FAC lacks sufficient particularity.  To the contrary, Relators have detailed each fraudulent scheme based on personal knowledge, with enough specificity to meet the Ninth Circuit's pleading standard for claims under the False Claims Act as announced in *Ebeid v. Lungwitz*, 616 F.3d 993 (9th Cir. 2010).

21

22

23

24

25

26

        Each of the six schemes alleged in the FAC is described in detail, and where appropriate, with specific examples.  That is all that is required in this Circuit to adequately plead violations of the False Claims Act.  *See id.* at 998-99 ("sufficient to allege 'particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted.'") (citation omitted).

27

28

_____

[1] Relators have agreed to dismiss named defendants United Beauty Enterprises, Inc. and Scope Beauty Enterprises, Inc.

**RELATORS' OPPOSITION TO DEFENDANTS' AMENDED MOTION TO DISMISS;** Case No. CV-13-5256-RGK(AJWX)

1

## II.   <u>SUMMARY OF THE COMPLAINT</u>

Defendant B&H Education, Inc. d/b/a Marinello School of Beauty ("MSB"), is a for-profit vocational post-secondary school offering cosmetology, beautician, and massage courses.  FAC at ¶ 19.  MSB students largely finance their education through the federal government's various student financial aid programs established by the Higher Education Act of 1965 ("HEA").  *Id.* at ¶ 40.  These program monies are known as "Title IV funds" and include the Federal Pell Grant Program ("Pell Grants"), the Federal Family Education Loan Program ("FFELP"), and the Federal Direct Loan Program ("FDLP").  *Id.*

In order for post-secondary institutions to participate in, or "draw down" funds from, federal financial aid programs, the school must be both (a) accredited and licensed by the state in which they operate, FAC at ¶ 43, and (b) consent to a Program Participation Agreement ("PPA") with the Department of Education ("DOE"), *id.* at ¶ 47.  By consenting to the PPAs, Defendants agreed to abide by specific federal regulations as a condition of payment of Title IV funds.  *Id.* at ¶¶ 47-49.  Federal regulations also prohibit institutions from making substantial misrepresentations about, among other things, the nature of the intuitions' educational programs and the employability of graduates, and the nature of the institution's financial charges.  *Id.* at ¶¶ 44-45.  The DOE has authority to revoke or terminate an institution's PPA if it is found to have engaged in substantial misrepresentations.  *Id.* at ¶ 46.

Because financial aid is taken out by the students, in order to become and remain eligible for Title IV funds, students must also meet certain requirements.  Chief among these requirements are that the student have (a) a high school diploma or its recognized equivalent, unless an enumerated exception applies, and (b) demonstrate they are making satisfactory academic progress in their court of study according to their intuitions published standards.  *Id.* at ¶ 41.

**RELATORS' OPPOSITION TO DEFENDANTS' AMENDED MOTION TO DISMISS;** Case No. CV-13-5256-RGK(AJWX)                                                                2

Fully aware of these regulations, Defendants engaged in a number of fraudulent schemes to maintain MSB's requisite accreditation and appear as though the institution and its students were eligible for Title IV funds.

### A.     Overview of the Fraudulent Schemes

In order to continue to draw down Title IV funds, Defendants employed various schemes including:  (1) manipulating student attendance records so as to make ineligible students eligible to receive financial aid; (2) falsifying the institution's accounting so it appeared to meet the 90/10 federal aid/other funding ratio requirements; (3) manipulating and falsifying students' entrance exams so that they met the high-school diploma or equivalent standard to be eligible for financial aid; (4) manipulating students' grades so otherwise ineligible students would appear to be making sufficient academic progress and remain eligible for financial aid; (5) manipulating placement statistics to misrepresent the employability of graduates; and (6) manipulating cohort default rates to retain its requisite accreditation.

### B.     Factual Allegations

Relators Terisa Mercer Caron, Veronica Trejo, Paige Stevens, Heather Luedtke, Tameca Shelton, and Cindy Juarez (collectively, "Relators") were employees at various MSB campuses in Southern California over various times from 2008 through September 2013.  FAC at ¶¶ 13-18, 5.  Through their limited roles at the MSB campuses, ranging from Campus Director to Financial Aid officers to course instructors, Relators were personally exposed to Defendants various fraudulent schemes, which form the basis of their FAC.

1.     <u>Defendants manipulated student attendance records so that students who should have been dropped were still eligible to receive Title IV monies.</u>

In order for students to be eligible for Title IV funds, they must, among other things, demonstrate they are maintaining satisfactory academic progress in their

course of study according to their school's published standards. *Id*. at ¶ 41. If a student withdraws from a school without completing their course of study, the school is required to return a *pro rata* share of any Title IV funds drawn down for that student. *Id*. at ¶ 42. Under the HEA, if a student has not attended a class within any fourteen-day period, then the student is considered "withdrawn," and no longer eligible for federal financial aid programs. FAC at ¶ 78. MSB's own published Leave of Absence ("LOA") Policy permitted only one LOA of up to 180 days per student during their course of study. *Id*. at ¶ 86. This policy was in line with Defendants' requirement to gauge students' achieving sufficient academic progress, a condition for drawing down Title IV funds. *Id*. at ¶¶ 41-42, 85-86.

To avoid returning federal financial aid monies for withdrawn students, Defendants routinely falsified student attendance records by adding an hour of fake attendance to students' records who would have been consecutively absent for fourteen days. FAC at ¶¶ 20, 79. Relators are aware of lists of students whose attendance was manipulated at MSB's Hemet and San Diego campuses, *id*. at ¶¶ 80-81, as well as dozens of specific students at the Victorville campus whose attendance was manipulated, *id*. at ¶ 84. MSB executive Dr. Garo Ghazarian instructed MSB employees to add falsified attendance hours to students who were supposed to have been withdrawn. *Id*. at ¶ 80. To accomplish this, MSB employees at the San Bernardino campuses used the students' swipe cards to enter falsified attendance hours. *Id*. at ¶ 89.

Defendants' own internal audits confirm a pattern of MSB employees manually entering falsified attendance hours that did not comport with the attendance records maintained by course instructors, a practice that was known by individual-officer Defendants Mike Benvenuti and Dr. Nagui Elyas. FAC at ¶¶ 82-84. Those same audits also acknowledge additional discrepancies between MSB's published Leave of Absences ("LOA") Policy and students' actual LOAs. Through their experience at the Victorville and San Diego campuses, Relators were

personally aware of students remaining on attendance records despite not attending classes for months or had dropped out, in violation MSB's own LOA Policy. *Id.* at ¶¶ 86-87.  To accomplish this, campus registrars would fabricate whole-cloth the required supporting documentation for students' LOAs and forge approval signatures. *Id.* at ¶ 87.  But for this fraudulent conduct, Defendants' students would not have remained eligible for federal financial aid programs.

## 2. Defendants concealed their failure to meet the 90/10 financial compliance by "over awarding" financial aid packages and admitting sham "cash-pay" students.

Defendants also fraudulently retained federal financial aid monies in an effort to avoid the 90/10 requirement.  Under the PPA Defendants consented to, MSB was required to ensure that at least ten percent of its revenues for each fiscal year were derived from sources other than Title IV programs.  FAC at ¶ 90.  This is known as the "90/10" rule.  *Id.*

Defendants engaged in a systematic "over awarding" of financial aid money and, in an effort to fraudulently collect federal financial aid monies.  FAC at ¶¶ 91-93.  Defendants held the "over awarded" amount beyond the time period allowed to rectify innocent mistakes. *Id.*  In fact, Defendants held a corporate training to discuss this fraudulent conduct where Defendant Michael Flecker instructed MSB employees to "over award" federal financial aid with the intent to falsify 90/10 compliance. *Id.* at ¶ 91.

Another means of avoiding this 90/10 requirement was to admit sham "cash-pay" students.  In this scheme, Defendants credited cash payments to students and then falsified those students' attendance records and grades to conceal the school's lack of compliance with the 90/10 rule.  FAC at ¶ 94.  In the case of one particular sham student, Defendant Dr. Nagui Elyas instructed Relator Terisa Mercer Caron to credit a $27,000 check to a student at the Moreno Valley campus and then to continue to enter attendance hours for that same student, despite the student only

attending two days of class.  *Id*. at ¶¶ 95-96.  Further compounding this fraud, Dr. Nagui Elyas instructed Relator Terisa Mercer to falsify an LOA for the sham student in order to keep her on attendance rosters.  *Id*. at ¶ 96.  In direct violation of their PPAs, Defendants concealed their failure to meet the "90/10" rule and continued to fraudulently draw down Title IV funds.

        3.     <u>Defendants failed to verify academic eligibility of students and fabricated students' entrance exams in order to ensure the students' eligibility for Title IV funds.</u>

To be eligible for Title IV program funds, students must have a high school diploma or its recognized equivalent, unless an enumerated exception applies. FAC at ¶ 41.  One such enumerated exception existed during the relevant time of the allegations in the FAC:  instead of high school diploma, a student needed to obtain a passing score on an independently administered test, known as "Ability to Benefit" ("ATB") exams.  FAC at ¶ 41.

In complete disregard of these eligibility requirements, Defendants failed to require or verify diplomas of potential students.  Defendants went so far as to help students cheat the ATB test and fabricate students' scores.  Specifically, Defendants developed a scheme to cheat on the "Ability to Benefit" ("ATB") test, including using surrogate test takers to take the exams at two campuses and providing answers to test-takers.  FAC at ¶¶ 100-101.  Relator Heather Luedtke witnessed a proctor merely collect the names and relevant identification information of potential students and then enter the collected information along with a "pass" score for the ATB exam.  *Id.* at ¶ 102.  Relators are personally knowledgeable of this scheme being carried out across six of MSB campuses.  *Id.* at ¶ 99.  After the ATB exception was removed, Defendants developed a relationship with Parkridge Private School ("Parkridge") and began the "Project Diploma" program.  *Id.* at ¶ 103.  Through "Project Diploma," MSB employees became proctors of exams for Parkridge students.  *Id.*

The purpose of these fraudulent schemes was to increase enrollment numbers, thereby allowing more MSB students to qualify for federal financial aid which Defendants would collect.  FAC at ¶¶ 102-103.  But for this fraudulent conduct, Defendants would not have been able to qualify students to receive federal financial aid.  *Id*. at ¶ 99.

4.  <u>Defendants manipulated student grades so that students who were failing to make satisfactory academic progress could still receive federal financial aid funds.</u>

Schools like MSB are required to demonstrate that students receiving Title IV funds are actually making sufficient academic progress in the course work, i.e., that they are on track to graduate and receive a degree.  FAC at ¶¶ 41-42, 108-109.  Demonstrating sufficient academic progress is a condition of payment for Title IV funds consented to through the PPA.  *Id*.

Yet, Defendants pervasive practice was to prevent teachers from failing or dropping students who were failing their courses.  Relators Paige Stevens and Tameca Shelton encountered multiple MSB administrators directing them to retroactively alter grade sheets for students who were not passing classes they taught.  FAC at ¶ 110.  In fact, Defendants' computer system prevented students from receiving failing grades.  *Id*. at ¶ 112.  As a result of these schemes, Defendants knowingly drew down Title IV funds MSB was not entitled to.

5.  <u>Defendants misrepresented placement statistics in order to maintain their required accreditation and eligibility for Title IV programs.</u>

Federal regulations, which Defendants agreed to abide by as a condition of payment of Title IV programs, prohibit institutions from making substantial misrepresentations to prospective applicants.  FAC at ¶ 44.  Specifically, federal regulations explicitly prohibited misrepresentations about the employability of the institution's graduates.  *Id*. at ¶ 45.  Other federal guidelines require schools'

1  tuition rates match graduates' ability to work entry level positions in their chosen

2  field. *Id*. at ¶ 123.  These graduation statistics were factors considered by the state

3  licensure boards for for-profit institutions in determining whether or not to grant or

4  renew an institution's license. *Id*. at ¶ 126.

5      Based on Relators' personal knowledge, Defendants manipulated placement

6  statistics across seven campuses over at least five years.  FAC at ¶ 114.

7  Defendants artificially inflated the placement statistics in their annual reports

8  which Defendants certified to the accreditation agencies. *Id*. at ¶¶ 115-116.  To do

9  this, Defendants instructed MSB employees to fabricate business cards for MSB

10  graduates who could not be placed and then identify those students as "self-

11  employed." *Id*. at ¶¶ 117-118.  Relators are aware of at least twenty-three students

12  who had these fake business cards.  FAC at ¶ 119.  Defendants also artificially

13  inflated placement statistics by improperly claiming students as "placed in their

14  field" if Defendants could find any tangential relationship between the student's

15  job and their field of study. *Id*. at ¶ 120.  For example, Cosmetology graduates

16  who worked merely as cashiers in salons would be counted as "placed in their

17  field." *Id*.

18      Defendants also artificially inflated entry level salaries of graduates.  FAC at

19  ¶ 123.  Relator Terisa Mercer was Dr. Nagui Elyas directed MSB's Career

20  Development personnel to change alumni salaries from the information originally

21  collected by campus-level Career Services personnel.  FAC at ¶ 124.  Defendants

22  own independent audits confirm that from 2009 through 2010, MSB's career

23  placement statistics were not accurate.  FAC at ¶ 125.

24      Through these fraudulent schemes and resulting misrepresentations of

25  material placement statistics, MSB was able to maintain its required licensure, a

26  material consideration for the DOE in determining Title IV funding.  As a result,

27  Defendants wrongfully certified their eligibility and fraudulently received Title IV

28  funds.

6.  <u>Defendants manipulated cohort default rates to maintain MSB's eligibility to receive Title IV funds.</u>

A "Cohort Default Rate" ("CDR") is the percentage of an institution's federal student loan borrowers who defaulted within three years of entering repayment.  FAC at ¶ 127.  The DOE considers an institution's CDR in evaluating whether an institution is a good investment of student and tax-payer financial aid.  FAC at ¶ 127.  If a school has a high default rate, it can be sanctioned or lose eligibility to receive federal financial aid altogether.  FAC at ¶ 127.

To prevent MSB from becoming ineligible for federal financial aid, MSB employees targeted students who had defaulted on their student loans to re-enroll them in MSB courses.  Specifically, defaulted students were identified on campus "Campaign Boards."  FAC at ¶ 128.  Campus directors were then incentivized with bonuses and program cost refunds to "re-enter" those defaulted students.  FAC at ¶ 128.  These "re-entered" students would then qualify under a new cohort year for determining the CDR, thereby making MSB's CDR appear much lower than they actually were.  FAC at ¶ 128.  Through this fraudulent scheme, MSB remained eligible for Title IV program funding.

## III.  <u>LEGAL STANDARD</u>

In the False Claim Act ("FCA") context, Plaintiffs must plead the sufficient facts to establish (1) a false statement or fraudulent conduct (2) was made with the requisite scienter (3) which was material to the government's decision (4) to pay Defendants.  *United States v. Univ. of Phoenix*, 461 F.3d 1166, 1171-72 (9th Cir. 2006).  Two theories under which FCA liability may attach are "false certification" or "fraud in the inducement."  Under an "express false certification theory," Defendants agree to various express conditions of payment which they never intend to abide by but nonetheless submit claims for payment to the government.  *Id.*  Under an "implied false certification theory," "certification occurs when an entity has previously undertaken to expressly comply with a law, rule, or regulation, and

that obligation is implicated by submitting a claim for payment even though a certification of compliance is not required in the process of submitting the claim." *Ebeid v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010), cert. denied 178 L. Ed. 2d 546 (2010). Under a "fraud-in-the-inducement" theory, the defendants submit claims for payment under a contract that was originally obtained through fraud. *Univ. of Phoenix*, 461 F.3d at 1173.

Under any FCA theory, Relators' burden under Rules 12(b)(6) and 9(b) is to plead sufficient facts such that there is a reasonable inference that Defendants knowingly engaged in fraudulent conduct resulting in government payment and Defendants are adequately on notice of the alleged fraudulent conduct so that they can prepare a defense. *U.S. ex rel. Lee v. Corinthian Colleges*, 655 F.3d 984, 991, 997 (9th Cir. 2011); *Ebeid v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010).

### A.  Rule 12(b)(6)

"Rule 12(b)(6) is read in conjunction with Rule 8(a), which requires only a short and plain statement of the claim showing that the pleader is entitled to relief." *Peel v. Brooksamerica Mortgage Corp.*, 788 F. Supp. 2d 1149, 1157 (C.D. Cal. 2011). A complaint need only allege "enough facts to state a claim to relief that is plausible on its face," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), or allege sufficient facts to "raise a right to relief above the speculative level." *Id.* at 555. The plausibility analysis is context-specific and includes the Court's own judicial experience and common sense. *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). The Court must accept as true all allegations of material facts alleged in the complaint, and must construe all inferences in the light most favorable to the non-moving party. *Moyo v. Gomez*, 32 F.3d 1382, 1384 (9th Cir. 1994).

### B.  Rule 9(b)

With respect to FCA complaints, in *Ebeid v. Lungwitz*, 616 F.3d 993 (9th Cir. 2010), the Ninth Circuit rejected the more-stringent standard adopted by several other circuits, and instead explicitly adopted the less-demanding Fifth

Circuit standard, holding:

> We **do not** embrace the district court's categorical approach that would, as a matter of course, require a relator to identify representative examples of false claims to support every allegation, although we recognize that this requirement has been adopted by some of our sister circuits. [citations] In our view, use of representative examples is simply one means of meeting the pleading obligation. We join the Fifth Circuit in concluding, in accord with general pleading requirements under Rule 9(b), that **it is sufficient to allege "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted."** [citation].

*Ebeid*, 616 F.3d at 998-99 (emphasis added). "Likewise, a plaintiff may, but need not, provide representative examples to establish the payment element of the prima facie case. The Rule 9(b) standard may be satisfied by pleading with particularity a **reasonable basis to infer** that the government either paid money or forfeited moneys due." *Id.* at 999 n.4 (emphasis added). "[T]he requirements of Rule 9(b) relax 'as to matters peculiarly within the opposing party's knowledge.'" *Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1439 (9th Cir. 1987) (quoting case). Rule 9(b) "requires the identification of the circumstances constituting fraud so that the defendant can prepare an adequate answer from the allegations." *Odom v. Microsoft Corp.*, 486 F.3d 541, 555 (9th Cir. 2006) (citing case); *Bly-Magee v. California*, 236 F.3d 1014, 1018 (9th Cir. 2001).

## IV.   ARGUMENT

### A.   Relators have provided sufficient particularity of the allegations against each defendant.

Defendant argue the FAC's allegations are only collectively plead against "Defendants" and, therefore, should be dismissed for lack of specificity with respect to the roles of Defendants Dr. Rashed Elyas, Dr. Nagui Elyas, Michael Benvenuti, Michael Flecker, (collectively, "Executive Defendants") and Abry Partners VI, L.P., Abry Investment Partnership, L.P., and Abry Senior Equity II, L.P. (collectively, "Investor Defendants"). Motion at 5-8. That argument,

however, ignores the case-specific analysis required for Rule 9(b) standards where evidence is in the exclusive control of Defendants.  As Defendants' Motion points out, Relators have, to the best of the evidence available to them, pleaded sufficient details such that the Executive defendants are on adequate notice of their involvement in MSB's fraudulent scheme.  Motion at 6-8.

The Ninth Circuit's Rule 9(b) pleading requirements are relaxed when evidence is exclusively controlled of the Defendants.  *United States v. Smithkline Beecham Clinical Labs*, 245 F.3d 1048, 1052 (9th Cir. 2001).  "There is no absolute requirement that where several defendants are sued in connection with an alleged fraudulent scheme, the complaint must identify *false statements* made by each and every defendant."  *Scwartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (emphasis in original).  "Instances of corporate fraud may . . . make it difficult to attribute particular fraudulent conduct to each defendant as an individual."  *Moore v. Kayport Package Express*, 885 F.2d 531, 540 (9th Cir. 1989).  One means to overcome such difficulties is to plead, where possible, the role of the individual defendants in the fraudulent scheme.  *Id.*  Accordingly, relators need only allege individual defendants' roles in making a false statement to the government so that Defendants are on notice of the allegations against them in order to prepare a defense.  *See U.S. ex rel. Lee v. Corinthian Colleges*, 655 F.3d 984, 998, 997 (9th Cir. 2011).

In *Smithkline Beecham Clinical Labs*, the Ninth Circuit refused to relax 9(b) pleading standards for a relator who had worked as a supervisor for the Smithkline Beecham Clinical Labs for over twenty years who had direct knowledge of the allegedly false tests fraudulently submitted for payment and was still employed by the lab at the time he filed his complaint.  245 F.3d at 1052.  A similar situation was at issue in *Scwartz*, where plaintiff alleged fraudulent conduct against both a corporation and individuals.  476 F.3d at 765.  In determining plaintiff had not

pleaded sufficient facts under Rule 9(b), the Court noted the failure to identify or attribute specific misconduct to any specific defendant. *Id.*

Unlike *SmithKline Beecham Clinical Labs* and *Schwartz*, here, Relators have sufficiently identified the individual Defendants' roles in MSB's fraudulent scheme, to the extent they had access to such information. Relators in this case were not executives in MSB's corporate offices nor were they supervisors over the processes for drawing down Title IV funds. Rather, Relators' positions ranged from Campus Director, to campus-based Financial Aid Officers and Career Services Manager, to course instructors. FAC at ¶¶ 13-18. Not one Relator held a supervisory role in MSB's corporate offices. As such, they were not privy to corporate records and files nor do they regularly interact with MSB's officers. In fact, as Relators uncovered Defendants' fraudulent schemes, each was targeted by Defendants for retaliation and continue to be scapegoated by Defendants. *See* Motion at 2 fn. 3.

Yet, to the extent their uncovering fraudulent activity resulted in interactions with or evidence of the Executive Defendants' role, Relators have identified the Executive Defendants' participation in causing fraudulent claims being presented to the government. For example, Relators identify that all of the PPAs MSB agreed to during the relevant time period of the FAC's allegations were signed by the Executive Defendants. FAC at ¶ 74. Relators specifically provided information from the September 2008 PPA and identified Dr. Rashed Elyas as the signatory on behalf of MSB. *Id.* at ¶ 68. With respect to Defendants' attendance manipulation scheme, Relators identified both Mike Benvenuti and Dr. Nagui Elyas as being copied on October 2012 emails highlighting the MSB's awareness of the systemic fraudulent conduct. *Id.* at ¶¶ 82-83. Dr. Nagui Elyas was also aware of the practice of falsifying LOAs to maintain students on attendance records. *See id.* at ¶ 96. With respect to the "over awarding" of financial aid awards to conceal 90/10 compliance, Relators identified an April 2011 training

**RELATORS' OPPOSITION TO DEFENDANTS' AMENDED MOTION TO DISMISS; Case No. CV-13-5256-RGK(AJWX)**                    13

session where Michael Flecker instructed MSB employees to engage in the fraudulent scheme and refused to entertain questions of such a policy's legality. *Id.* at ¶ 91.  Relators also identified Dr. Nagui Elyas's role in using sham "cash pay" students to further conceal MSB's 90/10 compliance. *Id.* at ¶¶ 95-96.  With respect to fabricating the MSB students' financial aid eligibility, Relators specified instructions from Mike Flecker and Dr. Nagui Elyas to falsify students' financial aid applications. *Id.* at ¶ 105.  Dr. Nagui Elyas is also identified as having instructed MSB's career services employees to falsify alumni salaries. *Id.* at ¶ 124.

The Executive Defendants were intimately involved in the various schemes to defraud the government.  At the very least, these specific instances allow for the plausible inference that the Executive Defendants were aware of fraudulent conduct yet acted in conscious disregard of their duty to prevent or correct it.  As such, Relators have met their pleading requirements under a case-specific analysis of Rule 9(b).

## B.   The FAC Adequately Alleges Scienter

Defendants argue Relators are required to allege specific details of Defendants' knowledge in perpetrating their fraudulent schemes.  This argument ignores Ninth Circuit precedent, which only requires Relators to allege general facts regarding Defendants' intent and/or knowledge.  Relators have met this burden.

"Under Rule 9(b), circumstances constituting fraud or mistake must be stated with particularity, but malice, intent, knowledge, and other conditions of a person[']s mind, including scienter, can be alleged generally." *U.S. ex rel. Lee v. Corinthian Colleges*, 655 F.3d 984, 996 (9th Cir. 2011) (internal citations and quotations omitted).  Relators need only provide sufficient facts such that the Court may draw an inference that the Defendants are liable for their misconduct. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Under the FCA, a defendant need

only act "knowingly," which is defined as including acting in "reckless disregard of the truth or falsity of the information," to be liable.  31 U.S.C. § 3729(b)(1).

Contrary to Defendants' reading of the FAC, Relators have provided sufficient detail of each of Defendants' fraudulent schemes to, at a minimum, infer Defendants' knowledge and intent.  As detailed above, Relators identified each of the Executive Defendants' role in causing MSB to wrongfully draw down federal financial aid dollars.  Both Mike Benvenuti and Dr. Nagui Elyas knew of Defendants' attendance manipulation scheme.  FAC at ¶¶ 82-83, 96.  Dr. Nagui Elyas and Michael Flecker instructed employees to manipulate MSB's 90/10 data through the "over awarding" and sham cash pay student schemes.  FAC at ¶¶ 91, 95-96.  Michael Flecker and Dr. Nagui Elyas also instructed MSB employees to falsify students' eligibility for Title IV funds.  FAC at ¶ 105.  Dr. Nagui Elyas also instructed MSB employees to falsify alumni salaries.  FAC at ¶ 124.

Far from merely inserting "knowingly" throughout the FAC, Relators have provided specific facts that establish Defendants' knowledge.  The FAC specifically alleges that the Executive Defendants themselves – those responsible for MSB's continuing compliance with the DOE's regulations – were aware of and/or intimately involved in the various schemes to defraud the government.

Moreover, the details that Relators provide in the FAC of each scheme are sufficient to plausibly infer scienter—which, under the FCA, requires only recklessness or more.  Under any fair reading of the FAC, Defendants did far more than accidentally or negligently falsify grades, attendance records, placement statistics, and entrance exams.  Accordingly, Relators have met the general pleading requirements to, at the very least, *infer* scienter.

### C. Defendants' fraudulent schemes are each pled with sufficient particularity and assert a claim under which relief can be sought.

1. Defendants' Attendance Record Manipulation Scheme is Sufficiently Pleaded.

Defendants argue the FAC should be dismissed for failure to specifically name the individuals responsible for each instance of attendance manipulation, when and how such manipulations were done.  Motion at 11-12.  Defendants further suggest that liability only attaches if the individual Defendant who signed the PPA knew of such manipulations.  *Id.*  In doing so, Defendants misapply the liberal pleading standards for FCA claims in the Ninth Circuit, and ignore the detail Relators supply regarding specific instances of attendance manipulation based on their personal knowledge.

Indeed, Relators meet even the stringent pleading standard of other circuits that was specifically rejected by the Ninth Circuit in *Ebeid*, which requires a complaint to provide specific examples of the false claims.  As stated in *Ebeid*, "We *do not* embrace the district court's categorical approach that would, as a matter of course, require a relator to identify representative examples of false claims to support every allegation, although we recognize that this requirement has been adopted by some of our sister circuits."  *Ebeid*, 616 F.3d at 998-99 (emphasis added).  Nonetheless, in the FAC, Relators have provided representative examples of Defendants' falsification of attendance records.  *See* FAC ¶¶ 80-84.  Accordingly, Relators do more that is required of simply "pleading with particularity a **reasonable basis to infer** that the government either paid money or forfeited moneys due." *Ebeid* at 999 n.4 (emphasis added).[2]

In the FAC, Relators explain that Defendants routinely falsified student attendance records by adding an hour of fake attendance to students' records who would have been consecutively absent for fourteen days.  FAC at ¶ 20.  Relators support their claims by identifying lists of students whose attendance was manipulated at MSB's Hemet and San Diego campuses.  FAC at ¶¶ 80-81.

---

[2] Relators meet the Rule 9(b) requirements by identifying "the circumstances constituting fraud so that the defendant can prepare an adequate answer from the allegations." *Odom v. Microsoft Corp.*, 486 F.3d 541, 555 (9th Cir. 2006) (citing case); *Bly-Magee v. California*, 236 F.3d 1014, 1018 (9th Cir. 2001).

Relators also identify specific students at the Victorville campus whose attendance was manipulated.  FAC at ¶ 84.  Relators further identify MSB executive Dr. Garo Ghazarian has having given the instruction to add these falsified attendance hours.  FAC at ¶ 80.  The FAC also explains how MSB employees at the San Bernardino campuses used the students' swipe cards to enter in the falsified time.  FAC at ¶ 89.

Furthermore, Defendants' internal audits confirm a pattern of MSB employees manually entering falsified attendance hours that did not comport with the attendance records maintained by course instructors, a practice that was known by individual-officer Defendants Mike Benvenuti and Dr. Nagui Elyas.  FAC at ¶¶ 82-84, 96.  The admission that "students should have been dropped" based on these time-keeping inconsistencies is a *de facto* admission that Defendants wrongfully retained any federal financial aid monies retained for those students.  In violation of the PPA and federal regulations Defendants consented to, Defendants knew that they should have returned any federal financial aid monies drawn down for those students yet failed to do so.

Defendants also suggest that the additional discrepancies between MSB's published Leave of Absences ("LOA") Policy and students' actual LOAs were permissible because there is no DOE prohibition regarding multiple LOAs.  Motion at 12.  What Defendants' argument ignores is that Defendants agreed to uphold their own published policies as a measure of ensuring a student is making sufficient academic progress as a condition for drawing down Title IV funds.  FAC at ¶¶ 41-42, 85-86.  To support their claims, Relators provided specific instances of students violating MSB's own LOA Policy at the Victorville and San Diego campuses.  *Id.* at ¶¶ 86-87.  Contrary to Defendants assertions, Relators sufficiently pleaded "how" and "where" Defendants fraudulent conduct occurred as well as "who" directed such conduct.  *See* Motion at 11.

> 2.   Defendants' Failure to Comply with the 90/10 Requirements is Sufficiently Pled and States a Claim upon Which Relief Can be Granted.

**RELATORS' OPPOSITION TO DEFENDANTS' AMENDED MOTION TO DISMISS; Case No. CV-13-5256-RGK(AJWX)**          17

Defendants next argue that their scheme to withhold federal financial aid disbursements from students was not in violation of the HEA's requirement that not more than 90% of an institution's income be derived from Title IV funds. Motion at 12-13.  However, Defendants, again, have mischaracterized the FAC's allegations and ignore the detail provided by Relators.

The Ninth Circuit has adopted an implied false certification theory for FCA claims.  Under this theory, "certification occurs when an entity has previously undertaken to expressly comply with a law, rule, or regulation, and that obligation is implicated by submitting a claim for payment even though a certification of compliance is not required in the process of submitting the claim."  *Ebeid*, 616 F.3d at 998.  Ignoring this precedent, Defendants assume an explicit false certification theory and rely on the Eleventh Circuit's *Uruquilla-Diaz* case.

Unlike the Relator in *Uruquilla-Diaz*, here, Relators allege Defendants have wrongfully retained federal financial aid monies in an effort to avoid the 90/10 requirement they consented to as part of their PPAs.  Specifically, the FAC explains Defendants systematic "over awarding" and withholding of financial aid money in an effort to wrongfully keep the federal financial aid monies.  Far from an innocent mistake, Defendants held the "over awarded" amount well beyond the time period allowed to rectify innocent conduct.  FAC at ¶¶ 91-93.  In fact, Relators identify a corporate training held by Defendants to discuss this fraudulent conduct where Defendant Michael Flecker instructed MSB employees to "over award" federal financial aid with the intent to falsify 90/10 compliance.  *Id*. at ¶ 91. Also unlike *Uruquilla-Diaz*, Relators identified a specific sham "cash-pay" student enrolled for the purpose of maintaining MSB's 90/10 requirements.  Relators also explain that Defendant Dr. Nagui Elyas instructed Relator Terisa Mercer Caron to credit a $27,000 check to a student at the Moreno Valley campus and then to continue to enter attendance hours for that same student, despite the student only attending two days of class.   FAC at ¶ 95-96.  Because of these fraudulent

concealment efforts, Defendants drew down and retained Title IV funds they knew they were not eligible for.

### 3. Defendants' Entrance Exam, Diploma and ATB Manipulation Scheme is Sufficiently Pled.

Defendants attempt to argue that failing to verify students' high school diploma or equivalent attainment does not rise to the level of fraud.  Motion at 14.  Defendants further argue that coaching students through their ATB exams and unqualified proctors are not violations.  *Id.*  Again, however, Defendants' arguments ignore the causal connection between Defendants' fraudulent conduct and subsequent wrongful receipt of federal financial aid monies.  FAC at ¶ 99.

As properly alleged in the FAC, but for Defendants' failure to require or verify diplomas and/or fabrication of eligibility, Defendants would not have been able to draw down Title IV funds.  FAC at ¶ 99.  Relators support these allegations by identifying six campuses where this fraudulent conduct occurred.  *Id.*  Relators also provide specific details of Defendants scheme to make eligible otherwise unqualified students through a scheme to cheat on the "Ability to Benefit" to test, including using surrogate test takers to take the exams at two campuses and providing answers to test-takers.  *Id.* at ¶¶ 100-101.  The FAC further identifies a specific instance where Relator Heather Luedtke witnessed a proctor merely collect the names and relevant identification information of potential students and then enter the collected information along with a "pass" for the ATB exam.  *Id.* at ¶ 102.

In their support, Defendants cite only one case, unpublished, from the Southern District of Florida, *United States ex rel. Gatsiopoulos v. Kaplan Career Inst.*, 2010 U.S. Dist. LEXIS 135246 (S.D. Fla. Dec. 22, 2010).  In that case, "[t]he Amended Complaint allege[d] that Defendants coach perspective students so that they will pass the exam."  *Id.* at *17.  The district court found there was nothing illegal about simply "coaching" a student.  *Id.*  The FAC in this case, in contrast,

alleges far more than mere "coaching."  It bluntly alleges, and provides details of, cheating and falsification.  Accordingly, *Gatsiopoulos* is of no help to Defendants.

4.   Defendants' Grading and Academic Progress Scheme is sufficiently pleaded and asserts a viable claim for relief.

Defendants attempt to argue that their scheme to falsify and otherwise manipulate students' academic progress does not give rise to an FCA claim. Motion at 14-15.  Again, however, Defendants argument is a mischaracterization of Defendants' larger scheme to fraudulently obtain Title IV funds and a failure to understand what constitutes a "certification" subject to FCA liability under Ninth Circuit precedent.

Unlike the grade inflation scheme at issue in *Uruquilla-Diaz*, Relators have sufficiently pled particular facts to establish that Defendants' grade inflation scheme was intended to fraudulently obtain Title IV funds.  Specifically, Relators explain that schools are required to demonstrate that their students receiving Title IV funds are actually making sufficient academic progress in the course work. FAC at ¶¶ 41-42, 108-109.  Demonstrating sufficient academic progress is a condition of payment for Title IV funds consented to through the PPA.  *Id.*  Yet, Defendants' pervasive practice was to prevent teachers from failing or dropping students who were failing their courses.  Relators Paige Stevens and Tameca Sheldon specify instances where multiple MSB administrators directed them to retroactively alter grade sheets for students who were not passing classes they taught.  *Id*. at ¶ 110.  In fact, Defendants computer system prevented students from receiving failing grades.  *Id*. at ¶ 112.  As a result, Defendants knowingly drew down Title IV funds they were not entitled to.  These allegations are far more detailed than those at issue in *Urquilla Diaz*, and tie Defendants' conduct directly to the continued draw-down of taxpayer money.

5.   Defendants' Falsified Placement Statistics are sufficiently pled and assert a viable claim for relief.

**RELATORS' OPPOSITION TO DEFENDANTS' AMENDED MOTION TO DISMISS;** Case No. CV-13-5256-RGK(AJWX)                    20

Defendants argue that misrepresenting placement statistics, a material consideration in determining maintaining accreditation, does not create FCA liability. Motion at 16-17. Defendants' argument entirely relies on the statutory option of the DOE to revoke an institution's eligibility in the event of substantial misrepresentations. *Id.* at 17. In doing so, Defendants fail to understand the full nature and purpose of an FCA claim.

In fact, in *Uruquilla-Diaz*, a case Defendants heavily rely upon, the Eleventh Circuit explained that lying to an accreditation agency constitutes an FCA violation because accreditation is material to receiving Title IV funds. *Uruquilla-Diaz v. Kaplan University*, 780 F.3d 1039, 1056 (11th Cir. 2015).[3] That is precisely the issue in this case: but for Defendants' fraudulent schemes, they would not have maintained the requisite accreditation the DOE mandates as a condition of payment for Title IV funds.

Relators specifically pled instances of manipulated placement statistics across seven campuses over at least five years. FAC at ¶ 114. The FAC alleges Defendants artificially inflated the placement statistics in their annual reports which Defendants certified to the accreditation agencies. *Id.* at ¶¶ 115-116. Relators explain Defendants efforts to fabricate business cards for MSB graduates who could not be placed and then identify those students as "self-employed." *Id.* at ¶ 117. To support this claim, Relators identify twenty-three students who had these fake business cards. *Id.* at ¶ 119. Relators also explain how MSB employees were taught by other MSB administrators on how to fabricate the business cards. *Id.* at ¶ 118.

    6.    <u>Defendants' manipulation of cohort default rates in order to continue to receive federal financial aid monies is a viable claim under the FCA.</u>

---

[3] The Eleventh Circuit simply found that the relator had failed to provide sufficient details of the scheme. *See id.*

**RELATORS' OPPOSITION TO DEFENDANTS' AMENDED MOTION TO DISMISS;** Case No. CV-13-5256-RGK(AJWX)                    21

Defendants finally argue that the manipulation of MSB's CDR cannot state a claim for relief because the DOE determines an institution's CDR and that marketing campaigns to re-admit students could not possibly impact the CDR. This argument is a selective reading of the allegations in the FAC.

In actuality, Relators allege that Defendants manipulate the base data the DOE uses to calculate the CDR. Defendants identified defaulted students on campus "Campaign Boards." FAC at ¶ 128. Campus directors were then incentivized with bonuses and program cost refunds to "re-enter" those defaulted students. FAC at ¶ 128. These "re-entered" students would then qualify under a new cohort year for determining the CDR, thereby making MSB's CDR appear much lower than they actually were. *Id*. at ¶ 128. This is a fraudulent manipulation of material information the DOE uses to determine Title IV eligibility. There is more than a plausible inference that incentivized MSB employees could re-enroll defaulted students and the only logical conclusion to such re-enrollment is that MSB's student default rates changed. Through this fraudulent scheme, MSB remained eligible for Title IV program funding. Simply put, this is a fraudulent scheme meant to alter data the government materially relies on in determining if an institution is eligible to receive payment. That is the very definition of a false claim.

Relators sufficiently pleaded viable claims under the FCA. Based on their own personal knowledge, Relators pleaded particular facts to not only detail specific instances of fraudulent conduct, but also to allow for a reasonable inference of fraudulent conduct perpetrated by Defendants. Relators have provided to the requisite "who," "where," "how," and "why" required of them. Despite Defendants' assertions to the contrary, Relators are not required to allege each specific instance of wrongfully retained financial aid monies. Relators need only provide sufficient facts and general knowledge of an intent to defraud, when

**RELATORS' OPPOSITION TO DEFENDANTS' AMENDED MOTION TO DISMISS;** Case No. CV-13-5256-RGK(AJWX)                    22

considered in a light most favorable to Relators, could reasonably lead to an inference of fraud.  Relators have met this burden.

### D.  The FAC Pleaded Conspiracy with Specificity

Defendants argue the FAC fails to plead conspiracy with specificity and would nonetheless be precluded by the intracorpoate conspiracy doctrine.  Motion at 18-19.  However, Relators have pled conspiracy as an alternate theory of liability and Count Four of the FAC specifically incorporates the entirety of the factual allegations pled.

Although not specifically addressed by the Ninth Circuit, sister courts in California have upheld conspiracy claims as an alternate theory of liability under the FCA.  *United States ex rel. Dalitz v. AmSurg Corp.*, 2014 U.S. Dist. LEXIS 177374 (Case No. 2:12-cv-02218-TLN-CKD, Eastern Dist. of Cal., December 24, 2014).  In *Dalitz*, the Eastern District upheld Relators alternate conspiracy theory of liability in the even the Defendants relied on their complicated corporate structure to avoid liability.  *Id.* at *18-19.

The FAC specifies as an alternative theory, that each Defendant "participated in, directed, authorized, ratified, controlled, aided or abetted, and/or otherwise caused or contributed to" the multiple fraudulent schemes meant to wrongfully draw down and retain Title IV funds.  FAC at ¶ 34.  Like *Dalitz*, Relators assume Defendants will rely on a complicated corporate structure to avoid liability.

Federal antitrust cases, which frequently involve allegations of conspiracy, provide good guidance on what is necessary to adequately plead a conspiracy. Federal antitrust cases make clear that the level of detail requested by Defendants is not required in a conspiracy case.  "The Court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 326 (2007).  Post-*Twombly* decisions have routinely rejected attempts to compartmentalize factual allegations and

**RELATORS' OPPOSITION TO DEFENDANTS' AMENDED MOTION TO DISMISS;** Case No. CV-13-5256-RGK(AJWX)                                          23

consider them piecemeal.  *See In re Rail Freight Fuel Surcharge Antitrust Litig.*, 587 F. Supp. 2d 27, 33, n.4 (D.D.C. 2008) ("*Rail Freight*"); *In re Southeastern Milk Antitrust Litig.*, 555 F. Supp. 2d 934, 943-44 (E.D. Tenn. 2008).  A conspiracy complaint need only "provide [d]efendants with fair notice of [p]laintiff's claims and the grounds on which they are based, such that these [d]efendants will know how to respond."  *In re Packaged Ice Antitrust Litig.*, 723 F. Supp. 2d 987, 1017 (E.D. Mich. 2010).  Ultimately, Plaintiffs will need to specifically "identify the people who acted on behalf of the various defendants" in the conspiracy, but Plaintiffs "cannot be expected to know or allege such details at this early stage of the case; [and] neither *Twombly* nor any case decided under that holding suggests otherwise."  *Id.*

Finally, in assessing a claim's plausibility, "[a] court must look to the evidence as a whole and consider any single piece of evidence in the context of other evidence."  *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 369 (3d Cir. 2004); *see also*, *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962); *Big Apple BMW, Inc. v. BMW of N.A., Inc.*, 974 F.2d 1358, 1364-65 (3d Cir. 1992).  A court should not parse or dismember the allegations in the complaint.  *See In re Tamoxifen Citrate Antitrust Litig.*, 466 F.3d 187, 201 (2d Cir. 2006)(stating that "plaintiffs should be given the full benefits of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each" (citation omitted)); *In re Pressure Sensitive Labelstock Antitrust Litig.*, 566 F. Supp. 2d 363, 373 (M.D. Pa. 2008) ("Nothing in *Twombly* . . . contemplates [a] 'dismemberment' approach to assessing the sufficiency of a complaint. Rather, a district court must consider a complaint in its entirety without isolating each allegation for individualized review. . . . '[T]he [*Twombly*] complaint warranted dismissal because it failed in total to render plaintiffs' entitlement to relief plausible.'" (quoting *Twombly*, *supra*, 550 U.S. at 569 n.14)); *see also*, *In re Rail Freight Fuel Surcharg*, *surpa*, 587 F.Supp.2d at 33 n.4.

**RELATORS' OPPOSITION TO DEFENDANTS' AMENDED MOTION TO DISMISS;** Case No. CV-13-5256-RGK(AJWX)                                    24

1    Moreover, the minute details of *each* Defendants' agreement to, or

2    involvement in, the conspiracy need not be alleged in a complaint.  This is so

3    because each defendant involved in a conspiracy need not even have engaged in

4    wrongful acts to be held liable.  For example, in the context of antitrust conspiracy,

5    "conspiracy allegations need not be detailed defendant by defendant.  Rather, an

6    antitrust complaint should be viewed as a whole, and the plaintiff must allege that

7    each individual defendant joined the conspiracy . . . ." *In re OSB Antitrust Litig.*,

8    No. 06-826 (E.D. Pa. Aug. 3, 2007) 2007 WL 2253419, *5; *see also*, *Cason-*

9    *Merenda v. Detroit Medical Center*, No. 06-15601 (E.D. Mich. March 31, 2008)

10   2008 WL 880286, at *2.

11       Like Defendants here, the defendants in *Starr v. Sony BMG Music Entm't*,

12   592 F.3d 314, 325 (2d Cir. 2010), argued that plaintiffs were required to "identify

13   the specific time, place, or person related to each conspiracy allegation."  The

14   Second Circuit replied, "[t]his is also incorrect." *Id.*  Plaintiffs "were not required

15   to mention a specific time, place, or person involved in each conspiracy

16   allegation." *Id.*; *see also*, *Ice Cream Liquidation, Inc. v. Land O'Lakes, Inc.*, 253

17   F. Supp.2d 262, 278 (D. Conn. 2003) (observing that plaintiffs "have not been

18   required to specify individual acts of each defendant in an antitrust conspiracy

19   allegation"); *Accord In re Flash Memory Antitrust Litig.*, 643 F.Supp.2d 1133,

20   1142 n.7 (N.D. Cal. 2009) (antitrust conspiracy "need not be detailed on a

21   'defendant by defendant' basis") (citation omitted).

22   **V.    CONCLUSION**

23       For the foregoing reasons, Plaintiffs respectfully request that the Court deny

24   Defendants' Motion in its entirety.  In the alternative, Plaintiffs request leave to

25   amend.

26

27

28

1

2 Dated:  August 3, 2015          **COTCHETT, PITRE & McCARTHY, LLP**

3

4                                  By:  _____/s/ Justin T. Berger_____

5                                       JUSTIN T. BERGER

6

7

8                                  **SKAPIK LAW GROUP**

9                                       MARK J. SKAPIK

10                                      GERALYN L. SKAPIK

11                                      JOHN D. GRAHAM

12                                  *Attorneys for Relators*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**RELATORS' OPPOSITION TO DEFENDANTS' AMENDED MOTION TO DISMISS;** Case No. CV-13-5256-RGK(AJWX)                26